**EXHIBIT 1**

7/10/2...

**Bashas' Inc.**
**13 Week Cash Flow Analysis**
($ in Thous.)

| Week Ending | Week 1 17-Jul-09 | Week 2 24-Jul-09 | Week 3 31-Jul-09 | Week 4 7-Aug-09 | Week 5 14-Aug-09 | Week 6 21-Aug-09 | Week 7 28-Aug-09 | Week 8 4-Sep-09 | Week 9 11-Sep-09 | Week 10 18-Sep-09 | Week 11 25-Sep-09 | Week 12 2-Oct-09 | Week 13 9-Oct-09 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | 34,344 | 33,726 | 35,575 | 33,961 | 33,405 | 33,965 | 37,123 | 34,200 | 33,404 | 33,546 | 36,705 | 34,796 | 34,546 | 449,295 |
| **Cash Disbursements** | | | | | | | | | | | | | | |
| Payroll & Benefits | 24,134 | 24,097 | 24,294 | 25,994 | 24,065 | 23,499 | 28,183 | 26,550 | 24,543 | 23,308 | 27,735 | 26,087 | 25,694 | 328,163 |
| Rent | 6,208 | 6,622 | 5,781 | 5,781 | 5,781 | 5,781 | 5,781 | 5,781 | 5,781 | 5,781 | 5,781 | 7,642 | 5,781 | 78,288 |
| Property and Equipment | 235 | | 3,726 | | | | | 3,726 | | | | 3,726 | | 11,178 |
| Repairs, Maintenance, & Supplies | 235 | 235 | 235 | 171 | 171 | 171 | 171 | 242 | 242 | 242 | 242 | 242 | 246 | 2,844 |
| Utilities | 426 | 418 | 441 | 421 | 414 | 421 | 460 | 424 | 414 | 416 | 455 | 432 | 429 | 5,573 |
| Taxes | 1,160 | 905 | 954 | 216 | 805 | 1,158 | 486 | 219 | 632 | 1,204 | 552 | | 485 | 9,020 |
| Insurance | 104 | 54 | 57 | 112 | 204 | 61 | 77 | 1,900 | | | | 1,300 | | 4,300 |
| Outside Services | 414 | 407 | 429 | 410 | 403 | 410 | 448 | 101 | 247 | 74 | 75 | 107 | 301 | 1,572 |
| Advertising | 512 | 503 | 531 | 507 | 498 | 507 | 554 | 412 | 403 | 405 | 443 | 420 | 417 | 5,418 |
| Other expenses | 493 | 484 | 510 | 487 | 479 | 487 | 533 | 510 | 498 | 500 | 547 | 519 | 515 | 6,701 |
| Bank Group Interest(1) | 58 | 27 | 332 | 174 | 59 | 13 | 281 | 225 | 161 | 39 | 50 | 309 | 171 | 1,898 |
| **Total Cash Disbursements** | 33,744 | 33,752 | 34,664 | 37,999 | 32,880 | 32,509 | 36,954 | 40,581 | 33,400 | 32,451 | 36,407 | 41,527 | 34,534 | 461,401 |
| **Net Cash Flow (Deficit)** | 600 | (25) | 911 | (4,038) | 525 | 1,456 | 169 | (6,381) | 4 | 1,095 | 298 | (6,731) | 12 | (12,105) |
| **Ch. 11 Disbursements:** | | | | | | | | | | | | | | |
| Professional Fees - Restructuring | | | | | | | | | | | | 86 | | 86 |
| DIP Interest | 27 | | | | | | | 1,073 | | | | 1,019 | | 2,119 |
| 503(b)(9) Claims | | 9,000 | | | | | | | | | | | | 9,000 |
| Vendor Deposits | 2,750 | | | | | | | | | | | | | 2,750 |
| **Total** | 2,777 | 9,000 | - | - | - | - | - | 1,073 | - | - | - | 1,105 | - | 13,955 |
| **Adjusted Net Cash Flow (Deficit)** | (2,176) | (9,025) | 911 | (4,038) | 525 | 1,456 | 169 | (7,454) | 4 | 1,095 | 298 | (7,836) | 12 | (26,061) |
| Beginning Cash Balance | 12,325 | 10,149 | 1,124 | 2,034 | - | 525 | 1,981 | 2,150 | - | 4 | 1,099 | 1,397 | - | 12,325 |
| **Net Available Cash (Deficit)** | 10,149 | 1,124 | 2,034 | (2,004) | 525 | 1,981 | 2,150 | (5,304) | 4 | 1,099 | 1,397 | (6,440) | 12 | |
| **Ending Cash Balance** | 10,149 | 1,124 | 2,034 | - | 525 | 1,981 | 2,150 | - | 4 | 1,099 | 1,397 | - | 12 | 12 |
| **DIP Facility:** | | | | | | | | | | | | | | |
| Beginning Balance | - | 2,000 | 2,000 | 2,000 | 4,004 | 4,004 | 4,004 | 4,004 | 9,308 | 9,308 | 9,308 | 9,308 | 15,748 | - |
| Increase/(Decrease) in Borrowings | 2,000 | - | - | 2,004 | - | - | - | 5,304 | - | - | - | 6,440 | - | 15,748 |
| **Ending Balance** | 2,000 | 2,000 | 2,000 | 4,004 | 4,004 | 4,004 | 4,004 | 9,308 | 9,308 | 9,308 | 9,308 | 15,748 | 15,748 | 15,748 |

Note:
(1) Interest payments based on 3.25% contract rate on $110,000,000 revolving line of credit to Bank Group (BofA, Compass, Wells Fargo) and contract rate (varied by tranche) or a fixed loan of $86,286,984 to Prudential.

PRELIMINARY DRAFT

**EXHIBIT 2**

# LOAN AGREEMENT

THIS LOAN AGREEMENT (the "Agreement") is made and entered into as of July 10, 2009, by and between GRACE FINANCING GROUP, LLC, an Arizona limited partnership ("Lender"), and Bashas' Inc., an Arizona corporation (the "Borrower").

## RECITALS

A.  Borrower requires certain financing for the purposes of providing operating capital with respect to its primary line of business.

B.  Lender is willing to make the Loan to Borrower upon and subject to the terms and conditions hereinafter set forth.

## AGREEMENTS

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**SECTION 1. DEFINITIONS.**  The following terms shall have the following meanings.

1.1  "Acquisition Financing" means, with respect to Lender's purchase of any parcel of the Property pursuant to <u>Section 6.11</u> hereof, a nonrecourse loan from a third-party lender secured only by the respective parcel and otherwise on terms and conditions acceptable to Lender in its sole discretion.

1.2  "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§101-1330, as amended from time to time and as applicable to the Chapter 11 Case.

1.3  "Business Day" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of Arizona or is a day on which banking institutions located in Arizona are authorized by law to close.

1.4  "Collateral" means the Property and all other collateral provided by the Deed of Trust.  The term Collateral includes, without limitation, all instruments, agreements or documents now or hereafter in existence evidencing or relating to the foregoing, replacements, substitutions, renewals and proceeds, including insurance proceeds thereof, as further defined in the various security documents executed in furtherance of this Agreement, in form and substance acceptable to Lender and Borrower.

1.5  "Confirmation Order" means the non-appealable order of the Bankruptcy Court confirming the Plan in accordance with the Bankruptcy Code.

1.6  "Deed of Trust" means the Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement securing the Note which will be granted by the Borrower simultaneously with the making of the Loan. Because the parcels of the Property are situated in

several different counties within the State of Arizona, the Deed of Trust will be executed by Borrower in multiple counterparts for contemporaneous recordation in the office of the recorder of each of such counties, it being acknowledged and agreed that the several recorded counterparts shall constitute a single deed of trust for all purposes including enforcement.

1.7    "Default" means the occurrence of an event or condition described in Section 7 hereof which, after passage of time and/or giving of notice, could ripen into or become an Event of Default hereunder.

1.8    "Default Rate" means the default rate of interest stated in the Note and computed as stated therein.

1.9    "Event of Default" means any Event of Default as described in Section 7 hereof or in any other Loan Document.

1.10    "Financial Statements" means the balance sheet, income statement, change in financial condition and cash flow statements of Borrower as of the last day of and for any fiscal year or quarter, prepared and reported according to GAAP, consistently applied.

1.11    "Governmental Authority" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

1.12    "Interest Rate" means the rate of interest on the Loan stated in the Note computed as specified therein.

1.13    "Loan" means all Advances to or on behalf of Borrower pursuant to the Loan Documents.

1.14    "Loan Documents" means this Agreement, the Note, the Deed of Trust,  the Memorandum of Option to Purchase and all other instruments, documents and agreements executed in connection herewith, referred to herein, or contemplated hereby.

1.15    "Material Adverse Change" means any change in the assets, business, financial condition, or results of operations of Borrower or any other event or condition that, in the reasonable opinion of Lender (a) could affect the likelihood of performance by Borrower of the Loan, (b) could affect the ability of Borrower to perform any of the obligations under the Loan Documents, (c) could affect the legality, validity or binding nature of any of the Loan Documents, or (d) could affect the priority of the Deed of Trust.

1.16    "Maturity Date" means the final date upon which all funds are due under the Note and the Loan Documents.

1.17    "Maximum Loan Balance" means the maximum amount of the Outstanding Loan Balance which is permitted to be outstanding at a given point in time. Until October 1, 2009, the Maximum Loan Balance shall be $16,000,000. After October 1, 2009, the Maximum Loan Balance shall be $45,000,000 until such time as a request for an Over $16MM Advance is made,

at which time the Maximum Loan Balance shall be the amount of the Outstanding Loan Balance which would exist if the full amount of the Over $16MM Advance is advanced. In addition, the Maximum Loan Balance shall be subject to reduction by the effect of partial releases permitted pursuant to Section 2.5 of this Agreement.

1.18    "Net Disposition Proceeds" means the gross sale price from a sale of all or a part of a parcel of the Property less in the case of such sale: (a) all costs and expenses paid by the Borrower in connection therewith, including, without limitation, commissions, legal fees, title costs, appraisal fees and other fees and costs, incurred in connection with such sale or preparing the property for sale; (b) any other items which under the sales agreement are to be deducted from or netted against the gross sales price , including, without limitation, pro rations, security deposits, reserves to be held by the buyer, title company or other third party for repairs or to provide a fund for damages in the event of any misrepresentations  In no event will the exclusions from the gross sale price described in the preceding sentence exceed the reasonable, customary, commercially typical amount payable by a seller of similar property in the county where the property is located, or be payable to Borrower or an affiliate of Borrower without Lender's prior, express consent.

1.19    "Note" means the Multiple Advance Promissory Note in form and substance identical to Exhibit "B" hereto, to be executed by Borrower and delivered to Lender to evidence Borrower's obligation to repay the Loan, and shall also include any note, agreement or other instrument accepted by Lender in whole or partial substitution for or replacement of the Note.

1.20    "Option Price" means, with respect to any parcel of the Property, the amount set forth in the far right hand column in the line item describing such parcel on Exhibit "A" to this Agreement.

1.21    "Outstanding Loan Balance" means at a point in time the aggregate of all loan Advances, including Advances to pay interest and fees which are added to the principal balance upon Advance, funded to the Borrower plus accrued interest and fees which are accrued but not Advanced under the Loan to such point in time less all payments made by Borrower of principal, interest and costs reimbursable to Lender.

1.22    "Permitted Encumbrances" means current taxes, assessments, reservations, patents, easements, rights of way, encumbrances, liens, covenants, conditions, restrictions, obligations, set off rights and other liabilities of record as may exist with respect to the Property.

1.23    "Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and governments and agencies and political subdivisions thereof.

1.24    "Plan" means, with respect to any Chapter 11 proceeding with respect to which the Borrower is a debtor, a plan of reorganization, the terms of which are approved by Lender.

1.25    "Purchase Option" means the option to purchase set forth in Section 6.11 hereof.

1.26 "Property" means the real property described on Exhibit "A" attached. Each parcel of Property described on Exhibit "A" is sometimes referred to herein as a "parcel of the Property." For purposes of the foregoing, the CC&F Lots described on Exhibit "A" shall be deemed to constitute a portion of the Distribution Center described on Exhibit "A."

## SECTION 2. AMOUNT AND GENERAL TERMS OF THE LOAN

### 2.1 The Loan.

(a) Purpose of Advance. Subject to the terms and conditions of this Agreement, Lender agrees to make a loan to Borrower in an amount of up to $45,000,000 in multiple advances (each an "Advance") to Borrower to provide funds to Borrower for its general corporate operational and liquidity needs as well the expenses of administration in connection with Borrower's filing under the Bankruptcy Code (ie, filing fees, legal expenses, professional fees and other amounts incurred by Borrower as a result of such filing).

(b) Advances.

(i) The first Advance ("First Advance") shall be in an amount requested in writing by Borrower of not less than $2,000,000 and shall be made on the date of execution and delivery of this Agreement. Lender shall withhold any costs reimbursable to Lender in connection with the Loan from the First Advance and shall disburse the balance as directed by the Borrower.

(ii) So long as they do not cause the outstanding principal balance of the Loan to exceed $16,000,000, future advances ("Future Advances") shall be not more than often than monthly in an amount requested in writing by Borrower of up to the permitted Maximum Loan Balance. Except as provided in clause (iii) below, Lender shall fund an Advance requested up to but not in excess of the permitted Maximum Loan Balance within five Business Days after receipt of written request.

(iii) Borrower shall be entitled to only one Future Advance which, if advanced, would cause the outstanding principal balance of the Loan to exceed $16,000,000 (an "Over $16MM Advance"). Borrower shall provide Lender with not less than 90 days prior written notice of the Over $16MM Advance. The obligation of Lender to make the Over $16MM Advance shall be subject to Lender's right and ability to exercise the Purchase Option pursuant to this Agreement, including the ability of the Lender to successfully procure Acquisition Financing in connection therewith, and Lender's failure to procure the Acquisition Financing shall entitle Borrower to no defenses against the enforceability of the portion of the Loan then advanced. In addition, Lender may require as a condition to any Advances which would cause the Outstanding Principal Balance to exceed $16,000,000, that Borrower procure at its expense an endorsement to the Title Policy (described in Section 4.1(d)) increasing the coverage to the Outstanding Principal Balance of the Loan after such Advance. Borrower expressly acknowledges and agrees that (i) Lender will have no liability to make an Over $16MM Advance unless Lender is able to procure

Acquisition Financing for the Property on terms acceptable to Lender in its sole discretion, and (ii) any purchase of Property which yields to the Borrower cash in an amount equal to the Over $16MM Advance pursuant to the Purchase Option shall constitute performance of the making of the Over $16MM Advance.

(c) Limitation on Advances. Notwithstanding any provision of this Agreement or any other Loan Document to the contrary, Lender shall not be required to make Advances on the Loan to the extent such Advance would cause the Outstanding Loan Balance to exceed the permitted Maximum Loan Balance.

No Advances shall be made after the Maturity Date. Borrower may make borrowings and prepayments, as permitted or required in the Note and this Agreement. The aggregate total of all Advances minus repayments shall not exceed the permitted Maximum Loan Balance. Borrower shall have no right to re-borrow any portion of the Loan which has been repaid by a cash payment made to the Lender, but Borrower may borrow an additional Advance for the payment of interest and any fees due Lender which can be added to the Outstanding Loan Balance without causing such Outstanding Loan Balance to exceed the permitted Maximum Loan Balance.

2.2 Term. The initial term of the Loan shall end on the earlier of (i) 24 months from the First Advance, or (ii) the date of the Confirmation Order, at which time, the Loan shall be due and payable without further notice.

2.3 Payments on Loan.

(a) Interest. Interest on the Loan shall accrue at the interest rate stated in the Note and unless paid by Borrower at its option shall be Advanced by the Lender under the Loan without a written request provided that, such Advance will not cause the Outstanding Loan Balance to exceed the then permitted Maximum Loan Balance.

(b) Place of Payment. All payments by Borrower on account of the principal of or interest on the Loan, or of any other amount owed to the Lender under this Agreement, the Note or any other Loan Document shall be made not later than 2:00 p.m., Phoenix time, on the date specified for payment at a place specified by the Lender in writing to Borrower. Funds received after such hour on any day shall be treated for all purposes of this Agreement as having been received on the next succeeding Business Day. If some, but less than all, amounts due from Borrower are received by Lender, then Lender shall apply such funds in payment of amounts due from Borrower to Lender hereunder in such manner and order as Lender determines in its sole discretion.

(c) Prepayment; Business Days. Borrower may prepay the Loan in part or in whole at any time and from time to time without premium or penalty. Any payment due to Lender hereunder which is due on a day which is not a Business Day shall be paid on the next Business Day.

2.5    Release of Collateral Prior to Full Payment of Loan   Borrower shall not sell, transfer, hypothecate or encumber any parcels of the Property except in accordance with the terms of this Section 2.5. For purposes hereof, the "Release Price" for any parcel of the Property shall be an amount equal to eighty percent (80%) of the Net Disposition Proceeds of such parcel, provided that in no event shall such Release Price be less than eighty percent (80%) of the Option Price for such parcel (except that as to Store Nos. 29 and 45, no such floor shall apply). Borrower shall notify Lender prior to each sale of a parcel of the Property of the terms and conditions of such sale and at the time of the sale Borrower shall provide Lender with a true and correct copy of the settlement statement for the sale together with true, complete and correct copies of all documents executed by Borrower in connection with the sale. The Maximum Loan Balance shall automatically reduce by the amount of each Release Price applicable to a parcel of the Property sold or disposed of by Borrower. Nothing herein shall require payment to Lender of any such Release Price, except and to the extent that the respective Release Price causes (i) the Maximum Loan Balance to be less than the Outstanding Loan Balance, or (ii) the ratio of the Outstanding Loan Balance to the sum of the Option Prices for parcels of Property remaining as Collateral for the Loan exceeds fifty percent (50%). Notwithstanding anything herein to the contrary, all right of Borrower to the partial release of further parcels of the Property following the date of Lender's exercise of the Purchase Option shall terminate and no further partial releases shall thereafter be available unless the Release Price is applied to first to the repayment of any portion of the Loan then outstanding with any remaining portion of the Release Price remaining after the Loan has been paid in full deposited into a cash collateral account in which the Lender receives a first priority perfected security interest (from which no Borrower has no right to withdrawals absent Lender's prior consent until all obligations secured have been satisfied or released) for the purposes of securing Borrower's remaining obligations under this Agreement including the Put described below with the balance of such amounts being released to Borrower (and Lender's priority perfected security interest also being released) without further instruction upon expiration of the Put.


**SECTION 3. COLLATERAL**

3.1    Security Interest in Collateral.  The performance of Borrower hereunder and with respect to the Loan, including all extensions, renewals or replacements thereof, and all obligations of Borrower to Lender of any kind or description, including without limitation those arising under, evidenced by or provided for in the Loan Documents, whether direct or indirect, absolute or contingent, due or to become due, whether now existing or hereafter arising, including any obligation to perform or forebear from any action, as well as any obligation to pay money, shall be secured by the Collateral, it being the intention of the parties hereto that all Advances to Borrower under the Loan Documents shall constitute one loan, and all indebtedness and all obligations of Borrower to Lender arising under, provided for in or evidenced by the Loan Documents, present and future, shall constitute one general obligation with all of the rights of Lender contained in the Loan Documents to apply to any modification of or supplement to the Loan Documents secured by the Collateral and all other security held by Lender hereunder. Unless agreed to by Lender at the time of an Advance hereunder, the security for the Loan shall be valid and perfected lien interests in the Collateral subject only to the Permitted Encumbrances.

3.2    Financing Statements and Additional Documents.    Borrower shall execute and deliver appropriate financing statements with respect to the liens created by the Loan Documents and Borrower shall also execute and deliver to Lender, such financing statements, security agreements, deeds of trust and other documents and instruments as Lender shall from time to time reasonably request to perfect, evidence or protect Lender's security interest in, or lien upon, the Collateral.

3.3    Rights and Duties with Respect to the Collateral.    Lender shall have no duty as to the collection or protection of the Collateral, or any income therefrom, nor as to the preservation of rights against prior parties nor as to the preservation of any rights pertaining thereto beyond the safe custody of any Collateral which may be in Lender's possession. Lender may exercise its rights with respect to all or any portion of the Collateral without resorting or regard to other portions of the Collateral or to any other sources of reimbursement for the indebtedness of Borrower.

3.4    Carve-Out. Lender agrees that the liens granted under the Loan will be subject to the following "Carve-Out" expenses:

(a)    statutory fees payable to the United States Trustee pursuant to 28 U.S.C. §1930; and

(b)    fees payable to the Clerk of the Court.

## SECTION 4. CONDITIONS PRECEDENT TO DISBURSEMENT OF THE LOAN

4.1    Conditions Precedent to Advances.    In addition to any requirements set forth in Sections 2 and 3 hereof, the following are conditions precedent to the disbursement of proceeds of the Loan:

(a)    Court Approval.    The United States Bankruptcy Court shall have approved the Loan and shall have made a specific finding that Lender is extending the credit provided herein in good faith pursuant to 11 U.S.C. Section 364 (e).

(b)    Loan Documents.    Borrower shall deliver (or cause the appropriate parties to execute and deliver) all Loan Documents and other documents required by this Agreement, in form and substance satisfactory to and approved by Lender.  In addition, Borrower shall execute and deliver (and certify if required) trustee, corporate and/or limited liability company borrowing resolutions, any other closing documents which Lender may reasonably require and all other documents and writings deemed necessary by Lender in its reasonable discretion to close the Loan.

(c)    Security.    The Deed of Trust shall have been duly recorded in the office of the County Recorder of each county in which any of the parcels of the Property are situated.

(d)     Accuracy of Representations and Warranties. Borrower's representations and warranties contained herein and in the other Loan Documents are then true with the same effect as though they had been made at the time of the disbursement.

(e)     No Default. There shall exist or have occurred no condition, event or act that would constitute a Default or an Event of Default by Borrower under any of the Loan Documents.

(f)     Title Policy. A title insurance company approved by the Lender shall have committed to issue to Lender a standard coverage Lender's Loan Policy in a form acceptable to Lender ("Title Policy") in the amount of $16,000,000 insuring Lender that Borrower is the fee owner of the Property, and that the Deed of Trust constitutes a valid, perfected lien on the real property, subject only to the Permitted Encumbrances. The cost of any Title Policy or endorsement shall be paid by Borrower as part of the First Advance under the Note and the Loan.

4.2     No Waiver. Lender may, in its sole discretion, advance the Loan proceeds even though the conditions in this Section are not satisfied. Any Advance so made shall be deemed to have been made pursuant to this Agreement and shall not be deemed a waiver by Lender of (a) any Default or future Default, (b) the remedies afforded Lender in any of the Loan Documents, or (c) any requirement by Lender that Borrower satisfy its obligation to Lender under any of the foregoing.

## SECTION 5.  REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender as follows:

5.1     Binding Nature. The execution and delivery of the Loan Documents by Borrower and the consummation of all the transactions contemplated hereby create legal, valid and binding obligations of Borrower subject to bankruptcy or other similar laws affecting creditor's rights generally and to general principles of equity.

5.2     Third-Party Consents. Except as disclosed to and approved by Lender in writing, such Borrower is not required pursuant to any law, regulation or contractual or other obligation, to obtain the consent, approval or authorization of any Person (including any Governmental Authority) to validly enter into, execute and deliver the Loan Documents and perform the acts and obligations required or contemplated thereby.

5.3     Non-Default of Borrower. There exists no Event of Default by Borrower under any of the Loan Documents.

5.4     Purpose of the Loan. The Loan is a business loan and the proceeds thereof shall be used solely for commercial or business purposes, and no portion thereof is intended to be or shall be used for any other purpose, including without limitation, the purpose (whether

8

immediate, incidental or ultimate) of purchasing any margin stock or for carrying, reducing or retiring any debt incurred for such purpose.

5.5     No Broker's or Finder's Fee.   Borrower has not employed or retained any broker or finder or incurred liability for any brokerage fees, commissions, consulting fees or finder's fees in connection with the lending transactions contemplated herein.

5.6     Good Standing.   Borrower has been duly organized and is validly existing under the law of the jurisdiction of its organization. Borrower has the full power and authority to own the Collateral owned by it and conduct its business as now being conducted and to enter into and consummate the transactions contemplated by this Agreement.

5.7     Reaffirmation and Survival of Representations and Warranties.   Each of the representations and warranties of Borrower contained in any of the other Loan Documents is true and correct in all material respects; all such representations and warranties are incorporated herein for the benefit of Lender. Each request by Borrower for an Advance under this Agreement shall constitute an affirmation on the part of Borrower that the representations and warranties contained in this Agreement and the other Loan Documents are true and correct in all material respects as of the time of such request. All representations and warranties made herein shall survive the execution of this Agreement, the making of all Advances hereunder and the execution and delivery of all other documents and instruments in connection with the Loan, so long as Lender has any commitment to lend to Borrower hereunder and until the Loan has been paid in full.

## SECTION 6. COVENANTS

6.1     Use of Loan Proceeds.   Borrower shall expend the Loan proceeds for the purposes set forth in this Agreement. No part of the proceeds of any borrowing hereunder shall be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock. If requested by Lender, Borrower shall furnish to Lender a statement in conformity with the requirements of the Federal Reserve Form U-1 referred to in Regulation U of the Board of Governors of the Federal Reserve System of the United States. Neither the making of the Loan, nor the use of the proceeds thereof, will violate or be inconsistent with the provisions of Regulations G, T, U or K of the Board of Governors of the Federal Reserve System of the United States.

6.2     Existence of Corporate Status.   Borrower shall at all times preserve and keep in full force and effect its existence as an Arizona corporation, and shall not allow or permit the dissolution and winding up of such separate Borrower entity and the rights and franchises material to its business.

6.3     Payment of Taxes; Obligations, Indebtedness and Claims.   Each separate entity constituting a part of Borrower shall, except as otherwise provided for in the Plan, pay all taxes, assessments and other governmental charges imposed upon it or any of its properties or assets or in respect to any of its business, income or Collateral before any penalty or interest accrues

thereon, and all claims (including, without limitation, claims for labor, services, materials and supplies) for sums which have become due and payable and which by law have or may become a lien upon any of its properties or assets, prior to the time when any penalty or fine shall be incurred with respect thereto.

6.4 <u>Maintenance of Property and Underlying Assets</u>. Borrower shall, at its own expense, maintain or cause to be maintained in good repair, working order and condition the Property and from time to time make or cause to be made all appropriate repairs, renewals and replacements thereof. Borrower shall not, without the prior written consent of Lender, make any material alteration to the Property or, without the prior written consent of Lender, remove or permit the removal of any fixtures or equipment which constitute part of the Property, unless otherwise permitted herein.

6.5 <u>Insurance</u>.

(a) <u>General Requirements</u>. For as long as the Loan is outstanding, Borrower shall, except as otherwise self insured in the normal course of Borrower's business, provide and maintain comprehensive general public liability insurance (with coverages of not less than $5,000,000), including "premises/operations" and "contractual" coverages, and such other insurance with respect to the Property against such other insurable hazards which at the time in question are commonly insured against in the case of like property in the locality of the Property or would be required by prudent institutional lenders making loans similar to the type secured hereby. All such insurance shall be at Borrower's own expense; shall contain a standard mortgagee clause naming Lender as additional insured; shall provide for thirty (30) days prior notice to Lender of cancellation; and may be provided by a so-called "blanket" or umbrella coverage so long as Lender approves the form of same and the blanket or overall policy provides coverages as stated above and names Lender as an additional insured in the forms stated above. Borrower shall also maintain all insurance required by any other Loan Document.

(b) <u>Form of Policy; Failure to Maintain</u>. All insurance policies shall be with companies or associations of companies from time to time approved by Lender and shall otherwise be in form and substance reasonably satisfactory to Lender. A certificate of insurance or certified copy of each policy shall be delivered to Lender within five days of execution of this Loan Agreement and thirty (30) days before the expiration date of each policy as evidence of the renewal of such policies. If any policy required by Lender is not renewed on or before thirty (30) days of its expiration and evidence thereof not provided to Lender on or before such date, Lender may, upon ten (10) days' prior written notice to Borrower, procure such insurance, pay the premium therefor as an Advance to Borrower which will be secured hereby.

6.6 <u>Negative Pledge</u>. Borrower shall not hereafter pledge, hypothecate or grant any other lien or security interest on any of its equipment, fixtures or inventory without the prior written consent of the Lender.

6.7 <u>Compliance with Laws, Etc</u>. Borrower shall comply with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority, noncompliance

with which would materially adversely affect the business, properties, assets, operations or condition (financial or otherwise) of Borrower.

6.8    Inspections; Services to Benefit Lender.  Borrower shall permit any authorized representatives designated by Lender to visit and inspect the Property, upon reasonable notice and at such times during normal business hours and as often as may be reasonably requested. All inspections and other services rendered by or on behalf of Lender, whether or not paid for by Borrower, shall be rendered solely for the protection and benefit of Lender, and Borrower shall not be entitled to claim of loss or damage against Lender or against any of Lender's agents or employees for failure to properly discharge their duties to Lender.

6.9    Expenses.  Borrower shall, upon demand, pay for or reimburse Lender for all reasonable costs and fees, including attorneys' fees, incurred by Lender in connection with the origination, documentation, administration and enforcement of the Loan.

6.10    Accounts and Records; Financial Information.  Borrower shall keep and maintain full and accurate accounts and records of its operations according to sound accounting practices for Borrower's type of business, and permit Lender or its representatives to inspect and copy the same upon reasonable notice to Borrower and during normal business hours.  Borrower shall furnish or cause to be furnished to Lender:

(a)    As soon as available, and in any event within 120 days after the end of each fiscal year of Borrower, a copy of the Financial Statements of Borrower and all wholly-owned subsidiaries and related entities (including all affiliates) of Borrower, prepared both individually and on a consolidated basis in consolidating form (together, in each case, with the comparable figures for the previous fiscal year), all in reasonable detail;

(b)    As soon as available, and in any event within 30 days after the end of each calendar quarter, interim Financial Statements signed by the Borrower; and

(c)    Within 15 days after the end of each calendar month (or on such more frequent basis as may be required by any court having jurisdiction over Borrower), cash flow statements with respect to such calendar month.

All Financial Statements shall be in reasonable detail, prepared in accordance with GAAP consistently applied throughout the periods involved and, in the case of audited statements, Borrowers must allow their auditors to audit the Financial Statements in accordance with generally accepted auditing standards.

6.11    Option to Purchase.

(a)    Grant of Option. Borrower hereby grants Lender the option to purchase the Property on the terms and conditions hereinafter described.

(b)     Method of Exercise of Option. Lender may exercise its option to purchase the Property, at any time after receipt of a request from the Borrower of an Over $16MM Advance request, by written notice to Borrower with the Lender's election to purchase of the Property (and payment of the purchase price therefor and funding to Borrower of an amount equal to the Over $16MM Advance) pursuant to this option constituting performance in lieu of the making of the Over 16MM Advance. The option may be exercised with respect to all or such portion of the parcels of the Property as Lender shall select, provided that the Lender shall utilize good faith efforts to limit the amount of the Property purchased to the amount required to yield net Acquisition Financing proceeds sufficient to generate the amount of the Over $16MM Advance requested by Borrower. With respect to any parcel of the Property containing stores or distribution centers in which the Borrower is conducting operations, Lender and Borrower shall execute, prior to the closing of any purchase of such parcels, a lease agreement having a lease term of 20 years and having such other terms and conditions, including the rental rate, as are mutually acceptable to Lender and Borrower and, to the extent the parcels are grocery store parcels, on a form substantially similar to the Borrower and an affiliate of Lender have previously executed with respect to Borrower's store located at River and La Cholla in Tucson, Arizona. Promptly upon the negotiation of the form of lease, Borrower shall procure any and all required approvals, including any required bankruptcy court approvals should Borrower then be a debtor in a Chapter 11 proceeding, necessary to confirm the legally binding nature of Borrower's obligations thereunder. In any event, Lender's obligation to make any advance pursuant to an Over $16MM Request shall be subject to Lender's successful procurement of Acquisition Financing in an amount sufficient to avoid Lender having to advance additional amounts (other than the giving of the Loan credit) as its equity in the parcel being purchased.

(c)     Purchase Price and Terms of Purchase. If Lender exercises its option to purchase the Property, the purchase price for the Property shall be the respective Option Price for such parcel. The purchase price for the Property shall be payable in full in cash at close of escrow, provided that the Lender shall have the right to credit against the purchase price all or any portion of the Loan.

(d)     Establishment of Escrow. Upon exercise of the option by Lender, the parties shall open an escrow for the option granted hereunder with Lawyers Title Insurance Corporation, as escrow agent ("Escrow Agent"). Escrow Agent shall hold and administer all documents and instruments contemplated by the option provided herein. Borrower and Lender shall execute the standard form of escrow instructions as required by Escrow Agent, provided, however, that in the event of any conflict between the terms of this Agreement and the form escrow instructions, the terms of this Agreement shall prevail. Upon exercise of option and close of the option escrow, Escrow Agent shall record the applicable special warranty deed from Borrower.

(e)     Close of Escrow. Escrow for the option shall close as soon as reasonably possible following the procurement by Lender of the Acquisition Financing. At close of escrow, Borrower shall deliver title to the applicable parcels of the Property free and clear of all liens and encumbrances other than the Permitted Encumbrances. All escrow fees, recording expenses, and other closing expenses shall be paid by Borrower. Borrower shall not grant any easements, rights-

of-way, liens, or other interests in the Property, or convey or encumber any portion thereof, prior to expiration or close of the options granted in this Agreement without Lender's prior written consent, which consent may be withheld in its absolute discretion.

(f)     <u>Term of Options</u>. Unless extended as hereinafter provided, the option granted hereunder shall automatically expire when the Loan is fully repaid and satisfied.

6.12     <u>Repurchase Options</u>. With respect to any parcel of Property purchased by Lender pursuant to the foregoing option, (i) Lender shall have a specifically performable option (referred to herein as the "Put") to require that Borrower repurchase any such parcel by no later than the date which is two (2) years following the date of Lender's purchase of such parcel and no earlier than one year following the date of such purchase (the "Repurchase Option Term"). The repurchase price of the parcel shall be payable in cash and shall equal the amount of the purchase price paid therefor by Lender multiplied by a per annum rate equal to eight percent (8%) from the date of such purchase to the date of closing of the repurchase, subject to credit for any net income received with respect to such property during such period (the "Repurchase Price"); and (ii) Borrower shall have a specifically performable option to repurchase any such parcel from Lender during the Repurchase Option Term for a cash price equal to the Repurchase Price. The terms of any purchase and sale pursuant to this <u>Section 6.12</u> shall otherwise be as set forth in <u>Section 6.11</u> above. Without limiting the generality of the extent of Borrower's obligations under this Agreement which are secured by the Deed of Trust, Borrower acknowledges and agrees that Lender's rights under the Put shall be secured by the Deed of Trust subject to the release provisions set forth in section 2.5 above.

6.13     <u>Depository Account Holder Indemnity</u>. If Borrower files a petition for reorganization under Chapter 11 and as a result, the holder of Borrower's depository operating accounts requires indemnity over any overdrafts on such accounts by Borrower, Lender agrees upon Borrower's request to enter into reasonable commitments to pay such overdrafts with such amounts advanced by Lender to constitute advances of the Loan, and provided that in no event shall the amount of such advances cause the outstanding principal balance of the Loan to exceed the Maximum Loan Balance.

6.14     <u>Insider Distributions</u>. Borrower shall pay no dividends or other distributions of cash (other than current compensation and benefits) or other property to any Persons who are shareholders or insiders of Borrower.

### SECTION 7. EVENTS OF DEFAULT

The occurrence of any one or more of the following shall constitute an Event of Default under this Agreement:

(a)     Failure by Borrower to pay any monetary amount when due under any Loan Document, which failure continues for ten (10) days after Lender provides written notice of such failure to Borrower; provided, however, that no notice shall be required upon or after maturity of either Note.

(b)     Failure by Borrower to perform any obligation not involving the payment of money, or to comply with any other term or condition applicable to Borrower under any Loan Document (other than a failure described in one or more of the other provisions of this Section 7), which failure continues for twenty (20) days after Lender provides written notice of such failure to Borrower or such longer period subject to Borrower's ongoing diligent efforts to cure the same.

(c)     Any representation, warranty or statement to Lender by or on behalf of Borrower in any Loan Document or any other document or instrument executed or delivered in connection with the Loan proves to have been materially false, incorrect or misleading as of the date made (or when reaffirmed as described in Section 5.7).

(d)     The occurrence of any Material Adverse Change which continues for thirty (30) days after Lender provides written notice of such event to Borrower.

(e)     Any litigation or proceeding is commenced before any Governmental Authority or arbitrator against or affecting Borrower, or property of Borrower, with respect to a claim or indebtedness in excess of $100,000, and such litigation or proceeding is not defended diligently and in good faith by such Borrower.

(f)     A final judgment, decree or arbitration award for monetary damages or a monetary fine or penalty (not subject to appeal or as to which the time for appeal has expired) is entered against Borrower by any Governmental Authority or arbitrator which, together with the aggregate amount of all other such judgments, decrees or arbitration awards against both Borrower that remain unpaid or that have not been discharged or stayed, exceeds $100,000.

(g)     Coversion of any case under the Bankruptcy Code under which Borrower is the debtor from a case under Chapter 11 to a case under Chapter 7 of the Bankruptcy Code.

(h)     Borrower is dissolved, liquidated or terminated, or otherwise ceases to exist, or any action or proceeding is commenced which seeks as one of its remedies the dissolution of Borrower.

(i)     Except as expressly permitted by this Agreement or the Deed of Trust, any sale, encumbrance, transfer, hypothecation, assignment or conveyance of any portion of or interest in the Property without Lender's prior written consent.

(j)     The occurrence of any default under any document or instrument given by Borrower in connection with any other indebtedness of Borrower or such persons or entities to Lender.

(k)     Any Loan Document shall, at any time, and for any reason (except as may be approved by Lender), and without substitution therefor acceptable to Lender, in its reasonable discretion, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability thereof shall be contested by Borrower, or Borrower shall deny that it has any further liability or obligation thereunder.

(l)     The occurrence of any other default under any other document or instrument executed or delivered in connection with the Loan, whether or not such default is expressly defined therein as an "event of default," which is not cured within the applicable cure period, if any, provided therefor.

## SECTION 8. LENDER'S REMEDIES

8.1     Generally.  Notwithstanding any provision to the contrary herein or any of the other Loan Documents, upon the occurrence of any Event of Default under this Agreement or any of the other Loan Documents, Lender's obligation to make further disbursements under the Loan shall abate, and Lender shall, at its option, have the remedies provided in any or all of the Loan Documents or under applicable law, including, without limitation, the option to declare all outstanding indebtedness to be immediately due and payable without presentment, demand, protest or notice of any kind, to cease making further disbursements to Borrower, to apply any of Borrower' funds in its possession to the outstanding indebtedness under the Note (in such order or manner as Lender may elect), and to exercise any and all other rights and remedies available to Lender under any of the Loan Documents or applicable law.  All sums expended by Lender for such purposes shall be deemed to have been disbursed to and borrowed by Borrower and shall be secured by the Deed of Trust.

8.2     Costs and Expenses.  Borrower shall pay to Lender upon demand all reasonable costs, expenses and fees (including reasonable attorneys' fees based upon the Phoenix, Arizona legal market), whether suit be instituted or not, incurred by Lender in protecting or enforcing its rights upon the occurrence of an Event of Default under the Loan Documents, and all expenses of taking any permitted taking any action to  dispose of the Collateral, whether the same shall be paid or incurred pursuant to provisions of this Section or otherwise, and all payments made or liabilities incurred by Lender under this Agreement upon the occurrence of an Event of Default of any kind whatsoever.  All or any portion of such costs, fees and expenses, at Lender's election, and without notice, shall be payable on demand with interest at the Default Rate set forth in the Note, or may be added to the principal balance of the Loan, and shall bear interest at the rate then and thereafter applied to said balance.

## SECTION     9.     REPRESENTATION     BY     COUNSEL;     ARMS-LENGTH AGREEMENT

9.1     The parties to this Agreement represent, acknowledge and agree that, with respect to this Agreement, each of the other Loan Documents, and all of the transactions contemplated herein:

(a)     The parties are represented by qualified counsel and have been advised by and consulted with such counsel;

(b)     The parties are aware of the risks and benefits associated with the Loan, the Loan Documents and the terms thereof, and such terms are in no sense grossly unfair, oppressive or unconscionable;

(c)     The Loan (and each provision of the Loan Documents) is an arm's-length, bargained for transaction entered into by the parties freely, with full knowledge of all material facts and without duress or coercion of any form; and

(d)     Each of the parties to this Agreement understands and is conversant with the respective rights and obligations of the parties under the Loan Documents.

### SECTION 10. JURISDICTION; VENUE; SERVICE OF PROCESS

Borrower hereby irrevocably submits to the jurisdiction of any Arizona or United States Federal court sitting in Arizona over any action or proceeding arising out of or relating to this Agreement and the Loan Documents, and Borrower hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such Arizona or Federal court. Borrower irrevocably consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process to Borrower at Borrower's address specified herein. Borrower agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Borrower further waives any objection to venue in such State on the basis of forum non conveniens. Borrower further agrees that any action or proceeding brought against Lender shall be brought only in Arizona or United States Federal court sitting in Maricopa County. Nothing contained herein shall affect the right of Lender to serve legal process in any other manner permitted by law or affect the right of Lender to bring any action or proceeding against Borrower or its property in the courts of any other jurisdictions.

### SECTION 11. MISCELLANEOUS

11.1     <u>This Agreement Part of Loan Documents</u>.  The Loan Documents shall be deemed to incorporate this Agreement.  In the event of a conflict between any of the provisions of this Agreement and any provision of any of the other Loan Documents, the provisions of this Agreement shall control.  Any occurrence of an Event of Default under any term or condition of this Agreement shall constitute an Event of Default under all other Loan Documents.

11.2     <u>No Excessive Interest</u>.  No provision of the Note or any other aspect of the transaction of which the Note is a part is intended to or shall require or permit the holder to take, receive, collect, contract for or reserve, directly or indirectly, in money, goods or things in action, or in any other way, any interest, sum or value in excess of the maximum rate of interest permitted by law in effect in the State of Arizona at the date hereof.  If any such excess shall nevertheless be provided for, or adjudicated to be provided for, Borrower shall not be obligated to pay such excess, but, if paid, then such excess shall be applied against the unpaid balance of the principal sum or, to the extent that the principal sum has been paid in full by reason of such application or otherwise, such excess shall be remitted to and accepted by Borrower.  In the event of conflict between the provisions of this <u>Section 11.2</u> and any other provision of the Note or any

other agreement given or executed in connection with the Note, the provisions of this <u>Section 11.2</u> shall control.

11.3 <u>Lender's Right to Appear in Litigation</u>. Lender shall have the right to commence, appear in or defend any action or proceeding which Lender believes may affect the rights or duties of any of the parties hereunder or in connection therewith or in and to the Collateral, and to pay all necessary and reasonable expenses in connection therewith (including but not limited to fees of counsel retained by Lender in connection with such action or proceeding), and Borrower shall repay all of the foregoing expenses to Lender upon demand.

11.4 <u>No Other Parties to Benefit</u>. The Loan Documents are made for the sole benefit of Borrower and Lender, and their heirs, personal representatives, successors and assigns, and no other Person or entity is intended to or shall have any rights or benefits hereunder, whether as third-party beneficiary or otherwise.

11.5 <u>Notices</u>. Any notices or other communications which any party may be required, or may desire, to give, unless otherwise specified, shall be in writing and shall be (i) hand-delivered, effective upon receipt, (ii) sent by United States Express Mail or by private overnight courier, effective upon receipt, or (iii) served by certified mail, postage prepaid, return receipt requested and addressed to such party at the address set forth below, or to such other address(es) or addressee(s) as the party to be served with notice may have furnished in writing to the other party, effective three (3) days after mailing.

If to Lender:

        Grace Financing Group, LLC
        7575 North 16th Street
        Suite 1
        Phoenix, Arizona 85020

If to Borrower:

        Bashas' Inc.
        22402 South Alma School Road
        PO Box 488
        Chandler, Arizona 85244

11.6 <u>Governing Law; Construction</u>. The Loan Documents are executed and delivered in the State of Arizona, and the substantive laws of the State of Arizona shall govern their interpretation and enforcement. This Agreement and the other Loan Documents are intended to express the mutual intent of the parties hereto and thereto, and irrespective of the party preparing any document, no rule of strict construction shall be applied against any party. All words used herein shall refer to the appropriate number or gender, regardless of the number or gender stated.

11.7    Modification and Waiver.  No provision of this Loan Agreement shall be amended, waived or modified except by an instrument in writing signed by the parties hereto.

11.8    Survival.  All covenants, agreements, representations and warranties made herein or in any Loan Document shall survive the execution and delivery of any of the Loan Documents and any disbursement or advance of funds made pursuant to this Agreement, until all of Borrower's obligations under the Loan Documents have been paid in full.

11.9    Headings.  All sections and descriptive headings of sections in this Agreement are inserted for convenience only, and shall not affect the construction or interpretation hereof.

11.10   Severability; Integration; Form and Substance of Documents; Time of the Essence.  Inapplicability or unenforceability of any provision of this Agreement shall not limit or impair the operation or validity of any other provision of this Agreement.  The Loan Documents supersede all prior agreements (including without limitation any commitment letter), and constitute the entire agreement between the parties with respect to the subject matter hereof.  All documents and other matters required to be furnished by Borrower shall be reasonably satisfactory in form and substance to counsel for Lender.  Time is of the essence hereof.

11.11   Counterparts.  This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original, but all of which shall together constitute one and the same instrument.

11.12   Assignability.  Borrower shall not assign this Agreement or any part of any advance to be made hereunder without the consent of Lender which may be given or withheld in Lender's sole and absolute discretion.  The rights of Lender under this Agreement are, subject to prior notice to Borrower of not less than 10 days,  assignable in part or in whole, to any financially responsible assignee who has the financial capacity to and is willing to assume the obligation to fund the Advances under this Agreement, and any assignee of Lender shall succeed to and be possessed of the rights and assume the obligations of Lender hereunder to the extent of the assignment made, including the right to make Advances to Borrower or any approved assignee of Borrower in accordance with this Agreement. Notwithstanding the foregoing, in the event of a partial assignment by Lender, any approval or consent required from the Lender for any action or omission by Borrower under this Agreement shall only require the consent or approval of the original Lender named in this Agreement.

11.13   No Agency Relationship.  Borrower understands and agrees that Lender is not Borrower's agent or representative, and this Agreement shall not make Lender liable to any materialman, contractor, subcontractor, craftsman, laborer or any other Person or entity for any goods delivered to or services performed by them upon the Collateral, or for any debts or claims accruing to such parties against Borrower, and there is no contractual relationship imposing any duty, obligation or liability on Lender, either express or implied, between Lender and any materialman, contractor, subcontractor, craftsman, laborer or any other Person or entity supplying work, labor or materials for the improvement of any property of Borrower.

11.14 <u>No Joint Venture, Alter Ego, or Control Person Relationship</u>. It is expressly understood and agreed by Borrower that Lender, by its making of the Loan, does not become a member or partner of or with Borrower. It is the express intention of the parties hereto that for all purposes the relationship between Lender and Borrower be deemed to be that of creditor and debtor. In this regard, the parties acknowledge that it is not now, nor has it ever been, their intent to be partners or joint venturers as a result of the Loan. The parties also expressly disclaim any intent that Borrower become Lender's alter ego or instrumentality and that Lender become a "control person" within the scope of federal securities law. Borrower also acknowledges that Lender has not participated directly or indirectly in any securities offerings made by Borrower.

11.15 <u>Waiver of Defaults</u>. The waiver by Lender of any breach or default by Borrower under any of the terms of any of the Loan Documents shall not be deemed to be a waiver of any subsequent breach or default on the part of Borrower under the same or any other of the Loan Documents.

11.16 <u>Costs and Expenses</u>. Borrower shall pay Lender upon demand any and all costs, expenses and fees (including reasonable attorneys' fees) incurred in closing the Loan or in enforcing or attempting to recover payment of the amounts due under the obligations secured, including negotiating, documenting and otherwise pursuing or consummating modifications, extensions, compositions, renewals or other similar transactions pertaining to this Agreement, the Note, or the Loan Documents, irrespective of the existence of a Default, and including costs, expenses and fees incurred before, after or irrespective of whether suit is commenced, and in the event suit is brought to enforce payment hereof, such costs, expenses and fees shall be determined by a court sitting without a jury. Should any proceedings or litigation be commenced between the parties hereto concerning the terms of this Agreement, or the rights and duties of the parties hereto, the prevailing party in such proceeding or litigation shall be entitled, in addition to such other relief as may be granted, to a reasonable sum as and for the prevailing party's attorneys' fees.

11.17 <u>Lender's Consent</u>. Except as otherwise provided herein, whenever Lender's consent, approval or judgment is called for in the Loan Documents, it may be withheld, exercised or given in Lender's sole, only and unfettered discretion.

11.18 <u>Exhibits</u>. All Exhibits attached to this Agreement are fully incorporated herein and are made part of the covenants of this Agreement whether or not the Exhibits are executed by any or all of the parties.

11.19 <u>Incorporation of Recitals</u>. The prefatory language and Recitals made and stated hereinabove are hereby incorporated by reference into, and made a part of, this Agreement.

[The remainder of this page is intentionally blank]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

Lender:

**GRACE FINANCING GROUP, LLC**, an Arizona limited partnership

By: Grace Investment Company, an Arizona corporation
Its Manager

By _____

Its: _____

Borrower:

**BASHAS' INC.**, an Arizona corporation

By: _____

Its: _____

## Exhibit "A"
## Property Description address ccf lots

| Store Type | Store # | Property Address | City or County | Option Price |
|---|---|---|---|---|
| Bashas | #3 | 3320 N. 7th Ave | Phoenix, AZ 85013 | $ 4,230,000 |
| Food City | #4 | 300 N. Florence Blvd. | Casa Grande, AZ 85222 | $ 890,000 |
| Food City | #5 | 3131 E. Indian School Rd. | Phoenix, AZ 85016 | $ 8,460,000 |
| Food City | #10 | 1342 E. Main Street. Mesa | Mesa, AZ 85203 | $ 4,150,000 |
| Food City | #12 | 2124 E. McDowell Road Phoenix | Phoenix, AZ 85006 | $ 3,210,000 |
| Food City | #21 | 1162 E. Florence Blvd. Casa Grande | Casa Grande, AZ 85222 | $ 3,800,000 |
| Food City | #25 (Beep D) | 450 E. Southern ave Mesa | Mesa, AZ 85204 | $ 2,170,000 |
| Bashas' | #29 | 1858 W. Baseline Rd. Mesa | Mesa, AZ 85202 | $ 1,200,000 |
| Bashas' | #30 (Beep D) | 3360 Andy Divine Drive Kingman | Kingman, AZ 86401 | $ 2,200,000 |
| Bashas' | #40 | 2323 W. Highway 70 Thacher | Thacher, AZ 85552 | $ 2,930,000 |
| Bashas' | #45 | 3530 E. Southern Ave. Mesa | Mesa, AZ 85204 | $ 1,500,000 |
| Bashas' | #49 | 650 Finnie Flat Rd Campe Verde | Campe Verde, AZ 86322 | $ 5,640,000 |
| Bashas' | #51 | 1122 N. Higley Rd. Mesa | Mesa, AZ 85205 | $ 2,400,000 |
| AJ's Fine Foods | #62 | 13226 N. 7th Street | Phoenix, AZ 85022 | $ 1,900,000 |
| Food City | #114 | 1240 W 8th Street | Yuma, AZ | $ 2,580,000 |
| Apache Lanes | Bowl Pd. | 816 E. Main Street Mesa | Mesa, AZ 85203 | $ 1,175,000 |
| Bullhead City Corporate Office | Bowl Pd. | 959 Hancock Road | Bullhead City, AZ 86442 | $ 840,000 |
| & Art Gallery | HQ's | 22402 S. Basha Road | Chandler, AZ 85248 | $ 5,550,000 |
| Distribution Center | Building | 200 S. 56th Street | Chandler, AZ 85226 | $ 37,450,000 |
| Sedona - Theatre Pad | Building | 2081 W Hwy 89A | Sedona, AZ 86336 | $ 1,860,000 |
| Marbella Vineyards | Vineyard | 5700 S. Higley Road | Gilbert, AZ 85297 | $ 8,370,000 |
| CC&F Lot 4 | Parking | 190 S. 56th Street | Chandler, AZ 85226 | $ - |
| CC&F Lots 2 & 3 | Parking | 25 - 125 S. 54th Street | Chandler, AZ 85226 | $ - |
| CC&F Lots 1 & 6 (and hardcorner) | Vacant Land | 133 W. Chandler Blvd | Chandler, AZ 85226 | $ - |
| Bashas' | #47 | 16605 E.Palisades | Fountain Hills, AZ 85268 | $ 4,800,000 |
| 75th / Glendale | Vacant Land | SW corner of 75th ave and Camelback | Phoenix, AZ 85303 | $ 3,100,000 |
| 75th / Camelback | Vacant Land | 4950 N. 75th Ave | Phoenix, AZ 85033 | $ 2,670,000 |
| Globe | Vacant Land | SE Corner of US Hwy 70 & US Hwy 60. | Globe, AZ | $ 340,000 |
| Dobson / Elliot | Vacant Land | 3030 N. Dobson Road | Chandler, AZ 85224 | $ 4,200,000 |
| 16th Street / Roeser | Vacant Land | 1735 E. Roeser Road | Phoenix, AZ 85040 | $ 1,700,000 |
| Trekkell / Rodeo | Vacant Land | 1102 E. Rodeo Rd. | Casa Grande, AZ 85222 | $ 1,450,000 |
| 35th / Buckeye | Vacant Land | 3450 W. Buckeye Road | Phoenix, AZ 85009 | $ 180,000 |
| West Apache Trail | Vacant Land | 1525 W. Apache Trail | Apache Junction, AZ 85220 | $ 1,800,000 |
| Lot 6 Williams Field | Vacant Land | 7171 W. Frye Road | Chandler, AZ 85226 | $ - |

$ 122,745,000

<u>MULTIPLE ADVANCE PROMISSORY NOTE</u>

$45,000,000.00                                          Phoenix, Arizona
                                                        July __, 2009

FOR VALUE RECEIVED, the undersigned borrower ( the "Maker"), promises to pay to the order of Grace Financing Group, LLC, an Arizona limited partnership ("<u>Lender</u>"), or such other person as Lender may from time to time designate in writing, no later than 2:00 p.m., Phoenix, Arizona time, on the date specified for payment in immediately available funds at such address as Lender may from time to time designate in writing, in lawful money of the United States of America, the principal sum of FORTY-FIVE MILLION AND NO/100 DOLLARS ($45,000,000.00), or so much thereof as may be advanced from time to time by Lender to or for the benefit of Maker pursuant to the terms of that certain Loan Agreement of even date herewith by and between Maker, as Borrower, and Lender, as Lender (the "<u>Loan Agreement</u>"), together with interest thereon from the date of disbursement at the Agreed Rate (as hereinafter defined). Capitalized terms used but not defined in this Multiple Advance Promissory Note ("<u>Note</u>") shall have the meaning ascribed thereto in the Loan Agreement.

Interest on the Outstanding Loan Balance from time to time shall be paid on October 1, 2009 and on the first day of each calendar quarter thereafter, unless the payment date is not a Business Day in which case the payment shall be due on the next Business Day.

If at any time during the term of the Loan, the Outstanding Loan Balance shall exceed the permitted Maximum Loan Balance, Borrower shall make a payment to Lender within two Business Days after receipt of written notice from Lender as to the amount of the required reduction necessary to reduce the Outstanding Loan Balance to the permitted Maximum Loan Balance, The entire outstanding principal balance of the Note, all accrued and unpaid interest and all costs and charges incurred by Lender which are an obligation of Maker under the Loan Agreement shall be due and payable in full on or before the Maturity Date (hereinafter defined).

The maturity date ("<u>Maturity Date</u>") of this Note shall be the earlier of (i) twenty-four (24) months from the date of the First Advance, or (ii) the date of entry of the Confirmation Order.

For purposes of this Note, the agreed rate of interest ("<u>Agreed Rate</u>") shall be Eight Percent (8%) per annum. If any payment of principal, interest or other amount due hereunder or under the Loan Agreement is not paid when the same becomes due and payable, each and every such delinquent payment, including the entire principal balance and accrued interest or other amount due hereunder or under the Loan Agreement, as the same may be accelerated, shall bear interest at the rate of Eighteen Percent (18.0%) per annum, compounded monthly ("<u>Default Rate</u>") from the due date of the delinquent payment until the date of receipt by Lender of the delinquent payment. All

interest referred to herein shall be calculated on the basis of a three hundred sixty (360) day year for the actual number of days outstanding, from, and including, the date Advanced or the most recent date of principal or interest payment (as applicable) to, but excluding, the date of receipt of payment.

Subject to the terms of the Loan Agreement, principal under this Note may be disbursed in more than one Advance. Except as provided in the Loan Agreement, Maker may not re-borrow of principal under this Note which has been repaid. This Note may be prepaid at any time without premium or penalty.

This Note shall be secured by the Deed of Trust.

It is agreed that time is of the essence in the performance of all obligations hereunder and under any other instrument now or hereafter given to secure the payment hereof or executed and delivered in connection with the loan evidenced hereby. The rights and remedies of Lender as provided in this Note and the Loan Documents shall be cumulative and concurrent, and may be pursued singly, successively, or together against Maker, the Collateral described in the Loan Documents, and any other funds, property or security held by Lender for the payment hereof or otherwise at the sole discretion of Lender. The failure to exercise any such right or remedy shall in no event be construed as a waiver or release of such rights and remedies or of the right to exercise them at any later time.

The Maker, endorsers, and accommodation parties hereof and all other persons liable or to become liable for all or any part of the indebtedness evidenced hereby, jointly and severally waive all applicable exemption rights, whether under the State of Arizona constitution, homestead laws or otherwise, and also jointly and severally waive diligence, presentment, protest and demand, and also notice of protest, of demand, of nonpayment, of dishonor and of maturity; and they also jointly and severally hereby consent to any and all renewals, extensions or modifications of the terms hereof, including time for payment, or of the terms of any of the Loan Documents, and further agree that any such renewal, extension or modification of the terms hereof, or of the terms of any of the Loan Documents, or the release or substitution of any security for the indebtedness evidenced hereby or any other indulgences shall not affect the liability of any of such parties for the indebtedness evidenced by this Note. Any such renewals, extensions or modifications may be made without notice to any of such parties.

The Maker, endorsers and accommodation parties hereof and all other persons liable or to become liable on this Note, agree, jointly and severally, to pay all amounts payable to Lender under this Note and the Loan Agreement and all costs of collection, including reasonable attorneys' fees based upon the Phoenix, Arizona legal market, and all costs of suit, in case the unpaid principal sum of this Note, or any payment of principal, interest thereon or other sum due hereunder or under the Loan Agreement, is not paid when due, or in case it becomes necessary to protect the security for the indebtedness evidenced hereby, or for the foreclosure by Lender of any Loan Document, or in the event Lender is made party to any litigation because of the existence of the indebtedness evidenced by this Note, or because of the existence of any Loan Document, whether suit be brought

or not, and whether through courts of original jurisdiction, as well as in courts of appellate jurisdiction, or through a Bankruptcy Court or other legal proceedings.

This Note may not be amended, modified or changed, nor shall any waiver of any provision hereof be effective, except only by an instrument in writing and signed by the party against whom enforcement of any amendment, modification, change or waiver is sought; provided, however, that all endorsers and accommodation parties hereof and all other persons liable or to become liable on this Note, agree that, without notice to or consent from any of them, and without affecting their obligations hereunder (a) this Note may from time to time be extended or renewed or its terms (including the terms of payment of principal and interest) otherwise modified; (b) any of the provisions of this Note or the Loan Documents may be amended or any requirement thereof or default thereunder waived or any departure therefrom consented to or any other forbearance or indulgence exercised with respect thereto; and (c) any collateral now or hereafter securing this Note may be exchanged, substituted, realized upon, released, compromised, extended or otherwise dealt with or disposed of.

Maker agrees to pay an effective rate of interest which is the rate provided for in this Note plus any additional rate of interest resulting from any charges of interest or in the nature of interest paid or to be paid in connection with the loan evidenced by this Note. Maker expressly acknowledges that the Agreed Rate, and any other fees, charges, incentives, or other repayment obligations of Maker described herein or in the Loan Agreement, whether in the nature of interest or otherwise, have been specifically discussed and agreed upon by Maker after consultation with counsel of Maker's choice. Notwithstanding any provision herein or in any instrument now or hereafter securing this Note, the total liability for payments of interest and in the nature of interest shall not exceed the limits imposed by the usury laws of the State of Arizona. If Lender receives as interest an amount which would exceed such limits, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance and not to the payment of interest, and if a surplus remains after full payment of principal and lawful interest, the surplus shall be remitted to Maker by Lender, and Maker hereby agrees to accept such remittance.

Maker hereby irrevocably submits to the jurisdiction of any Arizona or United States Federal court sitting in Arizona over any action or proceeding arising out of or relating to this Note and the Loan Documents, and Maker hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such Arizona or Federal court. Maker irrevocably consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process to Maker at Maker's addresses specified herein. Maker agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Maker further waives any objection to venue in such State and any objection to an action or proceeding in such State on the basis of forum non conveniens. Maker further agrees that any action or proceeding brought against Lender shall be brought only in Arizona or United States Federal court sitting in Maricopa County. Nothing contained herein shall affect the right of Lender to serve legal process in any other manner permitted by law or affect the right of Lender to bring any action or proceeding against Maker or its property in the courts of any other jurisdictions.

It is expressly understood and agreed by Maker that Lender, by its making of the loan evidenced by this Note, does not become a member or partner of or with Maker, and in no event shall Lender be liable for any of the debts, obligations or liabilities of Maker, or of Maker's members or beneficiaries, as a result of the making of the loan evidenced by this Note, nor is Lender liable for any contributions to Maker. It is the express intention of the parties hereto that for all purposes the relationship between Lender and Maker be deemed to be that of debtor and creditor. In this regard, the parties acknowledge that it is not now, nor has it ever been, their intent to be partners or joint venturers as a result of this Note or the Loan Documents.

Whenever used herein, the words "Maker" and "Lender" shall be deemed to include their respective heirs, personal representatives, successors and assigns.

This Note shall be governed by and construed in accordance with the laws of the State of Arizona.

IN WITNESS WHEREOF, Maker has executed this Note as of the date first above written.

BASHAS' INC., an Arizona corporation

By:_____
Its: President