MESCH, CLARK & ROTHSCHILD, P.C.
259 North Meyer Avenue
Tucson, Arizona 85701
Phone: (520) 624-8886
Fax: (520) 798-1037
Email: ecfbk@mcrazlaw.com
mmcgrath@mcrazlaw.com
fpetersen@mcrazlaw.com

AND

MICHAEL W. CARMEL, LTD.
80 E. Columbus
Phoenix, Arizona 85012-2334
Phone: (602) 264-4965
Fax: (602) 277-0144
Email: michael@mcarmellaw.com

Proposed Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Chapter 11 Proceedings |
| BASHAS' INC., Debtor | Case No. 2:09-bk-16050-JMM |
| BASHAS' LEASECO, INC., Debtor | Case No. 2:09-bk-16051-SCC |
| SPORTSMAN'S LLC, Debtor | Case No. 2:09-bk-16052-SCC |

**DECLARATION OF CONRAD N. PLOMIN IN SUPPORT OF DEBTORS' APPLICATION TO INCUR POST PETITION DEBT SECURED BY FIRST PRIORITY LIEN ON REAL PROPERTY**

CONRAD N. PLOMIN declares as follow:

1) I am the President of Sunbelt Capital Corporation. I have been employed by the Debtors pre-petition as their investment banker and financial advisor since 1991. I have filed an application to be employed by the Debtors in the same capacity in these cases.

2) As the Debtors' pre-petition investment banker, I am familiar with the Debtors' general business and financial affairs. I submit this Declaration based on personal knowledge in connection with the Debtors' application to incur post petition debt secured by real property. The statements set forth below are true to the best of my personal knowledge and if called to testify as to those statements, I would do so confidently.

3) Since at least November of 2008 I have been in negotiations with the Debtors' existing lenders, Wells Fargo Bank, N.A., Bank of America, N.A., Compass Bank and the various 1996, 2002, 2003 and 2005 Noteholders, to obtain an acceptable financing agreement that would provided the Debtors with needed working capital and longer repayment terms. As of July 9, 2009 the Debtors existing lenders were not willing to restructure the Debtors Revolving Credit Agreement that would provide the Company with adequate liquidity and acceptable terms to meet its existing financial constraints. In anticipation of this situation, at the Debtors request, I contacted various national lenders who might be willing to provide the Debtors with additional financing.

4) I contacted GE Capital, who was willing to provide the Debtors with a DIP loan as long as the new loan was secured by a first priority lien on the Debtors' inventory and accounts receivable. Since these assets were pledged as collateral to the Debtors' existing lenders in April, 2009, this new loan with GE Capital could not be consummated. GE Capital indicated its proposed DIP loan, assuming it could obtain the required first lien on the Debtors' inventory and accounts receivable, would,

nevertheless, require payment of an "upfront" fee of approximately $1,000,000. GE Capital also indicated the new loan would require payment of interest in the range of 8%-10% per annum.

5) I contacted Chase Bank's Asset Based Lending Group. After considerable time and exchange of financial information, they also indicated they would only agree to a DIP loan if they were secured by a first priority lien on the Debtors' accounts receivable and inventory. Since those assets were already pledged, Chase elected not to pursue the proposed loan with the Debtors.

6) I contacted Barclays Credit and was informed they took the same position as GE and Chase with respect to the requirement the Debtors provide them with a first priority lien on accounts receivable and inventory as security for any proposed new loan. As a result, no new loan with Barclays was pursued.

7) GE, Chase and Barclays were all offered a first priority lien on the Debtors' unencumbered real estate with a fair market value of at least $123 million as temporary collateral, until the Debtors' inventory and accounts receivable could subsequently be used to replace the real estate security. All of them declined to consider this proposal.

8) Finally, I also contacted Goldman Sachs, who expressed interest in the Debtors' real estate collateral as security for a new loan. Goldman Sachs, however, required the new loan become part of the Debtors' exit financing, payment of substantial pre-payment fees, as well as interest in the range of 10% per annum. Because Goldman Sachs is now a commercial bank, it is subject to federal regulations and timing

requirements. As a result, the Debtors' new DIP loan could not be implemented in time to satisfy the Debtors' current financial constraints.

9) Grace Funding Group, LLC was the only lender who was willing to meet the Debtors' financial needs. Grace Funding Group's new loan is secured only by the Debtors' unencumbered real property. The Debtors were not required to pay any "upfront" fees to obtain the new loan. The interest rate on the new loan is fixed at 8% per annum. The Debtors obtained immediate access to $2 million and can access another $14 million in financing over the next several weeks. The new loan also provides the Debtors with the ability to access an additional $29 million, if necessary, over the next several months. Under these circumstances, the Grace Funding Group loan was the only DIP financing available to the Debtors that was fair, reasonable and could meet the Debtors' existing financial needs.

Dated: July 13, 2009.                    s/Conrad N. Plomin
                                         Conrad N. Plomin

304542