| | |
|---|---|
| Robert J. Miller, Esq. (#013334) | Steven Wilamowsky, Esq. SW-9266 |
| Bryce A. Suzuki, Esq. (#022721) | (admitted pro hac vice) |
| **BRYAN CAVE LLP** | **BINGHAM McCUTCHEN LLP** |
| Two North Central Avenue, Suite 2200 | 399 Park Avenue |
| Phoenix, Arizona 85004-4406 | New York, New York 10022 |
| Telephone: (602) 364-7000 | Telephone (212) 705-7960 |
| Facsimile: (602) 364-7070 | Facsimile (212) 702-3607 |
| Email: rjmiller@bryancave.com | e-mail: steven.wilamowsky@bingham.com |
| bryce.suzuki@bryancave.com | |
| | Gerald K. Smith, Esq. (#001428) |
| Counsel for Wells Fargo Bank, N.A., | **LEWIS AND ROCA LLP** |
| Bank of America, N.A.; and Compass Bank | 40 North Central Avenue |
| | Phoenix, Arizona 85004-4429 |
| | Telephone (602) 262-5348 |
| | Facsimile (602) 734-3834 |
| | e-mail: gsmith@lrlaw.com |

Counsel for The Prudential Insurance Company of America, Northern Life Insurance Company, Hartford Life Insurance Company, Reliastar Life Insurance Company, Pruco Life Insurance Company, Prudential Retirement Insurance and Annuity Company, and United of Omaha Life Insurance Company

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| BASHAS' INC.,<br>BASHAS' LEASECO INC.,<br>SPORTSMAN'S, LLC,<br><br>Debtors. | Chapter 11<br><br>Case Nos. 2:09-bk-16050-JMM<br>2:09-bk-16051-JMM<br>2:09-bk-16052-JMM<br><br>(Jointly Administered under 2:09-bk-16050-JMM) |
| This filing Applies to:<br><br>☒ ALL DEBTORS<br>☐ SPECIFIED DEBTORS | **OBJECTION TO APPROVAL OF DEBTORS' JOINT DISCLOSURE STATEMENT**<br><br>Date of Hearing: February 22, 2010<br>Time of Hearing: 2:00 p.m. |

Wells Fargo Bank, N.A., in its capacity as collateral agent and lender, Bank of America, N.A., and Compass Bank (collectively, the "Bank Group"), and the Note Holders (collectively

with the Bank Group, the "Lender Group"),[1] by and through their duly authorized counsel, hereby object to approval of the *Joint Disclosure Statement* [DE #1129] (the "Disclosure Statement") for the *Joint Plan of Reorganization* (the "Plan") submitted by the above-captioned debtors-in-possession (the "Debtors").[2] The Disclosure Statement fails to provide the Lender Group and other creditors with critical information to make an informed decision on the Plan. In addition, the Debtors' efforts to preserve the equity interests of their insiders, at the expense of their creditors, have led them to propose a plan of reorganization that is facially unconfirmable. Rather than waste the time and resources of the various parties involved in this case, the Court should refuse to approve the Disclosure Statement and should direct the Debtors to consider other exit alternatives.

For the reasons explained below, the self-contradictory and incomplete information provided in the Disclosure Statement will not permit a hypothetical, reasonable investor to make an informed decision whether to accept or reject the Plan. Moreover, the Plan is not confirmable because it fails to address in any way claims against and interests in one of the Debtors, and it cannot be confirmed over the objection of the Lender Group because, among other things, it does not provide for the payment of post-petition, pre-confirmation interest and fees. This Court should not approve such a fatally flawed document.

In further support of this Objection, the Lender Group respectfully submits as follows:

**I.    BACKGROUND.**

1.    The Debtors filed chapter 11 petitions on July 12, 2009. The Debtors have retained possession of their assets and are operating as debtors in possession.

---

[1]    Wells Fargo is Collateral Agent pursuant to that certain *Intercreditor and Collateral Agency Agreement* dated as of April 14, 2008, by and between the Bank Group and the parties defined therein as the "Note Holders." The Note Holders are The Prudential Insurance Company of America, Hartford Life Insurance Company, Reliastar Life Insurance Company, Pruco Life Insurance Company, Prudential Retirement Insurance and Annuity Company, and United of Omaha Life Insurance Company.

[2]    As discussed below, the Plan and Disclosure Statement do not classify or disclose the treatment of claims against debtor Sportsman's, LLC. As a result, it is not clear whether the Plan is in fact proposed by that Debtor.

2. The Debtors owe the Bank Group in excess of $110 million and owe the Note Holders in excess of $104 million. The aggregate indebtedness owing to the Lender Group is secured by a valid, first and prior lien on substantially all of the Debtors' personal property.

3. On October 9, 2009, the Debtors commenced an adversary proceeding against the Lender Group, seeking therein to avoid the Lender Group's lien on the Debtors' personal property. The Lender Group immediately filed motions to dismiss the Debtors' complaint to avoid the liens of the Lender Group. This Court granted the Lender Group's motions to dismiss pursuant to its Memorandum Decision dated December 10, 2009. Promptly thereafter, the Debtors filed a motion to reconsider the Memorandum Decision. A hearing on the Debtors' motion to reconsider is currently scheduled for February 17, 2010.

4. Throughout these cases, the Debtors have provided the Lender Group with monthly "borrowing base certificates" that set forth the values of the following categories of the Lender Group's collateral: (i) cash, (ii) business equipment, (iii) inventory, and (iv) accounts receivable.[3] Based on the Debtors' representations in these borrowing base certificates, the value of the foregoing categories of collateral has been no less than $210 million at all times during the borrowing-base reporting periods, and exceeded $217 million as of January 2, 2010.

5. In addition to the borrowing-base categories of collateral, the Lender Group asserts liens on other personal property collateral, including: (a) the Debtors' art collection valued in the schedules of Bashas' Inc. at approximately $15 million; (b) the Debtors' remaining liquor licenses, which have an estimated value of $8,153,519 (exclusive of $3,814,725 in aggregate sales proceeds to date), according to the November monthly operating report of Bashas' Inc.; and (c) the Debtors' general intangibles, which include subsidiary LLC interests with a reported aggregate value of $1,112,195.

6. In sum, by the Debtors' representations in its borrowing base certificates, monthly operating reports, schedules, and other court filings, the value of the Lender Group's collateral,

---

[3] To date, the Debtors have provided five borrowing base certificates, which respectively represented the following aggregate values to the Lender Group: $222,045,329 as of 8/29/09; $210,173,963 as of 10/3/09; $213,760,212 as of 10/31/09; $215,193,592 as of 11/28/09; and 217,579,942 as of 1/2/10.

BRYAN CAVE LLP
Two North Central Avenue, Suite 2200
Phoenix, Arizona 85004-4406
(602) 364-7000

as of January 2, 2010, exceeds $240 million. Based on these values, the members of the Lender Group are oversecured creditors.

7. On January 15, 2010, the Debtors filed their Plan and accompanying Disclosure Statement. The Plan purports to provide full payment to all creditors over extended terms, while interest holders retain their equity and receive unspecified distributions. On January 29, 2010, the Debtors filed three missing exhibits to the Disclosure Statement.

**II. LEGAL ARGUMENT.**

The Lender Group submits that no hypothetical reasonable investor can make an informed decision regarding the Plan based on the self-contradictory and incomplete information provided in the Disclosure Statement. The primary purpose of a disclosure statement is to give creditors the information necessary to determine whether or not to accept the debtor's plan. *See In re California Fidelity, Inc.*, 198 B.R. 567, 571 (9th Cir. B.A.P. 1996). Section 1125 of the Bankruptcy Code obligates the plan proponent to provide, among other things, a disclosure statement with "adequate information," which is defined as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1).

A proper disclosure statement is critical for creditors and the Court to determine whether a debtor's proposed reorganization is viable and whether such proposal should be supported or rejected: "The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligations to provide sufficient data to satisfy the Code standard of adequate information." *Kunic v. St. Jean Financial, Inc.*, 233 B.R. 46, 54 (Bankr. S.D.N.Y. 1999); *In re Scott*, 172 F.3d 959, 967 (7th Cir. 1999) (debtor in possession has a fiduciary duty of disclosure to his creditors). Accordingly, objections to disclosure statement deficiencies are fully preserved at the plan-confirmation stage. *See In re Perez*, 30 F.3d 1209, 1217 (9th Cir. 1994)

(adequate disclosure "is in no way rendered moot by approval of the plan and is fully reviewable in an appeal from such an order").

Based on the fundamental need for full and adequate disclosure, courts have formulated lists of the type of information that generally should be addressed in a disclosure statement, including the following: (i) a complete description of the available assets and their value; (ii) the future management of the debtor; (iii) information relevant to the risks posed to creditors under the plan; (iv) litigation likely to arise in a non-bankruptcy context; and (v) the relationship of the debtor with any affiliates. *See In re Metrocraft Publishing Servs, Inc.*, 39 B.R. 567 (Bankr. N.D. Ga. 1984); *In re Jeppson*, 66 B.R. 269, 292 (Bankr. D. Utah 1986). The Disclosure Statement fails to provide critical disclosures related to the foregoing categories of information, and otherwise fails to provide adequate information, as more specifically discussed below.

**A.  The Disclosure Statement Lacks Adequate Information and Contains Misleading Information Regarding the Lender Group's Claims.**

The Disclosure Statement contains alternative treatments for the claims of the Bank Group and the Note Holders, based on whether their liens are avoided in the pending adversary proceeding. Both treatments are fatally flawed.[4]

The Disclosure Statement asserts, without any supporting analysis or discussion, that even if the Lender Group retains its liens, the Bank Group and the Note Holders "will be partially secured . . . and partially unsecured." Disclosure Statement, p.45; *see also id.*, p.39 (Lender Group's liens "are undersecured"). Despite the far-reaching implications of this assertion, the Debtors don't bother to classify the Lender Group's purported deficiency claims in the Plan or Disclosure Statement.

---

[4] This Objection focuses on the "secured treatment" of the Lender Group's claims, because the Lender Group has various defenses that make total lien avoidance a legal impossibility. The Lender Group observes, however, that even under the implausible scenario of "fully unsecured" treatment, the Plan and Disclosure Statement are fatally deficient. If the Lender Group's liens were successfully avoided in their entirety, the Lender Group would remain separately classified under the Plan, even though the Lender Group's claims would be general unsecured claims. *See* Disclosure Statement, pp.44, 48. Such separate classification from other unsecured creditors (Classes 11 and 13) is unfairly discriminatory and without legal justification. *See In re Barakat*, 99 F.3d 1520, 1525 (9th Cir. 1996). As a result, even if the Lender Group's liens were avoided in their entirety, the Disclosure Statement presents a facially unconfirmable plan. *Id.*

Bryan Cave LLP
Two North Central Avenue, Suite 2200
Phoenix, Arizona 85004-4406
(602) 364-7000

The paucity of information regarding these claims raises significant questions: Do these purported deficiency claims belong in Classes 11 and 13, with other general unsecured claims? Do they remain part of Classes 3 and 4, respectively, resulting in dissimilar claims existing in a single class? *See* 11 U.S.C. §§ 1122(a), 1123(a)(4). The Lender Group and other creditors have no way of determining these and other questions regarding the classification and treatment of these purported deficiency claims. To the extent such deficiency claims could affect the voting outcome for a class, full disclosure is important to all creditors.

The Debtors' failure to classify these purported claims is not surprising, given the internal inconsistencies of the Disclosure Statement and the contradictory positions taken by the Debtors to date. Exhibits 5 and 6 of the Disclosure Statement, for example, are alternative liquidation analyses, based on whether the Lender Group is secured or unsecured. Exhibit 5 assumes that the Lender Group has aggregate ***secured*** claims totaling $198,000,000 – i.e., Exhibit 5 does not assume there is any deficiency claim whatsoever. Exhibit 6 assumes the same amount in aggregate unsecured claims. Thus, the Debtors' liquidation analysis assumes an all-or-nothing lien position for the Lender Group and fails to comport with their own assertion that the Lender Group is undersecured.

In addition, the values ascribed to the collateral securing the Lender Group's claims vary, depending on what the Debtors want to show the Court and creditors at the time. The Disclosure Statement seeks to "have it both ways." On one hand, the Disclosure Statement must reflect a balance sheet and capital structure to support a feasible 100% payment plan, so that the Debtors' principals can retain their equity interests and receive distributions, without contributing a penny of new value. On the other hand, to support the assertion that the Lender Group is undersecured, which the Debtors mistakenly believe precludes payment of the Lender Group's postpetition legal fees,[5] the Debtors must diminish the value of the Lender Group's collateral to an amount

---

[5] In fact, under controlling Ninth Circuit authority, unsecured creditors are entitled to an allowed claim for postpetition legal fees that are provided for under their relevant agreements. *See In re SNTL Corp.*, 571 F.3d 826 (9th Cir. 2009). Because the Plan makes no provision for the allowance of such fees (even by way of an unsecured deficiency claim), it is, for this reason alone, unconfirmable on its face.

less than the Lender Group's aggregate claim. Accordingly, when it comes to asset values, the Disclosure Statement is an exercise in double talk.

The various personal property assets described on pages 11-12 of the Disclosure Statement, for example, tout an aggregate scheduled value of approximately $228 million. To preserve the "switch" for this "bait," the Debtors hedge their cited asset values, which were reported under penalty of perjury, by claiming that they represent "cost" and that "the fair market or liquidation value of these assets was not known at the time the schedules were filed." *See id.*[6] Elsewhere in the Disclosure Statement, however, the Debtors assert that "the value of the collateral securing [the Lender Group's] debts had a fair market value substantially less than the amounts owed." *Id.*, p.39. This assertion necessarily implies that the Debtors currently know what the fair market value of their assets was on the Petition Date. If the Debtors are to be taken at their word in the Disclosure Statement, why aren't these fair market values set forth in detail (or in any form) in the Disclosure Statement? Because these purported fair market values must differ from the values stated in the schedules, why haven't the schedules been amended? *See In re Searles*, 317 B.R. 368, 378-379 (9th Cir. B.A.P. 2004) (debtor has a continuing duty to assure the accuracy and completeness of schedules), *aff'd*, 212 F.Appx. 589 (9th Cir. 2006). This Court should not reward such duplicity, particularly when it is offered under the guise of "adequate disclosure."

The Debtors have an obligation to provide full and frank disclosure regarding the Plan's classification and treatment of the Lender Group's claims. At a minimum, the Debtors should be required to amend their Disclosure Statement to include full and accurate disclosures regarding: (i) the bases, if any, for their assertion that the Lender Group's claims are undersecured, including the specifics of any fair market values or other valuation of the Lender Group's collateral; (ii) the amount of the Lender Group's purported deficiency claims; and (iii) a clear statement of the intended classification of any purported deficiency claims.

---

[6] The Debtors cite their schedules as the primary source for the Disclosure Statement's asset descriptions and values. *See* Disclosure Statement, p.11 ("Bashas' property is specifically described in the schedules filed with the Bankruptcy Court").

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

**B. The Disclosure Statement Presents a Facially Unconfirmable Plan.**

The Plan's failings with respect to the Lender Group's claims are not limited to classification issues. The Disclosure Statement states that the Lender Group's allowed claims, under either proposed treatment, "will not include post-petition interest through the Effective Date." *See* Disclosure Statement, pp.56-57, 58-59. This treatment violates the fair and equitable standard for confirmation, resulting in a facially unconfirmable plan. *See* 11 U.S.C. § 1129(b); *In re Dow Corning Corp.*, 456 F.3d 668, 678 (6th Cir. 2006). A disclosure statement that presents an unconfirmable plan should not be approved, as it would result in "a wasteful and fruitless exercise" that would "further delay a debtor's attempts to reorganize." *In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988); *see also In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996); *In re Market Square Inn, Inc.*, 163 B.R. 64, 68 (Bankr. W.D. Pa. 1994); *In re Dakota Rail, Inc.*, 104 B.R. 138, 145 (Bankr. D. Minn. 1989).

To comply with Section 1129(b), a plan may not divest a creditor of a contractual right to post-petition interest and attorneys' fees where, as here: (i) the debtor has repeatedly provided evidence and made avowals of solvency, creditor oversecurity, and adequate protection, and (ii) the proposed plan provides for the retention of equity interests by insiders and related distributions under the plan. *See Consolidated Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 527 (1941) ("[A]ny arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights' of creditors comes within judicial denunciation."); *Dow Corning Corp.*, 456 F.3d at 678; *In re SNTL Corp.*, 571 F.3d 826 (9th Cir. 2009).

Congress has unequivocally indicated that a Chapter 11 debtor in a solvent case may not divest a creditor of its bargained-for contract rights: "[W]here an estate is solvent, in order for a plan to be fair and equitable, unsecured and undersecured creditors' claims must be paid in full, *including postpetition interest*, before equity holders may participate in any recovery." 140 Cong. Rec. H10, 752-01, H10, 768 (1994) (statement of Rep. Brooks, Chairman of the Committee on the Judiciary and co-author of the Bankruptcy Reform Act of 1994) (emphasis added).

Indeed, under the Plan's impaired treatment of the Lender Group's claims, the Lender Group would be entitled to default interest and fees consistent with the relevant loan documents, even if the Lender Group's claims were completely unsecured. *See SNTL Corp.*, 571 F.3d at 826; *Dow Corning Corp.*, 456 F.3d at 678. *Cf. General Electric Capital Corp. v. Future Media Productions Inc.*, 547 F.3d 956, 961 (9th Cir. 2008) (the court "should apply a presumption of allowability for the contracted default rate, provided that the rate is not unenforceable under applicable nonbankruptcy law" (internal quotations omitted)).

In this case, the Debtors filed schedules under penalty of perjury establishing the solvency of Bashas' Inc. by a margin of more than $100 million. The Debtors have produced monthly borrowing base certificates, signed by an officer of Bashas' Inc., showing collateral values for cash, equipment, inventory, and receivables to be no less than $210 million at any time during the pendency of the Debtors' cases, and to be worth more than $217 million as of January 2, 2010. As recently as February 2, 2010, the Debtors asked the Lender Group and the Court to rely on these borrowing-base values to show that the Lender Group is "adequately protected" for cash collateral purposes. In addition to the borrowing-base assets, the Lender Group has liens on the Debtors' other personal property, such as their extensive art collection valued at approximately $15 million in the schedules of Bashas' Inc. By all accounts (except the conclusory assertions of the Disclosure Statement), the Court is dealing with solvent estates and an oversecured Lender Group.

The Debtors may not contradict their many representations of solvency and over-collateralization to have it "both ways" for the benefit of insiders, and should be judicially estopped from doing so in the Disclosure Statement. The Plan's attempt to strip the Lender Group of its rights to postpetition interest and fees renders the Plan facially unconfirmable. The Court should not authorize the Debtors to disseminate the Disclosure Statement to, and solicit votes from, thousands of creditors, when the Plan described therein cannot be confirmed as a matter of law.

### C. Lack of Adequate Information Regarding Equity Interests, Certain Classes of Claims, Claims Against Sportsman's, and Inter-Debtor Claims.

#### 1. No Meaningful Disclosures Regarding Equity Interests.

The Disclosure Statement contains virtually no substantive information regarding the treatment of equity interests and insider claimants. The holders of equity interests in Class 18 would retain their ownership of the Debtors under the Plan, without contributing a penny's worth of new value. Because the Plan purports to shift the entire risk of reorganization to the creditors, and to the Lender Group in particular, the disclosures regarding equity should be particularly detailed. The Disclosure Statement, however, takes the opposite approach.

According to the Disclosure Statement, equity is entitled to receive distributions once "the company"—presumably Bashas' Inc.—reaches an undefined "EBITDA Threshold." *See* Disclosure Statement, p.67. This EBITDA Threshold is to be established on undisclosed criteria "at confirmation." *Id.* Creditors are entitled to disclosure of the purported justification and criteria for this EBITDA Threshold well in advance of the confirmation hearing. A finding of "adequate information" is not compatible with a debtor's ability, at confirmation, to blindside the very creditors who bear the risk of the debtor's proposed reorganization, all for the benefit of insiders.

The Plan also appears to reserve for equity holders the right to receive assets of the Debtors "for fair value," even if the EBITDA Threshold is not satisfied. *Id.*, p.68. The Lender Group is informed that the Debtors have regularly provided loans and other benefits for the shareholders and insiders. Again, creditors are entitled to know with specificity, prior to confirmation, what rights and benefits are being reserved for the insiders retained by the reorganized Debtors. Indeed, such disclosures are a condition for confirmation. *See* 11 U.S.C. §1129(a)(5).

#### 2. Lack of Disclosures Regarding Other Classes of Claims.

The Disclosure Statement is deficient with respect to various classes of claims, including: (i) the claim of Grace Funding Group, LLC in Class 2; (ii) non-vendor unsecured claims in Class 11; (iii) the claims of the Parra class-action litigants in Class 15; (iv) the claims of the "Supplemental Retirement Plan" beneficiaries in Class 16; and (v) the claims of the Rabbi Trust

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

beneficiaries in Class 17. The lack of disclosure and discretionary future treatment of these claims appear to be intended to allow the Debtors to treat insiders in a preferential manner. The Lender Group specifically objects to the Disclosure Statement's failings regarding the following:

  **(i)**   **Grace Funding Group, LLC.** The Disclosure Statement fails to specify the treatment of Grace Funding Group, LLC's claim. The Disclosure Statement states only that the existing maturity date will be extended by twelve months, with additional interest to accrue "at the rate the parties may agree will be paid . . . ." Disclosure Statement, p.56. If Grace serves as a post-confirmation lender, the maturity date may be further delayed as the parties may agree. *Id.*, p.42. Thus Grace may have an indefinitely delayed repayment on undisclosed terms, at an undisclosed interest rate. This is not adequate information.

  **(ii)**   **Non-Vendor Unsecured Claims.** Unsecured claims in Class 11 include the claims of all tort claimants, litigation claimants, and lease rejection damage claimants. *Id.*, p.51. Although a lease rejection damage estimate is provided, the Disclosure Statement makes clear that the amount of the claims in Class 11 is completely unknown. *Id.* Despite ignorance of the dollar amount at stake, the Plan seeks to pay a 10% lump payment on the Effective Date or upon allowance of each claim in Class 11, with total payment from net excess cash flow within five years. At a minimum, the Disclosure Statement should explain how these claims will be estimated for voting purposes, and how this "bucket" of liability in an unknown amount might affect feasibility.

  **(iii)**   **Parra Class-Action Claims.** The Parra litigants in Class 15 assert more than $36 million in disputed damages. As with Class 11 claims, the Disclosure Statement should provide how Class 15 claims will be estimated for voting purposes, and how this potential liability might affect feasibility. *See In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985).

  **(iv)**   **SERP Beneficiary Claims and Rabbi Trust Beneficiary Claims.** Virtually nothing is disclosed about the claims in Classes 16 and 17. The creditors

holding these claims ostensibly are insiders. Despite a glaring lack of disclosure regarding these claims, the holders of Class 16 and 17 claims are to receive releases of estate avoidance actions and are entitled to the resumption of payments or access to trust assets on undisclosed terms. The adequate-information standard requires far more disclosure, particularly with respect to such favored plan treatment for insider claims.

### 3. Lack of Disclosure Regarding Claims Against Sportsman's, LLC, and Inter-Debtor Claims.

The Disclosure Statement contains no discussion whatsoever regarding creditor claims against debtor Sportsman's, LLC ("Sportsman's"). There is a passing reference to a historical consolidation of Sportsman's business operations with Bashas' Inc., "such that the assets and liabilities [of Sportsman's, LLC] truly are Bashas'." *See* Disclosure Statement, p.14. At the same time, however, the Disclosure Statement identifies the separate liabilities of Sportsman's. *Id.*, p.19. In addition, the Debtors filed their cases separately, and each Debtor filed its own statements and schedules. Neither the Disclosure Statement nor the Plan proposes the substantive consolidation of Bashas' Inc. and Sportsman's, and a single sentence in a disclosure statement cannot accomplish this result. To the extent Sportsman's is a proponent of the "joint" Plan, the adequate-information standard requires disclosure of how the claims against Sportsman's will be classified and treated under the Plan.

The Disclosure Statement also lacks any information regarding inter-debtor claims. Bashas' Inc. apparently owes approximately $1.8 million to debtor Bashas' Leaseco Inc. ("Leaseco") for rent and repair expenses. *See id.*, p.13. Leaseco also has an executory contract with Bashas' Inc. for the lease of various commercial vehicles. This lease agreement presumably is necessary for the ongoing business operations of both debtors, yet it is not listed in Exhibits 7, 8, or 9 to the Disclosure Statement for executory contracts to be assumed, rejected, or remain "under consideration" by the Debtors. If the Leaseco executory contract is necessary for the Debtors' businesses, it should be assumed, which will require cure and likely will increase the Effective Date payments of Bashas' Inc. by approximately $1.8 million. The Disclosure Statement should not simply ignore this liability. If the contract will be rejected, the Disclosure

Statement should explain as much, how such rejection claims will be treated under the Plan, and how rejection will affect Leaseco's ability to reorganize. The Disclosure Statement also should provide the details, classification, and proposed treatment of all other inter-debtor claims.

### D. Failure to Disclose Various Post-Confirmation Matters.

#### 1. Lack of Disclosure Regarding Exit Financing.

The Disclosure Statement vaguely alludes to "a $35 million credit facility at competitive prices, for a term of between 12 and 18 months" from Grace Financial, LLC. *See* Disclosure Statement, p.70.[7] The Disclosure Statement provides virtually no information to the Lender Group and other creditors regarding this potential $35 million credit facility. The Debtors do not even disclose the applicable interest rate. Creditors know merely that it would be made "as an accommodation to Bashas' by the Grace Family" at "competitive prices." *Id.* Information regarding this potential exit financing is based on the Debtors' strong reliance on "the generosity of Grace Funding, LLC." *Id.* Whether such reliance is justified or misplaced should not be an open question at the disclosure-statement stage of a large Chapter 11 case.

Adequate information requires, at a minimum, the specific terms of the proposed financing, including the applicable interest rate. Prior to approval of any disclosure statement, the Debtors should be required to supply a loan commitment or binding term sheet to resolve this and other issues regarding the potential exit financing. The Disclosure Statement also should explain the Debtors' plans for repaying or refinancing the Grace facility at the end of the loan term in 12-18 months. To the extent there is no concrete plan thereafter, the Disclosure Statement should disclose the substantial risk of illiquidity at the end of the loan term.

#### 2. Failure to Disclose the Affiliations and Compensation of Insiders.

The Disclosure Statement indicates, in very abbreviated fashion, that if the Plan is approved, the existing officers and directors will manage the Debtors after confirmation. Although the names of the proposed post-confirmation officers and directors can be gleaned

---

[7] In addition to Grace Financial, LLC, the Disclosure Statement refers to "Grace Funding, LLC" and "Grace Funding Group, LLC." *See* Disclosure Statement, pp.33-34, 70. It is unclear whether the proposed exit lender is the same entity and is misnamed in the Disclosure Statement, or whether there are several special-purpose entities that may provide the exit financing.

from the Disclosure Statement, the affiliations of such individuals with the Debtors remain nebulous, at best. The Lender Group is informed, for example, that key officers are also board members and equity holders of the Debtors. Not only is the hypothetical reasonable investor entitled to the full and frank disclosure of such information, the Debtors are required to make these disclosures as a condition of plan confirmation. *See* 11 U.S.C. § 1129(a)(5)(A). In light of equity holders' retention of their interests without making any new contributions and while purporting to cram down creditors on extended payment terms, these disclosures are particularly important. Such disclosures also must be sufficient to enable the court to make its public policy determination under Section 1129(a)(5)(A)(ii).

In addition, the Debtors must disclose the proposed compensation of post-confirmation officers, directors, and any other insiders who will be employed or retained by the reorganized Debtors. *Id.* § 1129(a)(5)(B). The Lender Group is informed that compensation of insiders historically includes a grocery "allowance," a low-interest vehicle loan program, and other non-salary benefits. Insiders also would receive, on extremely nebulous terms, long-term debt repayment accommodations for more than $3.3 million in receivables they owe to the Debtors. *See* Disclosure Statement, pp.37, 67-68. The Disclosure Statement impermissibly fails to provide a complete disclosure of the nature and amount of the total compensation to be received by the post-confirmation insiders retained by the Debtors.

### 3. Misleading Disclosures Regarding Ongoing Involvement of CRO.

The Disclosure Statement dedicates nearly three full pages to describe the post-petition efforts and accomplishments of Darl Andersen, the Debtors' interim chief restructuring officer. Although the Disclosure Statement states that Mr. Andersen will make "[t]he primary decisions with respect to operations post-confirmation," *see id.*, pp.74-75, Mr. Andersen's employment contract with the Debtors is for only seventeen months, several of which have passed during the pendency of the case. Thus, it appears that Mr. Andersen will serve and make the "primary decisions" for the Debtors for only a handful of months after confirmation.

To be meaningful, the disclosures regarding post-confirmation management must fully and fairly describe who will lead the Debtors through reorganization. In light of the protracted

payment terms for almost all creditors under the Plan, it is only proper that the Disclosure Statement disclose: (i) Mr. Andersen's termination date under his contract with the Debtors; (ii) the identity of Mr. Andersen's successor (if any); (iii) such successor's affiliations with the Debtors; and (iv) the proposed compensation of such successor.

### 4. Lack of Disclosure Regarding the "Creditor Ombudsman."

The Disclosure Statement similarly fails to disclose the identity, credentials, or proposed compensation structure of the "Unsecured Creditor Ombudsman." *See* Disclosure Statement, p.77. As a preliminary matter, it is unclear why the reorganized Debtors would need a third-party liaison to communicate with unsecured creditors. Moreover, even assuming this new position could be justified, the Disclosure Statement fails to disclose the proposed compensation structure for the "Ombudsman," except that his compensation will not exceed $20,000 per year. Adequate disclosure requires far more than the meager information provided in the Disclosure Statement. *See* 11 U.S.C. § 1129(a)(4).

### 5. Lack of Disclosure Regarding Estate Causes of Action.

The Debtors have disclosed, by reference to the statement of financial affairs, potential avoidance actions against various parties who received payments prior to the Petition Date. The Debtors believe that certain avoidable transfers could be recovered for the benefit of the estates, or for funding the Plan. *See* Disclosure Statement, p.36. The Debtors justifiably retain all rights with respect to these causes of action, but the Disclosure Statement falls short by failing to disclose which causes of action the Debtors will pursue, the targets of such litigation, and the expected recoveries for the benefit of creditors under the Plan.

The adequate-information standard cannot be satisfied by the Debtors' merely asserting they will seek recovery of avoidable transfers "where appropriate" in their discretion. Does this mean that insiders and other favored constituents have a "free pass," regardless of the merits of the claims against them? Do the Debtors believe they have claims other than avoidance causes of action against third parties? Do the Debtors intend to pursue non-avoidance claims against the Lender Group if the adversary proceeding is dismissed?

The Disclosure Statement does not address these issues. A reasonable investor's knowledge that she is a litigation target under a plan of reorganization undoubtedly would affect her vote on the plan. The Debtors should be required, at a minimum, to provide their analysis of potential causes of action and the identity of parties they intend to pursue. *See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 321-23 (3d Cir. 2003).

### E. Misleading and Inaccurate Factual Statements.

"Adequate information" consistent with Section 1125 precludes the inclusion of misleading information in a disclosure statement. *In re Dakota Rail, Inc.*, 104 B.R. 138, 148-149 (Bank. D. Minn. 1989). The Disclosure Statement contains several materially misleading statements regarding the Lender Group. The pervasive mischaracterizations include the narrative on page 10 of the Disclosure Statement, which suggests that the Lender Group unilaterally took adverse, even hostile, action against the Debtors.

The actual facts are set forth in the *Declaration of Thomas F. McKeever on Behalf of Wells Fargo Bank, N.A., Collateral Agent*, which has been on file with the Court since August 18, 2009, and is incorporated herein by reference. [DE #399] The true facts establish that the Lender Group did not take unilateral adverse actions against the Debtors on April 14, 2009, as the Disclosure Statement portrays. Rather, the Lender Group, in good faith, entered into a consensual restructuring agreement with the Debtors on April 14, 2009, which permitted the Debtors to draw tens of millions of additional dollars from the Bank Group before blindsiding the Lender Group with bankruptcy filings. The Debtors should not be permitted to include misleading factual allegations in the Disclosure Statement to vilify the Lender Group.

**WHEREFORE**, the Lender Group respectfully requests that the Court enter an Order:

A. Denying approval of the Disclosure Statement; and

B. Granting to the Lender Group such other relief as the Court deems just and appropriate.

DATED this 12th day of February, 2010.

**BRYAN CAVE LLP**                                **BINGHAM McCUTCHEN LLP**

By: /s/ BAS, #022721                              By: /s/ BAS, w/permission for S. Wilamowsky
    Robert J. Miller                                 Steven Wilamowsky
    Bryce A. Suzuki                                  399 Park Avenue
    Two North Central Avenue, Suite 2200             New York, New York 10022
    Phoenix, Arizona 85004-4406

                                                            -and-
Counsel for Wells Fargo Bank, N.A.,
Bank of America, N.A., and Compass Bank         **LEWIS AND ROCA LLP**
    Gerald K. Smith
    40 North Central Avenue, Suite 1900
    Phoenix, Arizona 85004

Counsel for The Prudential Insurance Company of America, Northern Life Insurance Company, Hartford Life Insurance Company, Reliastar Life Insurance Company, Pruco Life Insurance Company, Prudential Retirement Insurance and Annuity Company, and United of Omaha Life Insurance Company

| | |
|---|---|
| COPY of the foregoing served via e-mail this 12th day of February, 2010, upon: | |
| Lowell E. Rothschild, Esq.<br>Michael McGrath, Esq.<br>Scott H. Gan, Esq.<br>Brenda Moody Whinery, Esq.<br>Frederick J. Petersen, Esq.<br>MESCH, CLARK & ROTHSCHILD, P.C.<br>259 North Meyer Avenue<br>Tucson, Arizona 85701<br>lrothschild@mcrazlaw.com<br>mmcgrath@mcrazlaw.com<br>sgan@mcrazlaw.com<br>bwhinery@mcrazlaw.com<br>fpetersen@mcrazlaw.com<br>Attorneys for Debtors | James Cross, Esq.<br>OSBORN MALEDON<br>2929 N. Central Ave., 21st Floor<br>Phoenix, Arizona 85012<br>jcross@omlaw.com<br>Attorneys for Official Committee of Unsecured Creditors<br><br>Edward K. Bernatavicius<br>Office of the United States Trustee<br>230 N. First Avenue, Suite 204<br>Phoenix, Arizona 85003<br>edward.k.bernatavicius@usdoj.gov |
| Michael W. Carmel, Esq.<br>MICHAEL W. CARMEL, LTD.<br>80 E. Columbus<br>Phoenix, Arizona 85012-2334<br>michael@mcarmellaw.com<br>Attorneys for Debtors | |

  /s/ Sally Erwin

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000