MESCH, CLARK & ROTHSCHILD, P.C.
259 North Meyer Avenue
Tucson, Arizona 85701
Phone: (520) 624-8886
Fax: (520) 798-1037
Email: ecfbk@mcrazlaw.com
mmcgrath@mcrazlaw.com
bwhinery@mcrazlaw.com
fpetersen@mcrazlaw.com

AND

MICHAEL W. CARMEL, LTD.
80 E. Columbus Avenue
Phoenix, Arizona 85012-2334
Phone: (602) 264-4965
Fax: (602) 277-0144
Email: michael@mcarmellaw.com

Attorneys for Debtors

## UNITED STATES BANKRUPTCY COURT

### DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Chapter 11 Proceedings |
| BASHAS' INC.,<br>BASHAS' LEASECO INC.,<br>SPORTSMAN'S, LLC,<br><br>                              Debtors. | Case No. 2:09-bk-16050-JMM<br>            2:09-bk-16051-JMM<br>            2:09-bk-16052-JMM<br>            (Joint Administration) |
| This Filing Applies to:<br><br>☒  All Debtors<br>☐  Specified Debtors | **Hrg.:   May 28, 2010 @ 10:00 a.m.<br>        U.S. Bankruptcy Court<br>        230 N. First Ave., Ctrm #602<br>        Phoenix, AZ** |

### MOTION TO:

**(a) Authorize Debtors to Disseminate Supplemental Disclosure and Description of a Non-Adverse, Cash Out Option;**

**(b) To Approve Supplemental Disclosure and Description of Non-Adverse, CashOut Option; and,**

**(c) To Authorize Retention of Imperial Capital, LLC and Approve Engagement Letter Agreement.**

Bashas' Inc. ("Bashas"), Bashas' Leaseco Inc. ("Leaseco"), and Sportsman's, LLC ("Sportsman's") (collectively referred to as the "Debtors") seek the entry of an order of this Court authorizing Debtor to Disseminate Supplemental Disclosure and Description of a Non-Adverse Cash-Out Option; approve the Supplemental Disclosure and Description of Cash-Out Option and the Cash Out Option Election Notice; and Authorize the retention of Imperial Capital LLC and Approve Engagement Letter Agreement.

This Motion is occasioned by the Debtor's investigation of the availability of "take-out" financing as a means to achieve a consensual resolution of these reorganization cases. If successful, the financing would result in a payment in-full of the allowed claims of the Lender Group, and afford the capital to offer Unsecured Creditors **the option** of a 50% payment on the Effective Date in full satisfaction of pre-petition claims.

The Debtors are unaware of any opposition to the relief requested by the motion. This proposal to creditors provides an enhanced—non-adverse—treatment for their claims compared to the Debtors' Plan of Reorganization, already noticed and balloted. This Motion is supported by the following Memorandum of Points and Authorities.

DATED: May  26 , 2010.

MESCH, CLARK & ROTHSCHILD, P.C.
- and -
MICHAEL W. CARMEL, LTD.


By  s/Michael McGrath, #6019
            Michael McGrath
            Attorneys for Debtors

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   JURISDICTIONAL AND PROCEDRUAL BACKGROUND

1.      On July 12, 2009, Bashas' Inc., Bashas' Leaseco Inc., and Sportsman's, LLC filed their voluntary petitions under Chapter 11 of the Bankruptcy Code. Since the Petition, Bashas' has continued in possession of their properties and operation of their businesses.

2.      The Debtors are authorized to operate their business as debtors in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. These cases are jointly administered pursuant to an Order of the Court dated July 16, 2009.

3.      On January 15, 2010, the Debtors filed their Joint Plan of Reorganization and their Joint Disclosure Statement.

4.      On February 25, 2010, Debtors filed their First Amended Plan of Reorganization Jointly Proposed by Debtors and the Official Joint Committee of Unsecured Creditors.

5.      On February 25, 2010, the Court approved the Joint Disclosure Statement and set hearing to consider approval of the Joint Plan of Reorganization for April 6, 2010.

6.      On or about April 2, 2010, the Debtors' had filed a Counsel's Certification of Ballots, reflecting the balloting on the first amended Plan. The Certification reflected 14 classes voting to accept the plan, with 3 classes, the Lenders and the Parra Litigation claimants, voting to reject.

7.     The hearing to consider approval of the Plan has been continued by the Court from time to time to allow the Debtors to continue their negotiations with the Lender Group (Wells Fargo Bank, Compass Bank, Bank of America, Prudential Life Insurance Company, and certain of their subsidiaries and affiliates) for a consensual plan, and their solicitations for new financing on reasonable terms. The next status hearing on confirmation is set for May 28, 2010.

## II.     RELIEF REQUESTED

8.     Since the filing of these cases, the Debtors have made considerable progress in restructuring and improving their operating performance. However, because of the general market conditions, it has been difficult for the Debtors to access capital markets for new financing on reasonable terms. That situation has now improved and the Debtors are hopeful that they will be able to secure new, reasonable financing to exit bankruptcy in July 2010.

9.     The Debtors believe that under the contemplated terms of new exit financing, creditors in Classes 10, 11, 12 and 14 (whose treatment is described in the Plan and Disclosure Statement) could now be provided an option and election to receive a one-time cash payment on account of their allowed claims, rather than deferred payments over a five year period. The specific terms and description of the cash out option are set forth in **Exhibit A** attached hereto: *Description of Cash Out Option Available to Certain Secured and Unsecured Creditors Holding Claims Against Bashas' and its Subsidiaries.*

10.     The Debtors propose to provide the Class 10, 11, 12 and 14 creditors with the Supplemental Disclosure contained in the Description of the Cash Out Option (Exhibit A). The Debtors seek the creditors' election by sending out **Exhibit B** the *Cash Out Option Election Notice*, a form by which creditors will be able to elect the cash out option or decline the cash out option and retain the treatment as contemplated by the Plan (i.e., payment in full over approximately five years).

11.     The Debtors have been able to access the potential funding for the possible enhanced creditor treatment through the efforts and expertise of Imperial Capital LLC. Bashas' seeks the appointment of this investment banking firm pursuant to the terms set forth in **Exhibit C** the *Imperial Capital Letter Agreement*.

WHEREFORE, Debtors request an order of this Court authorizing Debtors to disseminate the Supplemental Disclosure and Description of a Non-Adverse Cash Out Option; Approve a Non-Adverse Cash Out Option Notice; and, Authorize Retention of Imperial Capital and Approve Engagement Letter Agreement, and for such further relief as is proper under the circumstances.

**DATED:** May   26  , 2010.

MESCH, CLARK & ROTHSCHILD, P.C.
- and -
MICHAEL W. CARMEL, LTD


By   s/Michael McGrath, #6019
       Michael McGrath
       Attorneys for Debtors

Copy e-mailed May <u> 26 </u>, 2010, to:

Larry Watson
Edward K Bernatavicius
Office of the United States Trustee
230 N First Ave Ste 204
Phoenix AZ 85003
[larry.watson@usdoj.gov](mailto:larry.watson@usdoj.gov)
[edward.k.bernatavicius@usdoj.gov](mailto:edward.k.bernatavicius@usdoj.gov)


<u> s/Deborah Elkins                     </u>

320565

# EXHIBIT A



## DESCRIPTION OF CASH OUT OPTION AVAILABLE
## TO CERTAIN SECURED AND UNSECURED CREDITORS
## HOLDING CLAIMS AGAINST BASHAS' AND ITS SUBSIDIARIES

### BANKRUPTCY COURT APPROVAL

*This Supplemental Disclosure and Description of the Cash Out Option being made available to certain of Bashas' secured and unsecured creditors was approved by an order of the Bankruptcy Court dated as of May 28, 2010. The Bankruptcy Court's approval of this Supplemental Disclosure and Description of the Cash Out Option does not constitute an endorsement by the Bankruptcy Court as to whether a particular creditor should elect the Cash Out Option. The decision to elect the Cash Out Option can be made only by the holder of a claim.*

### SUMMARY OF RECENT DEVELOPMENTS

On July 12, 2009, Bashas' Inc. ("Bashas'"), Bashas' Leasco Inc., ("Leasco") and Sportsman's LLC (together with Bashas' and Leasco, collectively referred to as the "Company") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. These Chapter 11 cases have been consolidated for procedural purposes only under Case No. 2:09-bk-16050-JMM, and are pending before the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court"). For purposes of this Supplemental Disclosure and Description of the Cash Out Option (the "Cash Out Option"), "we", "us" and "our" or similar terms refer to the Company.

On February 25, 2010, the Bankruptcy Court entered an order approving our Disclosure Statement relating to the "First Amended Plan of Reorganization Proposed By The Debtors and the Official Committee of Unsecured Creditors" (the "Plan") and authorized the solicitation of votes to approve the Plan. As a result of this solicitation, and except as set forth below, each impaired class of creditors voted to accept the terms of the Plan. The only impaired classes of creditors who voted to reject the Plan were: (i) those classes comprised of approximately $200 million in alleged senior claims against the Company held by Wells Fargo Credit Corporation, Bank of America, Compass Bank, Prudential Life Insurance Company, and certain of their subsidiaries and affiliates (the "Existing Senior Debt", and the holders thereof, the "Institutional Lenders"); and (ii) the class comprised solely of a contingent, disputed and unliquidated litigation claim.

With respect to the treatment of the Existing Senior Debt, the Plan provided that the Existing Senior Debt would be "rolled over" into a newly, restructured senior credit facility of

the Company, as reorganized. In addition, with respect to certain other impaired classes of claims, the Plan provided, in part, as follows:

*Class 10 Bashas' Secured Vendor Claims*. As described more fully in the Disclosure Statement and the Plan, this Class is comprised of certain vendors holding unsecured claims against Bashas', and such claims were either partially or wholly secured by advance deposits or letters of credit. Under the terms of the Plan, such creditors are entitled to setoff against the amount of the unsecured claims the amount of the advance deposits or letters of credit and any remaining claim is to be paid in full over approximately 5 years.

*Class 11 Bashas' Unsecured Vendor Claims*. As described more fully in the Disclosure Statement and the Plan, this Class is comprised of certain vendors holding unsecured claims against Bashas', and such creditors did not hold advance deposits or letters of credit. Under the terms of the Plan, such creditors are to be paid in full over approximately 5 years.

*Class 12 Bashas' Non-Vendor Unsecured Claims*. As described more fully in the Disclosure Statement and the Plan, this Class is comprised of other unsecured creditors, notably claims from creditors whose leases were rejected as part of the Chapter 11 cases. Under the terms of the Plan, such creditors are to be paid in full over approximately 5 years.

*Class 14 Leasco's Unsecured Claims*. As described more fully in the Disclosure Statement and the Plan, this Class is comprised of certain unsecured claims, including vendor claims. Under the terms of the Plan, such creditors would be paid in full over approximately 5 years.

Since filing our Chapter 11 cases, we have made considerable progress in restructuring and improving our operating performance. In addition, due to general market conditions over the past few years, our ability to access the capital markets for new financing on reasonable terms was severely limited. Over the past several months, the capital markets have improved considerably and, combined with our significant operational improvements, we believe that we may be able to now access new financing on reasonable terms.

Specifically, over the past 30 days, the Company has solicited and received several proposals for new financing to essentially "take out" the amount of the allowed claims as determined by the Bankruptcy Court represented by the Existing Secured Debt held by the Institutional Lenders. In consultation with our Creditors' Committee and the Institutional Lenders holding the Existing Senior Debt, the Company has decided to pursue up to $225 million in new, senior secured financing (the "New Exit Financing"). To facilitate the underwriting and placement of the New Exit Financing, the Company has retained a reputable investment banking firm. Whether we can close the New Exit Financing is subject to uncertainty and substantial risk. If we are able to close the New Exit Financing, however, we would expect the Company to emerge from its Chapter 11 cases in the latter part of July 2010.

Under the contemplated terms of the New Exit Financing, we believe that we will be able to provide those creditors in Classes 10, 11, 12 and 14 (whose treatment is described above and in the Plan and Disclosure Statement) with the option and election (described below and referred to as the "Cash Out Option") to receive a one-time cash payment on account of their allowed claims, rather than deferred payments over a 5 year period.

## DESCRIPTION OF THE CASH OUT OPTION

The Cash Out Option described below is at the sole discretion of each holder of a claim in Classes 10, 11, 12 and 14. If a particular creditor does not elect the Cash Out Option and the Plan is confirmed and consummated, such holder will receive payment in full based on deferred payments over an approximate 5 year period, as provided for in the Plan. Set forth below is a summary of the Cash Out Option.

***Class 10: Bashas' Vendor Secured Claims.*** Subject to closing the contemplated New Exit Financing and the confirmation and consummation of the Plan (as may be amended to implement the New Exit Financing), each creditor holding an allowed claim in Class 10 may elect to receive, in full satisfaction of all allowed pre-petition claims against the Company, the following:

- **Setoff.** Each holder electing the Cash Out Option will setoff against the amount of its allowed claim, the amount of any advance deposit or letter of credit, thereby reducing the allowed amount of its Class 10 claim (the "Remaining Claim Amount").

- **Treatment of Remaining Claim Amount.** Each holder electing the Cash Out Option will receive upon the latter of: (i) the consummation of the Plan (anticipated to be in late July 2010); and (ii) the date on which such claim becomes an allowed claim, a cash payment equal to **fifty percent (50%)** of the Remaining Claim Amount.

  For illustrations purposes only, a creditor holding an allowed claim in Class 10 in the amount of $100, and an advance deposit in the amount of $40, would receive, in full satisfaction of the allowed claim against Bashas' the sum of: (A) $40 from exercising its set off rights with respect to the advance deposit; and (B) 50% of the remaining claim amount of $60 (*i.e.*, $30). Hence, under this illustration, the holder of an allowed claim in the amount of $100 electing the Cash Out Option would receive a total distribution of $70 on account of its $100 claim.

***Classes 11, 12 and 14: Unsecured Claims against Bashas' and Leasco.*** Subject to closing the contemplated New Exit Financing and the confirmation and consummation of the Plan (as may be amended to implement the New Exit Financing), each creditor holding an allowed unsecured claim in Classes 11, 12 and 14 electing the Cash Out Option would receive a one-time cash payment in full satisfaction of such pre-petition unsecured claim in the amount of fifty percent (50%) of such allowed claim. Creditors electing the Cash Out Option would receive

the cash payment upon the latter of (i) consummation of the Plan (anticipated to be in late July 2010), and (ii) the date that such claim becomes an allowed claim.

## FREQUENTLY ASKED QUESTIONS

### *What if I have an allowed Claim under Section 503(b)(9) of the Bankruptcy Code?*

Under Section 503(b)(9) of the Bankruptcy Code, creditors who delivered goods to the Company that were actually received by the Company within 20 days prior to the filing of the Chapter 11 cases, are given administrative priority over general unsecured claims and such amounts must be paid in full. Any creditor holding an allowed claim for good actually received by the Company within 20 days prior to the filing of the Chapter 11 cases will be paid in full in cash under the Plan and the Cash Out Option is not applicable.

### *If I have a disputed claim in Classes 10, 11, 12 or 14, can I still elect the Cash Out Option?*

Yes, holders of disputed claims in these classes may elect the Cash Out Option, but actual cash payments will only occur once (and only if) such claim becomes an allowed claim against the Company.

### *What happens if I elect the Cash Out Option and the New Exit Financing Does Not Occur?*

The Company's ability to provide the Cash Out Option is conditioned upon the closing of the New Exit Financing, and the confirmation and consummation of the Plan. If the New Exit Financing fails to close for whatever reason, your election of the Cash Out Option is null and void and you would receive payment in full of your allowed claim over the approximate 5 year period contemplated by the current Plan (assuming such Plan is ultimately confirmed and consummated). To facilitate our ability to close the New Exit Financing, we need to have ascertained as quickly as possible the number of creditors and the amount of their claims electing the Cash Out Option.

### *How Do I Elect The Cash Out Option?*

Attached is a color coded, Discounted Cash Payment Election Notice (the "Election Notice") for Class 10 and Classes 11, 12 and 14. You must prepare the Election Notice by providing the requested information and executing the Notice and returning the Election Notice **NO LATER THAN 5:00 P.M., PREVAILING ARIZONA TIME ON JUNE ---, 2010 (the "Election Deadline"). THE ELECTION NOTICE MUST BE RECEIVED, BY FACSIMILE, MAIL OR E-MAIL TO THE FOLLOWING:**

**MESCH, CLARK & ROTHSCHILD, P.C.**
**259 North Meyer Avenue**
**Tucson, Arizona 85701**
**Phone: 520.624.8886**
**Fax: 520.798.1037**
**Email: mmcgrath@mcrazlaw.com**
**fpetersen@mcrazlaw.com**

*If I have questions or need additional information concerning the Cash Out Option or the preparation of the Election Notice, who do I contact?*

**MESCH, CLARK & ROTHSCHILD, P.C.**
**259 North Meyer Avenue**
**Tucson, Arizona 85701**
**Phone:  520.624.8886**
**Fax:  520.798.1037**
**Email:  mmcgrath@mcrazlaw.com**
            **fpetersen@mcrazlaw.com**

*What if I fail to elect the Cash Out Option by returning the Election Notice by the Election Deadline of June _____, 2010?*

You will not be entitled to receive the Cash Out Option and your claim will be paid in full over an approximate 5 year period under the Plan (assuming confirmation and consummation thereof), unless the Company, in its sole discretion, elects to accept late received Election Notices.

Dated:  May 28, 2010

BASHAS' INC.

By:_____

Its:_____

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| In re | In Proceedings Under Chapter 11 |
| BASHAS' INC.,<br>BASHAS' LEASECO, INC.<br>SPORTSMAN'S, LLC | Case No. 09-bk-16050-JMM<br>09-bk-16051-JMM<br>09-bk-16052-JMM |
| Debtors. | (Jointly Administered) |

## CASH OUT OPTION ELECTION NOTICE
### CLASS 10: BASHAS' SECURED VENDOR CLAIMS

As the holder of a Claim[1] in Class 10 of the above-captioned debtors (the "**Debtors**"), please use this Election Notice to elect the Debtors' Cash Out Option, the terms of which are set forth in the enclosed Supplemental Disclosure and Description of the Cash Out Option (the "**Supplemental Disclosure**").

**Please review the Supplemental Disclosure and this Election Notice carefully before you decide to elect the Cash Out Option..**

---

**HOW TO ELECT THE CASH OUT OPTION**

1. REVIEW INSTRUCTIONS ON PAGE 2 BEFORE COMPLETING THIS ELECTION NOTICE.
2. REVIEW AND COMPLETE ITEMS 1 & 2.
3. SIGN THE ELECTION NOTICE
4. **RETURN THE ELECTION NOTICE AS DIRECTED BELOW BY JUNE [    ], 2010**.

---

**Item 1. Vote to Accept the Cash Out Option (check only one box):**

☐      ACCEPT the Cash Out Option.

☐      DECLINE the Cash Out Option and retain Claim treatment as contemplated by the Plan (*i.e.*, payment in full over approximately 5 years).

**Item 2. Certification.** By returning this Election Notice, the holder certifies that it: (i) has full power and authority to vote to accept or decline the Cash Out Option; and (ii) has previously received copies of the Disclosure Statement and the Plan.

Name of Holder: _____
(Print or Type)

Federal Tax I.D. Number: _____

Signature: _____

Title: _____

Street Address: _____

City, State, Zip Code: _____

Telephone Number: _____

Date Completed: _____

---

[1]      As defined in the Plan.

# INSTRUCTIONS FOR COMPLETING CASH OUT OPTION ELECTION NOTICE

**THE DEADLINE TO ACCEPT THE CASH OUT OPTION IS 5:00 p.m., prevailing Arizona time, on June [ ], 2010 (the "Election Deadline")**

If MESCH, CLARK & ROTHSCHILD, P.C. does not timely receive your Election Notice by the Election Deadline, you may not be eligible to receive the Cash Out Option Payment.

Election Notices must be mailed, faxed, or emailed so as to be actually received on or before the Election Deadline to:

MESCH, CLARK & ROTHSCHILD, P.C.
259 North Meyer Avenue
Tucson, Arizona 85701
Phone: 520.624.8886
Fax: 520.798.1037
Email: mmcgrath@mcrazlaw.com; fpetersen@mcrazlaw.com

Questions regarding this Election Notice or the Cash Out Option should be directed to:

MESCH, CLARK & ROTHSCHILD, P.C.
259 North Meyer Avenue
Tucson, Arizona 85701
Phone: 520.624.8886
Fax: 520.798.1037
Email: mmcgrath@mcrazlaw.com; fpetersen@mcrazlaw.com

1. Complete Items 1 & 2. If you receive another Election Notice for a class of Claims that is different from the class in which this Claim has been classified, you may indicate that this Election Notice is different from the Election indicated on that Election Notice.

2. Review the certifications contained in Item 2.

3. **Sign the Election Notice.**

4. Return the Election Notice by mail, fax, or email to:

   MESCH, CLARK & ROTHSCHILD, P.C.
   259 North Meyer Avenue
   Tucson, Arizona 85701
   Phone: 520.624.8886
   Fax: 520.798.1037
   Email: mmcgrath@mcrazlaw.com; fpetersen@mcrazlaw.com

5. Once you have submitted your Election Notice, your election to accept or decline the Cash Out Option may be changed or withdrawn only with the consent of the Debtors or permission of the Bankruptcy Court for cause shown.

6. Election Notices that are signed and returned, but not expressly indicating accepting or declining the Cash Out Option will, at the option of the Debtors, be treated and designated either accepting or declining the Cash Out Option.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| In re | In Proceedings Under Chapter 11 |
| BASHAS' INC., | Case No. 09-bk-16050-JMM |
| BASHAS' LEASECO, INC. | 09-bk-16051-JMM |
| SPORTSMAN'S, LLC | 09-bk-16052-JMM |
| Debtors. | (Jointly Administered) |

## CASH OUT OPTION ELECTION NOTICE
### CLASS 11: BASHAS' UNSECURED VENDOR CLAIMS;
### CLASS 12: BASHAS' NON-VENDOR UNSECURED CLAIMS; AND
### CLASS 14: LEASECO'S UNSECURED CLAIMS

As the holder of a Claim[1] in Class 11, 12, or 14 of the above-captioned debtors (the "**Debtors**"), please use this Election Notice to elect the Debtors' Cash Out Option, the terms of which are set forth in the enclosed Supplemental Disclosure and Description of the Cash Out Option (the "**Supplemental Disclosure**").

**Please review the Supplemental Disclosure and this Election Notice carefully before you decide to elect the Cash Out Option..**

---

**HOW TO ELECT THE CASH OUT OPTION**

1. REVIEW INSTRUCTIONS ON PAGE 2 BEFORE COMPLETING THIS ELECTION NOTICE.
2. REVIEW AND COMPLETE ITEMS 1 & 2.
3. SIGN THE ELECTION NOTICE
4. **RETURN THE ELECTION NOTICE AS DIRECTED BELOW BY JUNE [ ], 2010.**

---

**Item 1. Vote to Accept the Cash Out Option (check only one box):**

☐ ACCEPT the Cash Out Option.

☐ DECLINE the Cash Out Option and retain Claim treatment as contemplated by the Plan (*i.e.*, payment in full over approximately 5 years).

**Item 2. Certification.** By returning this Election Notice, the holder certifies that it: (i) has full power and authority to vote to accept or decline the Cash Out Option; and (ii) has previously received copies of the Disclosure Statement and the Plan.

Name of Holder: _____
(Print or Type)

Federal Tax I.D. Number: _____

Signature: _____

Title: _____

Street Address: _____

City, State, Zip Code: _____

Telephone Number: _____

Date Completed: _____

---

[1] As defined in the Plan.

PHOENIX/467436.1

# INSTRUCTIONS FOR COMPLETING CASH OUT OPTION ELECTION NOTICE

**THE DEADLINE TO ACCEPT THE CASH OUT OPTION IS 5:00 p.m., prevailing Arizona time, on June [ ], 2010 (the "Election Deadline")**

If MESCH, CLARK & ROTHSCHILD, P.C. does not timely receive your Election Notice by the Election Deadline, you may not be eligible to receive the Cash Out Option Payment.

Election Notices must be mailed, faxed, or emailed so as to be actually received on or before the Election Deadline to:

**MESCH, CLARK & ROTHSCHILD, P.C.**
**259 North Meyer Avenue**
**Tucson, Arizona 85701**
**Phone: 520.624.8886**
**Fax: 520.798.1037**
**Email:  mmcgrath@mcrazlaw.com; fpetersen@mcrazlaw.com**

Questions regarding this Election Notice or the Cash Out Option should be directed to:

**MESCH, CLARK & ROTHSCHILD, P.C.**
**259 North Meyer Avenue**
**Tucson, Arizona 85701**
**Phone: 520.624.8886**
**Fax: 520.798.1037**
**Email:  mmcgrath@mcrazlaw.com; fpetersen@mcrazlaw.com**

1.  Complete Items 1 & 2.  If you receive another Election Notice for a class of Claims that is different from the class in which this Claim has been classified, you may indicate that this Election Notice is different from the Election indicated on that Election Notice.

2.  Review the certifications contained in Item 2.

3.  **Sign the Election Notice.**

4.  Return the Election Notice by mail, fax, or email to:

> **MESCH, CLARK & ROTHSCHILD, P.C.**
> **259 North Meyer Avenue**
> **Tucson, Arizona 85701**
> **Phone:  520.624.8886**
> **Fax:  520.798.1037**
> **Email:  mmcgrath@mcrazlaw.com; fpetersen@mcrazlaw.com**

5.  Once you have submitted your Election Notice, your election to accept or decline the Cash Out Option may be changed or withdrawn only with the consent of the Debtors or permission of the Bankruptcy Court for cause shown.

6.  Election Notices that are signed and returned, but not expressly indicating accepting or declining the Cash Out Option will, at the option of the Debtors, be treated and designated either accepting or declining the Cash Out Option.

# EXHIBIT C

May 17, 2010

BASHAS' INC.
22402 South Basha Road
Chandler, AZ 85248
Attention:   Edward N. Basha III
              Interim Chief Executive Officer

Dear Edward:

Pursuant to this letter agreement (this "*Agreement*") Bashas' Inc. (together with its subsidiaries and affiliates, the "*Company*") hereby engages Imperial Capital, LLC ("*Imperial Capital*") as the exclusive financial advisor to the Company in connection with the private placement of up to $210,000,000, or such other amount as may be agreed in writing between the parties, of debt securities (the "*Financing*") on a best efforts basis on terms satisfactory to the Company and in compliance with Section 4(2) of the Securities Act of 1933, as amended (the "**Securities Act**") and all other applicable federal and state securities laws.

Section 1.   Services to be Rendered.   As advisor to the Company, Imperial Capital may perform the following services as may be requested by the Company: (i) assisting the Company in developing, evaluating, structuring and negotiating the terms and conditions of a potential Financing; (ii) assisting the Company in the preparation of solicitation materials with respect to the Financing, any securities to be issued in connection with the Financing and the Company (such solicitation materials, including, without limitation, all exhibits, amendments and supplements thereto, the "*Offering Materials*"); (iii) analysis of the Company's business, operations, properties, financial condition, competition, forecast, prospects and management; (iv) identification of and contacting selected qualified purchasers ("*Purchasers*") to participate in the Financing and furnishing them, on behalf of the Company, with copies of Offering Materials; and (v) providing such other financial advisory services with respect to the Company's financial issues as may from time to time be agreed upon between the Company and Imperial Capital.   Nothing contained herein shall constitute a commitment on the part of Imperial Capital to purchase any of the securities comprising or issued in connection with the Financing.

Section 2.   Compensation.   In consideration for the services to be provided under this Agreement, Imperial Capital shall be paid a cash fee (the "*Cash Fee*"), payable out of the proceeds of the Financing, by wire directly from the Financing source at closing equal to 2.5% of the face amount of any debt sold or arranged as part of the Financing.

If during the term of this Agreement, the scope of the engagement changes, for example, a financing engagement becomes a mergers and acquisitions engagement, if the compensation for the new engagement has not been agreed upon prior to closing, then the Company agrees to pay Imperial Capital the reasonable and customary fee for the type of engagement involved based upon market conditions and market rates at the time of the engagement.

In addition, without regard to whether the Financing is consummated or this Agreement expires or is terminated, all fees, disbursements and out-of-pocket expenses (the "*Expenses*") incurred by Imperial Capital in connection with the services to be rendered hereunder (including, without limitation, reasonable attorneys' fees, travel and lodging expenses, word processing charges, messenger services, duplicating services, facsimile expenses and other customary expenditures) shall be reimbursed to Imperial Capital, or paid on behalf of Imperial Capital, promptly as billed.   Imperial Capital shall provide to the Company reasonable documentation regarding any such reimbursable expenses, and Imperial Capital acknowledges and agrees that the Company may provide copies of such documentation to counsel for the holders of the

Company's existing senior indebtedness and the Office of the United States Trustee overseeing the Company's current reorganization proceedings. Imperial Capital shall be paid a cash deposit of $50,000 (the "*Deposit*") against Expenses upon the execution of this Agreement. Any unused amounts of the Deposit will be returned to the Company upon demand. Further, the Company shall be responsible for all other Expenses associated with the Financing including, without limitation, its own accounting and attorneys' fees, travel and lodging expenses, word processing charges, messenger services, duplicating services, facsimile expenses, printing costs and other expenditures. The Company acknowledges that is customary for the Company to reimburse the potential Purchasers for all out-of-pocket expenses (including, without limitation, reasonable attorneys' fees) associated with pursuing and completing the Financing.

As further consideration, the Company agrees to the indemnification and other obligations set forth in Schedule I attached hereto, which such schedule is an integral part hereof and incorporated herein by reference.

All fees and expenses payable to Imperial Capital pursuant to this Section 2 shall be payable in cash via wire transfer to an account designated by Imperial Capital. No fee paid or payable to Imperial Capital or any of its affiliates shall be credited against any other fee paid or payable to Imperial Capital or any of its affiliates.

Section 3.  Term and Scope of Engagement.  The services and compensation arrangements set forth herein do not encompass other investment banking services such as the exclusive sale or disposition of assets, the raising of capital other than the Financing, financial advisory services, fairness opinions, or any other specific services not set forth in Section 1 hereof. This Agreement may be terminated by either the Company or Imperial Capital upon thirty (30) days prior written notice, or by the Company immediately if it elects to pursue the ABL transaction as set forth below. Upon any termination or expiration of this Agreement, Imperial Capital shall be entitled to receive prompt payment of all unpaid fees and expenses accrued pursuant to Section 2 hereof up to and including the date of such termination or expiration. Sections 2, 3, 5, 6, 9, 10 and 11 of this Agreement and the indemnity and other provisions contained in Schedule I shall remain operative and in full force and effect regardless of any termination or expiration of this Agreement.

Notwithstanding the foregoing paragraph and except as provided below, if at any time prior to 24 months after the termination or expiration of this Agreement for any reason, the Company enters into a financing transaction or transactions similar to the Financing contemplated by this Agreement and the Company completes any such financing transaction or transactions, or any understanding, statement or letter of intent or agreement, whether binding or non-binding, and whether explicit or implicit, is entered into during such period which subsequently results in a completed Financing transaction (whether or not such completed transaction occurs within such 24 month period), Imperial Capital shall, in each case, in addition to any expense reimbursement due, be entitled to payment in full of the compensation described in Section 2 of this Agreement with respect to such transaction or transactions; provided, however, that no such compensation shall be payable to Imperial Capital with respect to any such Financing transaction the majority of which (in principal amount) consists of "rollover" financing provided by one or more of the Company's existing lenders. Notwithstanding the foregoing, Imperial Capital acknowledges that the Company may also be pursuing an asset-based credit facility arranged by JP Morgan Securities, Inc. (the "ABL"). If the Company, in its sole discretion, elects to proceed with the ABL and provides written notice of such election to Imperial Capital on or before June 7, 2010, the Company shall have the right to terminate this Agreement and all of its obligations hereunder (including without limitation the obligations set forth in the first sentence of this paragraph) shall cease except for (i) the obligation of the Company to reimburse Imperial Capital for Expenses in accordance with Section 2 hereof, and (ii) the indemnity obligations set forth in Schedule I hereto.

Section 4.  Cooperation.  To the extent possible, the Company shall: (i) furnish Imperial Capital with all current and historical financial and other information and data regarding the business and financial condition of the Company ("*Information*") as Imperial Capital reasonably believes appropriate in connection with its services hereunder; (ii) provide Imperial Capital with access to the officers, directors, employees and professional advisors of the Company as Imperial Capital reasonably believes appropriate in connection with its services hereunder; and (iii) with the assistance of Imperial Capital, be responsible for preparation of the Offering Materials. The Company agrees that it and its counsel will be solely responsible for ensuring that any Offering Materials comply in all respects with applicable law. To the extent permitted by applicable law, the Company authorizes Imperial Capital to transmit the Offering Materials to qualified prospective Purchasers of the proposed Financing. The Company agrees that neither the Information nor Offering Materials will contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein not misleading in light of the

circumstances under which they were made. The Company will promptly notify Imperial Capital if it learns of any material inaccuracy or misstatement in, or material omission from, any Information or Offering Materials theretofore delivered to Imperial Capital. The Company will also cause to be furnished to Imperial Capital at any closing of the Financing, copies of such agreements, opinions, certificates and other documents delivered at the closing as Imperial Capital may reasonably request.

The Company recognizes and confirms that Imperial Capital, in connection with performing its services hereunder: (i) will be relying without investigation upon information that is available from public sources and upon the Information and Offering Materials supplied to it by or on behalf of the Company; (ii) shall not in any respect be responsible for the accuracy or completeness of such public information, Information or Offering Materials or have any obligation to verify the same; (iii) shall not conduct any appraisal of any assets of the Company; and (iv) may require that any Offering Materials contain appropriate disclaimers consistent with the foregoing.

Section 5. Confidentiality. The Company agrees that any reference to Imperial Capital in any release, communication, or other material is subject to Imperial Capital's prior written consent, which may be given or withheld in Imperial Capital's sole discretion. Any advice, written or oral, provided by Imperial Capital pursuant to this Agreement shall be treated by the Company as confidential, shall be solely for the information and assistance of the Company in connection with its consideration of the matters set forth in Section 1 hereof and shall not be used, circulated, quoted or otherwise referred to for any other purpose, nor shall it be filed with, included in or referred to, in whole or in part, in any registration statement, proxy statement, offering materials or other communication, whether written or oral, prepared, issued or transmitted by the Company or any of their affiliates, directors, officers, employees, agents or representatives, without, in each instance, Imperial Capital's prior written consent, which may be given or withheld in Imperial Capital's sole discretion; *provided, however*, that the foregoing shall not apply to any information which becomes publicly available other than as a result of the breach by the Company of the undertakings hereunder, or that which the Company is required to disclose by judicial or administrative process in connection with any action, suit, proceeding or claim.

Section 6. Conflicts. The Company acknowledges that Imperial Capital and its affiliates may have and may continue to have investment banking and other relationships with parties other than the Company pursuant to which Imperial Capital may acquire information of interest to the Company. Imperial Capital shall have no obligation to disclose such information to the Company, or to use such information in connection with the matters set forth in Section 1 hereof. Notwithstanding the Company's obligation to pay the fees and expenses of Imperial Capital hereunder, to indemnify Imperial Capital and to provide Imperial Capital with Information, the Company recognizes that Imperial Capital is being engaged hereunder to provide the services described above only to the Company and is not acting as an agent or fiduciary of, and shall have no duties or liability to, the equity holders of the Company or any third party in connection with its engagement hereunder, all of which are hereby expressly waived. No one other than the Company is authorized to rely upon the engagement of Imperial Capital hereunder or any statements, advice, opinions or conduct by Imperial Capital.

The Company acknowledges that Imperial Capital or its affiliates may, from time to time, quote a market in or make purchases or sales for their own accounts or the accounts of its brokerage customers in debt or equity securities of or claims against the Company and Imperial Capital's research department may express views or opinions with respect thereto. Imperial Capital has, and agrees to maintain, information barriers between Imperial Capital's corporate finance department and its sales and trading department and research department, pursuant to which Imperial Capital's corporate finance employees are prohibited from disclosing confidential information to Imperial Capital's sales and trading or research employees.

Section 7. Public Announcements. Imperial Capital shall have the right to place announcements and advertisements in financial and other newspapers and journals, at its own expense, describing its services in connection with the Financing and other services rendered pursuant to this Agreement.

Section 8. Exclusivity. Except for the engagement of JP Morgan Securities, Inc. in connection with the potential ABL transaction as set forth above, the Company agrees that no other financial advisor is or will be authorized by it during the term of this Agreement to perform the same services on its behalf of the type which Imperial Capital is authorized to perform hereunder. No fee payable to any other financial advisor either by the Company or any other entity shall reduce or otherwise affect the fees payable hereunder to Imperial Capital.

Section 9. Entire Agreement; Severability; Amendments; Assignments. This Agreement constitutes the entire agreement among the parties hereto related to the subject matter hereof and supersedes all prior agreements or understandings related to the subject matter hereof. If any provision of this Agreement is determined to be invalid, unlawful or unenforceable in any respect, such determination shall not affect such provision in any other respect or any other provision of this Agreement, which shall remain in full force and effect. This Agreement may not be amended or otherwise modified or waived except by an instrument in writing duly executed by both Imperial Capital and the Company. No waiver by either party of any provision hereof shall be taken or held to be a waiver of any subsequent breach thereof. This Agreement may not be assigned by either party without the prior written consent of the other party. This Agreement shall be binding upon and inure to the benefit of the Company, Imperial Capital, each Indemnified Person (as defined in Schedule I hereto) and their respective permitted successors and assigns, and no other person or persons shall have the right to enforce the provisions hereof.

Section 10. Governing Law; Forum. This Agreement shall be construed, interpreted, governed and applied in all respects in accordance with the internal laws of the State of New York, without giving effect to principles of conflicts of laws. Except for Indemnification claims under schedule 1 any controversy, claim or dispute relating to this Agreement shall be resolved by binding arbitration in accordance with the rules of the American Arbitration Association pursuant to arbitration conducted in New York County, New York. Judgment upon such arbitration may be entered in any court having jurisdiction thereof. With respect to claims for Indemnification under schedule I the parties hereby consent to the jurisdiction of any State or Federal Court located within the New York County, State of New York. The parties further acknowledge that they waive any right they have or may have to a trial by jury with regard to the claims of Indemnification provided under Schedule I. If any litigation or arbitration shall ensue among the parties in connection with this Agreement or arising out of Imperial Capital's engagement hereunder, the prevailing party shall be entitled to recover from the non-prevailing party or parties its reasonable attorneys' fees and other costs and expenses in connection therewith.

Section 11. Bankruptcy Court Approval. The Company shall promptly seek approval of this Agreement by the United States Bankruptcy Court overseeing the Company's current Chapter 11 reorganization proceedings, and all pleadings and orders relating thereto shall be in form and substance reasonably acceptable to the Company and Imperial Capital.

Section 12. Counterparts. This Agreement may be executed in one or more counterparts (including by facsimile), each of which shall constitute an original and all of which, when taken together, shall constitute one and the same instrument.

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Imperial Capital the enclosed original copy of this Agreement.

Very truly yours,

**IMPERIAL CAPITAL, LLC**

By: _____
      Name: Chris Shepard
      Title: Managing Director

Accepted and agreed as of the date first above written:

**BASHAS' INC.**

By: _____
      Name: Edward N. Basha III
      Title: Interim Chief Executive Officer

### Schedule I

This Schedule I is a part of and is incorporated into that certain letter agreement (the "*Agreement*") dated May __, 2010 by and between Bashas' Inc. (together with its subsidiaries and affiliates, the "*Company*") and Imperial Capital, LLC ("*Imperial Capital*").

Because Imperial Capital will be acting on behalf of the Company in connection with the services contemplated by the Agreement, and as part of the consideration for the agreement of Imperial Capital to furnish its services pursuant to the Agreement, the Company (the "*Indemnifying Party*") agrees, jointly and severally, to indemnify and hold harmless Imperial Capital and its affiliates, and their respective officers, directors, partners, members, shareholders, employees, representatives, consultants, advisors and agents and each person, if any, who controls Imperial Capital or any of its affiliates within the meaning of the Securities Act of 1933, as amended, (Imperial Capital and each such other person being referred to as an "*Indemnified Person*"), to the full extent lawful, from and against all claims, liabilities, losses, damages and expenses, or actions in respect thereof, as incurred, based upon, related to, arising out of, or in connection with (i) actions taken or omitted to be taken by the Company and their affiliates, officers, directors, counsel, employees or agents, (ii) actions taken or omitted to be taken by any Indemnified Person pursuant to the terms of, or in connection with, the services rendered pursuant to the Agreement or in connection with the Financing or proposed transaction contemplated thereby or any Indemnified Person's role in connection therewith, and (iii) any untrue statement or alleged untrue statement of a material fact contained in any of the Information or Offering Materials (each as defined in the Agreement) or omission or alleged omission to state a material fact required to be stated therein to make the statements therein not misleading, and shall reimburse each Indemnified Person promptly upon demand for any legal or other expenses (including, without limitation, fees and expenses of counsel) reasonably incurred by that Indemnified Person in connection with investigating, preparing to defend, defending against, or appearing as a third party witness, in connection with any such claims, liabilities, losses, damages, expenses or actions; *provided, however*, that the Indemnifying Party shall not be responsible for any claims, liabilities, losses, damages, expenses or actions of any Indemnified Person to the extent, and only to the extent, that it is determined in a final judgment (not subject to further appeal) by a court of competent jurisdiction that such claims, liabilities, losses, damages, expenses or actions resulted directly from the fraud, willful misconduct or gross negligence of the Indemnified Person. No Indemnified Person shall have any liability to the Company, or any of their respective affiliates, officers, directors, partners, members, shareholders, employees, representatives, consultants, advisors and agents in connection with the services rendered pursuant to the Agreement except to the extent, and only to the extent, that it is determined in a final judgment (not subject to further appeal) by a court of competent jurisdiction that such claims, liabilities, losses, damages, expenses or actions resulted directly from the fraud, willful misconduct or gross negligence of the Indemnified Person.

Promptly upon receipt by an Indemnified Person of notice of any claim or the commencement of any action, if an indemnification claim in respect thereof is to be made against the Indemnifying Party, the Indemnified Person shall notify the Indemnifying Party in writing of the claim or commencement of such action; *provided, however*, that the failure to so notify shall not relieve the Indemnifying Party from any liability which it may have pursuant to this Schedule I except to the extent, and only to the extent, that it has been materially prejudiced by such failure to so notify; and, *provided, further*, that the failure to so notify shall not relieve the Indemnifying Party from any liability it may have to an Indemnified Person otherwise than pursuant to this Schedule I. If any such claim or action shall be brought against an Indemnified Person, the Indemnifying Party shall be entitled to participate therein and to assume the defense thereof at its expense with counsel reasonably satisfactory to the Indemnified Person. After notice from the Indemnifying Party to the Indemnified Person of its election to assume the defense of such claim or action, the Indemnifying Party shall not be liable to the Indemnified Person under this Schedule 1 for any legal or other expenses subsequently incurred by the Indemnified Person in connection with the defense thereof other than reasonable costs of investigation; *provided, however*, that any Indemnified Person shall have the right to employ separate counsel in any such action and to participate in the defense thereof; and, *provided, further*, that Indemnifying Party shall continue to be liable for the legal or other expenses incurred by the Indemnified Person in connection with the defense of such action if (i) the employment of such separate counsel has been specifically authorized by the Indemnifying Party in writing, (ii) such Indemnified Person shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or in addition to those available to the Indemnifying Party and in the reasonable judgment of such counsel it is advisable for the Indemnified Person to employ separate counsel (in which case the Indemnifying Party shall not have the right to assume the defense of such action on behalf of the Indemnified Person), (iii) the use of counsel chosen by the Indemnifying Party to represent the Indemnified Person would, in the reasonable judgment of the Indemnified Person, present

such counsel with a conflict of interest, or (iv) the Indemnifying Party has failed to assume the defense of such action and employ counsel reasonably satisfactory to the Indemnified Person, it being understood, however, that the Indemnifying Party shall not, in connection with any one such action or separate but substantially similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys at any time for all such Indemnified Persons. The Indemnifying Party shall not settle or compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action or claim in which any Indemnified Person is or could be a party and as to which indemnification or contribution has or could have been sought by such Indemnified Person pursuant to this Schedule I, unless such Indemnified Person has given its prior written consent to the settlement, compromise, consent or termination or such settlement, compromise, consent or termination includes an express complete and unconditional release of such Indemnified Person.

In order to provide for just and equitable contribution, if any claim for indemnification with respect to claims, liabilities, losses, damages, expenses or actions in respect thereof covered by this Schedule I is found to be unenforceable in a final judgment (not subject to further appeal) by a court of competent jurisdiction or is otherwise unavailable or insufficient to hold harmless an Indemnified Person (except directly due to the fraud, willful misconduct or gross negligence of the Indemnified Person), then the Indemnifying Party shall, in lieu of indemnifying such Indemnified Person, contribute to the amount paid or payable by such Indemnified Person as a result of such claims, liabilities, losses, damages, expenses or actions in respect thereof, in such proportion as shall be appropriate to reflect the relative benefits received and relative fault of the Indemnifying Party on the one hand and the Indemnified Person on the other, as well as any other relevant equitable considerations. The relative fault shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Indemnifying Party or by the Indemnified Person and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Indemnifying Party agrees that it would not be just and equitable if contributions pursuant to this Schedule I were to be determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to herein. No person found liable for a fraudulent misrepresentation or omission shall be entitled to contribution from any person who is not also found liable for such fraudulent misrepresentation or omission. Notwithstanding the foregoing, the aggregate contribution of all Indemnified Persons with respect to such claims, liabilities, losses, damages, expenses or actions in respect thereof shall not exceed the amount of fees actually received by Imperial Capital for its services pursuant to the Agreement.

The foregoing indemnity, contribution and expense reimbursement provisions are not exclusive and shall be in addition to any liability which the Indemnifying Party might otherwise have and shall not limit any rights or remedies which may otherwise be available at law or in equity to the Indemnified Persons. These indemnification provisions shall (i) remain operative and in full force and effect regardless of any termination or expiration of the Agreement; (ii) inure to the benefit of any successors, assigns, heirs or personal representative of any Indemnified Person; (iii) shall remain operative and in full force and effect regardless of any investigation made by or on behalf of any Indemnified Person, and (iv) shall be binding on any successor or assign of the Indemnifying Party and each of its successors or assigns.

Section 9. <u>Entire Agreement; Severability; Amendments; Assignments.</u> This Agreement constitutes the entire agreement among the parties hereto related to the subject matter hereof and supersedes all prior agreements or understandings related to the subject matter hereof. If any provision of this Agreement is determined to be invalid, unlawful or unenforceable in any respect, such determination shall not affect such provision in any other respect or any other provision of this Agreement, which shall remain in full force and effect. This Agreement may not be amended or otherwise modified or waived except by an instrument in writing duly executed by both Imperial Capital and the Company. No waiver by either party of any provision hereof shall be taken or held to be a waiver of any subsequent breach thereof. This Agreement may not be assigned by either party without the prior written consent of the other party. This Agreement shall be binding upon and inure to the benefit of the Company, Imperial Capital, each Indemnified Person (as defined in Schedule I hereto) and their respective permitted successors and assigns, and no other person or persons shall have the right to enforce the provisions hereof.

Section 10. <u>Governing Law; Forum.</u> This Agreement shall be construed, interpreted, governed and applied in all respects in accordance with the internal laws of the State of New York, without giving effect to principles of conflicts of laws. Except for Indemnification claims under schedule I any controversy, claim or dispute relating to this Agreement shall be resolved by binding arbitration in accordance with the rules of the American Arbitration Association pursuant to arbitration conducted in New York County, New York. Judgment upon such arbitration may be entered in any court having jurisdiction thereof. With respect to claims for Indemnification under schedule I the parties hereby consent to the jurisdiction of any State or Federal Court located within the New York County, State of New York. The parties further acknowledge that they waive any right they have or may have to a trial by jury with regard to the claims of Indemnification provided under Schedule I. If any litigation or arbitration shall ensue among the parties in connection with this Agreement or arising out of Imperial Capital's engagement hereunder, the prevailing party shall be entitled to recover from the non-prevailing party or parties its reasonable attorneys' fees and other costs and expenses in connection therewith.

Section 11. <u>Bankruptcy Court Approval.</u> The Company shall promptly seek approval of this Agreement by the United States Bankruptcy Court overseeing the Company's current Chapter 11 reorganization proceedings, and all pleadings and orders relating thereto shall be in form and substance reasonably acceptable to the Company and Imperial Capital.

Section 12. <u>Counterparts.</u> This Agreement may be executed in one or more counterparts (including by facsimile), each of which shall constitute an original and all of which, when taken together, shall constitute one and the same instrument.

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Imperial Capital the enclosed original copy of this Agreement.

Very truly yours,

**IMPERIAL CAPITAL, LLC**

By: _____
Name: Chris Shepard
Title: Managing Director

Accepted and agreed as of the date first above written:

**BASHAS' INC.**

By _____
Name: Edward N. Basha III
Title: Interim Chief Executive Officer