**SIGNED.**

**Dated: August 13, 2010**



_____
**JAMES M. MARLAR**
**Chief Bankruptcy Judge**
_____

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

In re: ) Chapter 11 Proceedings
)
BASHAS' INC., ) No. 2:09-bk-16050-JMM
BASHAS' LEASECO INC., ) 2:09-bk-16051-JMM
SPORTSMAN'S, LLC, ) 2:09-bk-16052-JMM
)
_____ Debtors. ) (Joint Administration)
This Filing Applies to: )
)
■   All Debtors )
☐   Specified Debtors )
_____ )

---

## MEMORANDUM DECISION:

## PLAN CONFIRMATION

**TABLE OF CONTENTS**

I.     THE PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2

II.    THE DEBTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     3

       A.     Pre-Bankruptcy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     3

       B.     Post-Bankruptcy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     4

III.   THE BANKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     5

IV.    THE NOTEHOLDERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     6

V.     THE GRACE LOANS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     7

VI.    PLAN TREATMENT AND BALLOT REPORT . . . . . . . . . . . . . . . . . . . . . . .     8

VII.   THE CONFIRMATION HEARING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

       A.     Debtors' Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

              1.     Christopher G. Linscott . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

              2.     Conrad N. Plomin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

              3.     Jon Young . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

              4.     Darl J. Andersen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

              5.     F. Phillips (Phil) Giltner. . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

       B.     Objecting Creditors' Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    26

              1.     Morris C. Aaron . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    26

VIII.  OBJECTIONS TO THE PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    29

       A.     Preliminary Comment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    29

       B.     Specific Legal Objections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    30

IX.    THE CONFIRMATION ELEMENTS OF § 1129--THE 16 ELEMENTS . . . .    31

       A.     Sections 1129(a)(1) and (2)--General Compliance . . . . . . . . . . . . . . . .    32

              1.     In General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    32

              2.     Specific Concerns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    32

|  |  | (a) | The Parra Litigants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 32 |
|  |  | (b) | Bank Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36 |
|  |  | (c) | The Noteholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 40 |
|  |  | 3. | Sections 1129(a)(1) and (a)(2)--Conclusion . . . . . . . . . . . . . . . . . . | 41 |
|  | B. | | Section 1129(a)(3)--Good Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 41 |
|  |  | 1. | Parra Litigants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 42 |
|  |  | 2. | Banks and Noteholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 43 |
|  |  | 3. | Section 1129(a)(3)--Conclusion . . . . . . . . . . . . . . . . . . . . . . . | 45 |
|  | C. | | Section 1129(a)(4)--Payments In Connection With the Case or Incident to the Case Must Be Approved and Reasonable . . . . . . . . . . . | 45 |
|  | D. | | Section 1129(a)(5)--Post-Confirmation Officers and Directors, Insiders and Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . | 45 |
|  | E. | | Section 1129(a)(6)--Governmental Rate Control . . . . . . . . . . . . . . . . . | 48 |
|  | F. | | Section 1129(a)(7)--Best Interests of Creditors Test . . . . . . . . . . . . . . | 48 |
|  | G. | | Section 1129(a)(8)--Each Class Must Accept or is Left Unimpaired . . . | 49 |
|  | H. | | Section 1129(a)(9)--Priorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 50 |
|  | I. | | Section 1129(a)(10)--At Least One Impaired Consenting Class . . . . . . . | 50 |
|  | J. | | Section 1129(a)(11)--Feasibility . . . . . . . . . . . . . . . . . . . . . . . . . . | 50 |
|  | K. | | Section 1129(a)(12)--Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 55 |
|  | L. | | Section 1129(a)(13)--Retiree Benefits . . . . . . . . . . . . . . . . . . . . . . . | 55 |
|  | M. | | Section 1129(a)(14)--Domestic Support Obligations (Alimony; Child Support) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 55 |
|  | N. | | Section 1129(a)(15)--Individual Chapter 11 Case . . . . . . . . . . . . . . . | 55 |
|  | O. | | Section 1129(a)(16)--Transfers of Property . . . . . . . . . . . . . . . . . . . . | 55 |
| X. | | | SECTION 1129(b)--THE CRAMDOWN PROVISIONS AND UNFAIR DISCRIMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 56 |
|  | A. | | Classes 3 and 4:  The Secured Debt (Banks and Noteholders)-- Cramdown Interest Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 56 |
|  |  | 1. | In General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 56 |
|  |  | 2. | Banks' Objection Regarding Cramdown Interest Rates; Unfair Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 61 |

|  |  | 3. | Noteholders' Objections to Cramdown Interest Rates . . . . . . . . . | 62 |
|  |  | 4. | Cramdown Rates as to the Banks--Conclusion . . . . . . . . . . . . . | 62 |
|  |  | 5. | Cramdown Rates as to the Noteholders--Conclusion . . . . . . . . | 65 |
|  |  | 6. | Cramdown as to Secured Creditors--Conclusion . . . . . . . . . . . | 66 |
|  | B. | Section 1129(b)(2)(A)(i)(I)--Retention of Liens (Cramdown) . . . . . . . | 66 |
|  | C. | Section 1129(b)--Other Unfair Discrimination . . . . . . . . . . . . . . . . . | 66 |
|  |  | 1. | Banks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 66 |
|  |  | 2. | Noteholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 68 |
| XI. | OTHER MISCELLANEOUS OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . | 69 |
|  | A. | Banks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 69 |
|  | B. | Noteholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 70 |
| XII. | SECTION 1129(b)(2)(A)(iii)--"INDUBITABLE EQUIVALENT" (NOTEHOLDERS) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 71 |
| XIII. | SECTION 1129(b)(2)(A)--ABSOLUTE PRIORITY RULE (NOTEHOLDERS) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 71 |
| XIV. | SUBSTANTIVE CONSOLIDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 72 |
| XV. | CONCLUSION--CONFIRMATION APPROVED . . . . . . . . . . . . . . . . . . . . . | 74 |

Presented to the court over a five-day period, July 22, 28-30 and August 9, 2010, was the plan of reorganization proposed for the three related Debtors in these cases. For all practical purposes, the Leaseco and Sportsman's entities are divisions within the larger Bashas' organization. In the plan, both Sportsman's and Leaseco have asked that their creditors be consolidated and included for payment within the overall plan of reorganization, and the three Debtors have thus presented a single plan for court approval (the "Plan").

Evidence was taken in the form of numerous documents and six witnesses, and the parties have filed written memoranda on legal points, and further addressed their positions through oral argument.

The court has considered all sides of the issues, has carefully reviewed the pertinent record in these cases, and now rules.

## I. THE PLAN

The Plan to be considered is that filed on February 25, 2010 (ECF No. 1372), along with modifications[1] thereto filed by the Debtors and urged by them to be non-adverse. These Modifications were filed on June 14 and August 4, 2010 (ECF Nos. 1949 and 2338). Finally, at the conclusion of the Debtors' case-in-chief, and to conform to either the evidence or to cleanup the cases in a non-prejudicial manner, the Debtors offered additional plan elements which they then filed with the court after the evidentiary hearing concluded. (ECF. No. 2338.)

After the court approved the Debtors' Disclosure Statement, both it and the Plan were circulated to the various classes of creditors. The creditors voted, and the Debtors filed a tally with the court as to the results of the voting by each class. (Ballot report and supplement, ECF Nos. 1631 and 2272).

---

[1] Although the Debtors characterize and label their modifications as "non-adverse," this label carries legal implications and ultimately is a decision for the court. The court will call them, simply, the "Modifications."

While certain secured parties, who have been referred to throughout these cases as the "Noteholders" or the "Bank Group" (or "Banks"), objected to the Modifications, primarily on the grounds that new and additional disclosure was required to be approved before being considered, the court finds and concludes that additional disclosure is unnecessary and that no party has been prejudiced by the lack of additional disclosures or pre-approval thereof. The court also finds the Modifications to be, in fact, non-adverse.

This is because virtually all constituencies have been represented in some significant way, because no other class has objected, and because every class of creditor, except for the Banks, Noteholders and the "Parra Litigants" have voted in favor of the Plan. And, since the Plan proposes to repay all classes of creditors in full, it would appear to be a futile act to re-disclose and re-ballot, because it is more likely than not that all creditor classes would vote, if asked to do so, in exactly the same way. Based on the history of these cases, accepting parties would continue to accept, and rejecting parties would continue to object. No amount of additional disclosure will change that dynamic.

Finally, to the extent that the Noteholders can legally and factually support their objections to the Plan, then denial of confirmation would moot out all of their concerns over §§ 1125 and 1127 disclosure and pre-confirmation modification.

## II.  THE DEBTORS

### A.  Pre-Bankruptcy

Bashas' has been a locally-owned, privately held grocery store chain in Arizona since 1932 (Ex. 26). It currently employs approximately 8,500 people in about 134 stores statewide (including one in Needles, California and one in Crownpoint, New Mexico). Some of the stores operate under other names, such as AJ's, Food City, Eddie's Country Store, and the Dine Markets located on the Navajo reservation.

In its 78-year existence, Bashas' has never sought reorganization in the federal court.

Until April 2009, Bashas' and its entities were able to borrow money on an unsecured basis, and were able to repay current obligations as they came due. But, over time, due to a number of factors including overexpansion, and a general downturn in the national and Arizona economies, Bashas' found itself overextended, paying higher than market rate leases, and suffering more demands on its cash flow than it could handle. Bashas' became subject to more intense scrutiny from its lenders, which, among other things, demanded and received collateral to support its outstanding debt, shorter terms for repayment and stricter covenants.

When it became clear that Bashas' could not meet the lenders' anticipated demands for full payment, and was unlikely to gain immediate and more favorable long-term extensions or relief, Bashas' filed for Chapter 11 protection on July 12, 2009.

## B. **Post-Bankruptcy**

During the year that Bashas' has been under bankruptcy court protection, it has remained in business, renegotiated many of its leases, closed underperforming stores or those with no future potential, sold excess assets, and operated on its current income, staying within its budgets. And, importantly, it has become profitable.

Since filing, it has amassed over $100 million in cash, tightened its belt and trimmed its expenses, renegotiated or rejected leases for 103 stores (63% of its stores), and positioned itself to emerge from bankruptcy as a leaner, more efficient enterprise.

Its Plan envisions using most of its cash to bring its lenders' interest current, pay the bulk of its priority claims, pay its professionals and also those of the Unsecured Creditors' Committee (the "Committee"), the Banks and Noteholders, and then continue to pay its creditors on a regular payment schedule for three years. At the end of three years, if its projections hold, Bashas' believes that it will have lessened its debt-to-asset ratio to such an extent that it will then be able to refinance the remaining obligations--about $155 million. That final payment will complete payments to its existing creditors. Then Bashas' can repay its new, refinanced sum on longer and more favorable terms.

### III.  THE BANKS

The relationship between Bashas' and their banks,[2] of course, goes back further than 2002, but for purposes of bringing the history of this matter forward from a time in the recent past, the parties have chosen to present their cases from that historical moment.

On December 26, 2002, the parties entered into an agreement that the Banks would lend Bashas' up to $110 million in revolving credit.[3]  Promissory Notes were executed to each Bank, in the amount of each's participation (Exs. L, M and N).  These obligations were personally guaranteed by Edward N. Basha, Jr. (Exs. O, P and Q).  (These continuing guarantees were released at a later time, on September 8, 2006.  (Ex. S.))

The 2002 agreement remained in force and was extended in 2004, 2006 and 2008 (Exs. R, S and T).

On April 14, 2009, although specifically noting that no monetary defaults had occurred under the prior agreements, the atmosphere changed.  (*See*, Ex. U at 17, para. (d) and (e)). In anticipation of executing a concurrent Intercreditor Agreement with the Noteholders, the previous credit agreements were again amended, to tighten up reporting requirements, and to change the unsecured loan to a secured one (Exs. U and V).  In addition, continuing guaranties were required of the Leaseco and Sportsman's entities (Exs. Y and Z).

At the same time, Bashas', Sportsman's and Leaseco granted the Banks and Noteholders security interests in various categories of property, such as accounts, inventory, machinery, furniture, fixtures and equipment, trademarks and trade names (Ex. V).

Currently, the Banks' debt is approximately $120,000,000, and which, for convenience, is broken down as follows:

---

[2]  The banks involved are Wells Fargo, Bank of America and Compass Bank.  Their portions of the entire credit were $46 million, $44 million and $20 million, respectively.

[3]  Exhibit K recites a relationship dating back to 1994 between the Banks or their predecessors.

| | |
|---|---|
| Principal | $110,000,000 |
| Interest | 6,167,450 |
| Default Interest | 3,813,333 |
| **TOTAL** | **$119,980,783** |

(Ex. OO). While these figures are not exact, and there may be some debate over the right to default interest, this figure is what generally makes up the Banks' claim.

Sometime in July 2009, the Banks refused to allow further extensions, and declared covenant defaults, contending that Bashas' financial reporting was beyond the boundaries of agreed contractual compliance. However, there were no "payment defaults." (Trans. Depo. of Edward N. Basha, III at 21, lines 11-20).

To protect the companies, Bashas' then filed Chapter 11 on July 12, 2009.

## IV. <u>THE NOTEHOLDERS</u>

There is another group of secured lenders, made up of insurance company loans to Bashas'. Theses debts, too, were unsecured until April 14, 2009, at which time they and the Banks were granted concurrent security intents in the three Debtors' collateral (Ex. V).

The Banks and the Noteholders share <u>pari passu</u> in the collateral, with each obligation standing with the others as a percentage of the whole. According to the Security Agreement (Ex. V), the Noteholders' obligations are broken down in the following manner:

| <u>Date</u> | <u>Noteholder</u> | <u>Due</u> | <u>Interest Rate</u> | <u>Balance on Apr. 14, 2009</u> |
|---|---|---|---|---|
| 02/15/96 | Prudential | July 14, 2011 | 7.5% | 4,285,714.28 |
| 07/19/02 | " | Sept. 30, 2012 | 5.4% | 5,714,285.71 |
| 07/19/02 | " | June 3, 2010 | 4.75% | 10,714,285.72 |
| 12/12/03 | Prudential Investment Management | Feb. 25, 2014 | 4.99% | 5,555,555.53 |
| 12/12/03 | "          " | Mar. 22, 2011 | 4.31% | 4,000,000.00 |

| | | | | | |
|---|---|---|---|---|---|
| " | " | " | Sept. 11, 2010 | 4.82% | 4,800,000.00 |
| 06/22/05 | " | " | Aug. 28, 2016 | 6.27% | 13,360,000.00 |
| " | " | " | Mar. 31, 2014 | 5.75% | 8,300,000.00 |
| " | " | " | Sept. 27, 2017 | 6.10% | 31,700,000.00 |

(Ex. V). The Banks and Noteholders appointed Wells Fargo to be their "collateral agent" for all significant purposes in policing, collecting and disbursing amounts due under their various agreements. UCC-1 Financing Statements were filed on April 21, 2009 with the Arizona Secretary of State (Ex. W).

Roughly, the Noteholders maintain that they are owed:

| | |
|---|---|
| Principal | $ 86,286,984 |
| Interest | 8,658,945 |
| Default Interest | 1,960,632 |
| **TOTAL** | **$ 96,906,591** |

(Ex. OO).

## V.  <u>THE GRACE LOANS</u>

Another interesting player in the Bashas' case involves the Grace Financing Group, LLC, an entity controlled by Howard T. Grace.  Mr. Grace and his family are long-time friends of the Basha family, who, within two days prior to the Chapter 11 filing, agreed to lend Bashas' up to $45 million for "general corporate operational and liquidity needs," including post-bankruptcy needs (Ex. CC).  Pursuant to that agreement, Bashas' drew $2 million immediately (Ex. CC, para. 21.1(b)(i)).

The loan was secured by 34 parcels of real property with a value of approximately $122,745,000, more than adequate to secured the debt (Exs. PPP and CC).  The deeds of trust were

recorded.[4]  There has been no assertion that this transaction was improper.  Interest to be paid on the debt, under the Plan and by agreement, is 8% per annum.

In Mr. Grace's deposition transcript, he related that he supported the Debtors' Plan, that he does not intend to lend beyond the $2 million already lent, and will release his lien on a portion of the Bashas' collateral at the Plan's Effective Date.  (Selected portions of Trans. Depo. of Howard T. Grace, ECF Nos. 2308 and 2310.)  It appears that the immediate release of liens extends only to the "non-core real estate," to enable Bashas' to offer that real estate to the Banks and Noteholders as additional collateral for their existing obligations.

## VI.  PLAN TREATMENT AND BALLOT REPORT

The Debtors' plans are combined and integrated, and none of the three Debtors has a separate plan.  For simplification, it is fair to note that, however similar creditors are treated in Bashas' Plan, so too will be the creditors of Leaseco and Sportsman's.

The Plan is made up of three components, which this court will attempt to summarize in its review of class treatment, voting and compliance with the Bankruptcy Code.  The components are found in:

- • The First Amended Plan, filed February 25, 2010 (ECF No. 1372).
- • The Modifications, filed June 14, 2010 (ECF No. 1949).
- • Oral adjustments made at the Confirmation Hearing, later filed August 4, 2010, (ECF No. 2338) (the "Second Modifications").

Thus, the Plan's final iteration, for each class, and the vote of each class, is:

---

[4]     The recording date is July 10, 2009 (Maricopa County).  (Ex. PPP.)

| Class | Type | Treatment | Estimated Amount | Impaired | Vote |
|-------|------|-----------|------------------|----------|------|
| 1 | Administrative (UST; professionals; certain types of wages; § 503(b)(9) (goods delivered 20 days pre-bankruptcy); stub rent to landlords | Paid in full on Effective Date or when claim resolved. | $6,314,846 (Ex. 6) | No | N/A |
| 2 | Grace Funding | Release liens on "non-core" real estate. $2 million loan secured by core real estate. Payable in full in one year from Effective Date. Quarterly payments 8% interest per annum. Obligation to lend additional money to Bashas' is released. (Depo. of Howard T. Grace at 26-29; 32-33; testimony at trial). Options eliminated. | $2,000,000 | Yes | Accept |
| 3 | Bank Group | • Allow claim for principal sum of $110,889,447.  In addition, pay contract rate interest (without default) through Effective Date.<br><br>• Pay reasonable attorneys' fees and costs up to $3.1million. Any additional balance paid over time.<br><br>• Additional collateral granted in "non-core" real estate worth approx. $35,790,000. 18 separate parcels (12 within Phoenix metropolitan area; 1 in New Mexico; 5 scattered in Arizona). If any parcel sold, Banks to receive 50% of net proceeds, which Banks must apply to reduce principal.<br><br>• Retain existing liens.<br><br>• Acceleration of debt nullified and waived; payment obligations deemed cured upon payment of accrued contract rate interest at confirmation.<br><br>• Challenge default interest and abide court ruling. | $110,889,447 | Yes | Reject |

| Class | Type | Treatment | Estimated Amount | Impaired | Vote |
|---|---|---|---|---|---|
| 3 | Bank Group (cont.) | • Principal balance of approx. $110,889,447 divided into two tiers:<br><br>Tier One:     $40,000,000<br><br>• Amortized over 20 years.<br><br>• Monthly interest paid.<br><br>• $750,000 (approx.) principal reduction after one year.<br><br>• $2,000,000 (approx.) principal reduction in subsequent years.<br><br>• Principal reduction payments paid annually only.<br><br>• Fully paid (balloon) at end of third year.<br><br>Tier Two:   $70,000,000<br><br>• 10-year amortization.<br><br>• Monthly interest paid.<br><br>• Annual principal payments<br><br>  - $2,625,000 at end of first year (estimate).<br><br>  - $7,000,000 each year thereafter (estimate).<br><br>• Fully paid (balloon) at end of third year.<br><br>Interest on Tier One and Tier Two Loans:  Floating rate (the Daily One Month LIBOR Rate plus a margin). The margin shall be equal to the swapped equivalent of 8.5% as of two business days prior to the Effective Date minus the then current Daily One Month LIBOR rate. | | | |

| Class | Type | Treatment | Estimated Amount | Impaired | Vote |
|---|---|---|---|---|---|
| 4 | Noteholders | • Claim allowed for principal amount of $86,607,304.<br><br>• Retain liens.<br><br>• Additional collateral of "non-core" real estate (concurrent with Bank Group).<br><br>• Interest at contract rate brought current at Effective Date, without penalties. Defaults waived.<br><br>• Reasonable attorneys' fees (along with Bank Group) of $3.1 million. If exceeded, balance paid over time.<br><br>• Principal balance interest to accrue at 8.5%.<br><br>• "Yield-Maintenance" provisions to be legally challenged, and abide court ruling.<br><br>• Monthly interest payments.<br><br>• End of first year--annual principal reduction of $2,662,500.<br><br>• Subsequent annual principal reductions: $7,100,000 (approx. term: 12 years).<br><br>• Three-year balloon. | 86,607,304 | Yes | Reject |
| 5 | Secured Tax Claims (real and personal property taxes) | Retain liens. Paid in full with statutory interest. At Effective Date, 10% paid. Equal payments of 10% every six months until paid off in April 2014. | 481,787.74 | Yes | Accept |
| 6 | Bashas' Priority Tax Claims | Paid monthly through April 2014. Interest at statutory rate. 10% paid at Effective Date; 90% over time. | 3,520,908 | Yes | Accept |
| 7 | Leaseco's Priority Tax Claims | Paid monthly through April 2014. Interest at statutory rate. 10% paid at Effective Date; 90% over time. | 53,437 | Yes | Accept |
| 8 | Wage Claims Earned Within Six Months | Paid in full within six months by paid time off, with an interest component. | Unknown | Yes | No Vote |

11

| Class | Type | Treatment | Estimated Amount | Impaired | Vote |
|---|---|---|---|---|---|
| 9 | Bunzl | § 503(b)(9) component paid on Effective Date ($536,944). Retain liens; paid without interest pursuant to Pre-Bankruptcy Agreement, i.e. terms of contract. Retain $250,000 deposit for three months, then apply it to future purchases. | 1,698,146 | Yes | Accept |
| 10 | Bashas' Secured Vendor Claims | These creditors select from Alternatives A or B.<br><br>Alternative A:  Retain deposits until claim satisfied, but use them to offset against allowed claim. No further distributions.<br><br>Alternative B:  Apply setoff rights against claim. Balance paid with 5% interest. Accrued interest paid annually. 10% principal paydown of remaining claim paid every six months. Balance at three-year anniversary. | 4,500,000 | Yes | Accept |
| 11 | Bashas' Unsecured Vendor Claims (Trade Creditors) | Previous plan options eliminated. All will be paid as follows: 10% paid at Effective Date. 10%, with 5% interest, every six months. Balance paid off at third-year anniversary. | 30,000,000 | Yes | Accept |
| 12 | Bashas' Non-Vendor Unsecured Claims | 10% on Effective Date or when allowed; 5% interest, 10% principal paydown every six months. Balance paid on three-year anniversary. | 18,225,911 | Yes | Accept |
| 13 | Bashas' Unsecured Convenience Claims ($5,000 or less) | 80% of allowed claim at Effective Date or upon allowance. 20% released and waived. | 492,694 | Yes | Accept |
| 14 | Leaseco's Unsecured Claims | 10% at Effective Date; 5% interest on balance; 10% paid every six months. Balance paid off at three-year anniversary. | 89,108 | Yes | Accept |
| 15 | Leaseco's Unsecured Convenience Class ($5,000 or less) | 80% of allowed claim at Effective Date or upon allowance. 20% released. | 8,059 | Yes | Accept |

| Class | Type | Treatment | Estimated Amount | Impaired | Vote |
|-------|------|-----------|-----------------|----------|------|
| 16 | Parra Litigants | As disputed and unliquidated claims in litigation, paid 10% upon claim allowance (liquidation of claims). Balance at 5% interest. Every six months a 10% principal reduction, plus accrued interest. Fully paid (balance) on later of third anniversary of Effective Date or liquidation of claims. | 36,338,568 | Yes | Reject |
| 17 | SERP; SEWBP Plan Beneficiaries | Waive post-bankruptcy claims; avoidance actions for pre-bankruptcy distributions waived by Debtors; medical benefits eliminated and cash stipend replaces it. | 50,732 | Yes | Accept |
| 18 | Rabbi Trust Beneficiaries (deferred compensation benefits) | Pre-petition contributions made by employees paid 30 days after confirmation. Waiver of any post-bankruptcy claims. | 406,974.87 | Yes | Accept |
| 19 | Equity | Retain interests; no distributions on account of equity interests (other than tax payments passing through to IRS) until all senior classes paid pursuant to Plan. | N/A | Yes | Accept |

(Plan; Modifications; Second Modifications; Ballot Report; testimony). The figures set forth are not exact, but approximate the anticipated claim amounts. The precise figures will not be fully known until the post-confirmation claims process is concluded. This latter process, for most creditors, typically occurs swiftly.

Now that the details of the Plan itself have been established, the court turns to the evidence and testimony offered at the confirmation hearing, in order to flesh out other facts surrounding how the Plan will be implemented, and to ultimately decide whether the Plan will actually work as envisioned.

# VII. THE CONFIRMATION HEARING

## A. Debtors' Case

The confirmation hearing took place over a five-day period (July 22, 28-30 and August 9, 2010). During that time, the court heard from six witnesses who testified in person, and considered portions of the deposition testimony of Howard T. Grace and Edward N. Basha, III. A synopsis of the testimony given in court follows.

## 1. Christopher G. Linscott

Christopher Linscott was appointed by this court, as the Debtors' financial advisor, on November 5, 2009 (ECF No. 935). Since then, he has worked closely with the Debtors, the Committee, and others in analyzing the Debtors' past, and assisting in charting a course for the future of the reorganized companies. Mr. Linscott explained that throughout his involvement, the reliability of Bashas' record keeping and reporting was "excellent" or "quite good."

In summary, Mr. Linscott noted that "the company has reorganized" itself, and needs only to exit Chapter 11 in order for payments to creditors to begin. Pointing to charts supporting the Debtors' actual earnings in the first six months of 2010 (January-June), Mr. Linscott explained that the Debtors have been profitable in every month.

Mr. Linscott is a respected expert who is well-known to the bankruptcy court. He is a Certified Public Accountant and has been for 25 years. He is also a Certified Fraud Examiner, and a Certified Insolvency and Restructuring Advisor. He has been an owner of his CPA firm in Tucson since 1994, and has participated, in various capacities, in innumerable reorganization proceedings in Arizona. (Ex. 1).

Mr. Linscott's view that the companies have already reorganized themselves was based upon several objective facts which have occurred in the one-year duration of these bankruptcy cases, including:

- the companies have accumulated cash in the approximate sum of $104 million (Ex. 4);

- they will be able to make all of their anticipated "Effective Date" payments of approximately $59 million (Ex. 5);

- they will be able to pay, going forward, all of the scheduled payments under the Plan and pay their ongoing expenses without the need for additional financing;

- over the three-year duration of scheduled payments, they will be able to reduce their outstanding debt from approximately $240 million to $155 million (an $85 million reduction) (Ex. 8);

- due to such a substantial reduction, the companies will have "de-leveraged" to a degree to enable them to refinance, and thus pay off the balance of approximately $155 million at that time, as the Plan contemplates;

- the elimination of unprofitable stores, during the cases, as well as re-negotiating the leases on the retained stores, to current market rates, has concurrently brought the Debtors' leases into conformity with current market conditions, thereby saving millions in future rent payments (Ex. 1);

- the Debtors may still close 4-5 more stores, thus lessening risk of loss;

- all or a significant portion of vendor-held deposits of $15-20 million stand an excellent chance of being released or applied to existing debt (as the Plan provides) as the companies normalize their relations with trade creditors;

- the companies will see cash of approximately $6-9 million, as equity members' return their excess tax contributions; that money will come back into the companies' operating coffers;

- a 3% annual growth in sales, with the companies' initiatives having stopped unnecessary cash outlays and trimmed other operating costs, is a reasonable and conservative growth figure (Ex. 7);

- the companies are capable of operating on cash revenues, without the need for new borrowing during the next three years;

- cost-cutting measures undertaken during Chapter 11 have cut over $57.5 million from the annual budget and achieved one-time savings of $9.5 million (Ex. 22);

- with no new store construction contemplated over the next three years, the necessary capital expense for existing stores is predictable and in line with reasonable budgeting practices;

- the Banks and Noteholders will continue to be over-secured in their collateral positions during the Plan's duration;

- the Debtors' "core" and "non-core" real estate was conservatively estimated to be about $119 million, and a portion thereof could possibly be accessed for cash contingencies, if necessary; and

- if required, the companies could raise another $14-15 million by selling non-essential assets.

Mr. Linscott further testified that "the Debtors have met or exceeded the projections. The projections have borne out, and are solid . . . conservative and reasonable." (Ex. 24).

As far as the terms of the Plan are concerned, and with regard to Bashas' ability to carry it out, Mr. Linscott believes that, after observing the Debtors' evolution and progress over a 10-month period (October-July), the company is now properly positioned, from a managerial and operational standpoint, to enable the Plan to work as contemplated.

Mr. Linscott, as the Debtors' court-appointed financial advisor, in the nine months since his appointment, testified that he has worked closely with Debtors' management and accounting departments to understand the Debtors' financial picture, and has helped them in

analyzing projections for a future under the Plan. Ultimately, Mr. Linscott concluded that the Debtors' Plan was feasible (Ex. 2). Essentially, because Bashas' has been able to operate for the past year without post-petition financing or a revolving line of credit, and because it has been able to accumulate more than $100 million in cash, Mr. Linscott concluded that Bashas' "is able to fulfill all scheduled payments for three years following the Effective Date . . . ." (Ex. 2.)

In support of his testimony that the Debtors will be able to meet their operating expenses and accumulate cash, on a going-forward basis, Mr. Linscott pointed to the Debtors' actual financial reports for the period January-May, 2010 (Ex. 3), and then carried forward his monthly projections for the next three years of the Plan (Ex. 9, 10).

The projections estimate an approximate 3% annual increase in sales[5] each year, which was partly based upon current and anticipated cost-savings measures, including savings realized by the lease modifications (Ex. 11), the annual savings accomplished by other post-filing, cost-reducing measures (Ex. 22), the predictable limitation on future capital expenditures (Ex. 23) and a projected increase in Arizona's population (Ex. 27).

According to Mr. Linscott, the actual figures reflect that the Debtors are currently doing better than their budget (Ex. 3). The cash on hand, as of May 29, 2010, was $104,179,611 (Ex. 4), and in the first five months of 2010 had increased to that figure from a starting point of $61,220,708 (Ex. 4) at the first of the year.

On the Effective Date, which he anticipated to be approximately August 28, 2010, Mr. Linscott testified that the Effective Date payments would be about $57,433,671, leaving the companies with $38,689,559 upon exiting bankruptcy (Ex. 6). The payouts to the creditor classes, on the Effective Date, were pegged at:

---

[5]     Ex. 26 reflects a three-year increase of 7.5%, which is 2.5% per year.

| Cash Available for Plan Payments | | | 96,123,230 |
|---|---|---|---|
| Class 1 | **Administrative Claims** | | |
| | Estate Professionals | 6,314,846 | |
| | § 503(b)(9) creditors | 29,653,056 | |
| | Lease Cure & Stub Rent | 2,000,000 | |
| | | | 37,967,902 |
| Class 3 | **Bank Group Claims** | | |
| | Tranch A | 2,739,689 | |
| | Tranch B | 4,794,456 | |
| | | | 7,534,146 |
| Class 4 | **Noteholder Claims** | | 5,909,988 |
| Class 5 | **Bashas' Secured Tax Claims** | | 250,000 |
| Class 6 | **Bashas' Priority Tax Claims** | | 352,091 |
| Class 7 | **Leaseco's Priority Tax Claims** | | 5,344 |
| Classes 10 & 11 | **Bashas' Secured & Unsecured Vendor Claims** | | 3,200,000 |
| Class 12 | **Bashas' Non-Vendor Unsecured Claims** | | 1,800,000 |
| Class 13 | **Bashas' Unsecured Convenience Class (less than $5000)** | | 400,000 |
| Class 14 | **Leaseco's Unsecured Vendor Claims** | | 14,200 |

| Total Claims--All Classes | | | 57,433,671 |
|---|---|---|---|

| Cash Remaining After Effective Date Plan Payments | | | 38,689,559 |
|---|---|---|---|

(Ex. 6.) Thereafter, the Debtors will have shed themselves of ongoing administrative expenses associated with the Chapter 11 cases, and will be adequately positioned to operate more efficiently and economically.

By the end of the three-year post-plan period, in August 2013, the Debtors will have reduced their outstanding debt by approximately $85 million, from $240 million to $155 million.

At that point, by improving their performance and decreasing their secured debt by 35%, the companies will be, in Mr. Linscott's opinion, well-positioned to attract new financing and fully consummate the Plan. (Ex. 2.) Then, Mr. Linscott projects that the Debtors will have cash reserves of $28,833,922. (Ex. 6.) Because Mr. Linscott notes that the monthly available cash on hand will not drop below this figure, he felt the need for revolving credit during that three-year time frame was not a necessity.

In discussing historic interest rates charged by the Banks, Mr. Linscott stated that those rates floated between 3.25% to 4.5%. Under the Plan's provisions, however, the rate (while still floating) would be around 7.1% to 7.6% if calculated as the day of his testimony. He observed that in April, 2009, the last negotiated arms-length rate with the Banks was at a variable rate of approximately 4.5%. Mr. Linscott also testified that the current borrowing rate, from the Federal Reserve, is less than 1%.

As for dividing the Banks' debt into two tiers, he stated that the reason for doing so was to lengthen the amortization in order to assist with feasibility concerns.

The Noteholders' treatment was structured to return a market (or better) rate for the modifications associated with their debt, and that amortization was lengthened so that the Debtors were not unduly hampered by the size of the periodic payments.

As for the Debtors' balance sheet, it reflected post-Effective Date asset value of $350,904,348. (Ex. 8.) By the end of the three-year term, the assets would be $305,807,506, against which the Debtors would have to borrow approximately $155 million to fully consummate the Plan. (Ex. 8.) By that time, the companies would have significantly de-leveraged themselves, and could procure a take-out source.

Over the Plan's term, the Debtors would have adequate operational cash flows (Ex. 10). This conclusion was supported in part by the evidence that the Debtors would realize total rental/lease savings of $26,469,370 over the Plan's term, and have already partially accomplished this since the filing of the cases in July, 2009. (Ex. 11).

As for the collateral securing the combined Bank and Noteholder debt (Classes 3 and 4), after the Effective Date, Mr. Linscott felt that the Debtors' balance sheet reflected a value

of the collateral at $249,939, 334 (Ex. 14).  This exhibit is supported by the Banks' observation that "there is no dispute in these cases that the members of the Bank Group are oversecured."  (Banks' Objection at 29, line 3, ECF No. 2245.)  (*See also*, Ex. 25.)

Finally, although recognizing that he was not qualified as an appraiser, Mr. Linscott noted that the Debtors' balance sheets carried its "non-core" real estate at a value of approximately $39 million,[6] and its "core" real estate at about $80 million.  Except for the current Grace loan, on which is owed $2 million, this real estate is unencumbered.  Thus, $117 million in unencumbered real property adds strength to the Debtors' long-term financial health.  As for how the value figures were arrived at, Mr. Linscott stated that these were "a consistent number used throughout this case," which had been relied on by the parties, with neither objections, court fights nor negative feedback.

When cross-examined, Mr. Linscott noted that material adverse occurrences, in the future, could of course negatively impact the Debtors.  Some of these events could be a high verdict for the Parra Litigants, a court ruling favoring the Banks and Noteholders on the default interest and Yield-Maintenance provisions, a failure of sales to meet projected increases, and vendor deposits not reducing as rapidly as expected.

After his full and complete study of the Debtors' finances and property over the many months he has served as a court-appointed financial advisor, Mr. Linscott's opinion was that the Plan would work as contemplated.

## 2.  Conrad N. Plomin

Conrad N. Plomin is the owner and President of Sunbelt Capital Corp., a company which assists in acquiring debt financing for corporate entities.  His 38-year career as a commercial and investment banker has seen many workouts, restructuring and new debt placements, via traditional as well as "alternative sources."  (Ex. 16).  In his time at Sunbelt, he has personally

---

[6]    Ex. D and its Ex. 1 reflects the value at $35,790,000.

placed over 100 loans, ranging from $5-240 million.  In total, at Sunbelt, Mr. Plomin has assisted clients in acquiring over $2 billion in debt financing.

Mr. Plomin has been active in Bashas' financing issues since 1985, when he held positions at the Valley National Bank of Arizona in its corporate lending and investment banking areas.  It was here that he first became acquainted with the Debtor and its principals, and Bashas' borrowing needs.

After starting Sunbelt in 1990, he assisted Bashas' in its ongoing borrowing efforts, including placement and closing of the predecessors to the existing bank loans.

After describing the events that led up to the execution of the most recent loan documents between the Banks and the Noteholders, and Bashas' deviation from certain financial covenants which led to the debt being converted from unsecured to secured, Mr. Plomin explained that Bashas' had lost a significant amount of money in 2008, and that its leverage, on its ability to borrow, decreased in a corresponding way.  By April 2009, Bashas' was "not profitable and did not have a strong cash position."  In short, "It needed to be restructured."

After one year in Chapter 11, and after having now restructured itself, Mr. Plomin stated that Bashas' had become a "vastly different borrower" that can meet its projected budgets without the need for a revolving credit line.  In essence, while in the Chapter 11, Bashas' has "self-financed" itself and built up additional cash.

If the projections for the companies hold, Mr. Plomin expressed the opinion that Bashas' would have improved its financial strength to a point where he felt confident in opining that Bashas' would then be able to find a new lender, within three years, for approximately $155 million, and that with that financing, it could fully effectuate the Plan and conclude payments to all existing creditors.  "In my opinion, they will be able to get it."

On cross-examination, Mr. Plomin agreed that he had spent many hours attempting to locate take-out, or exit financing, or even a new revolving credit line, but that the current market was not conducive to finding such a loan that was competitively priced.  (Exs. SS, XX, YY, BBB, TTTT).

Ultimately, through his long experience in the credit markets, and his familiarity with the Debtors and their operations, both pre- and post-bankruptcy, Mr. Plomin felt that the Plan was feasible, and that the interest rates suggested for the Banks and Noteholders were consistent with rates being charged in today's commercial markets.

### 3. Jon Young

Jon Young is the President of Oracle Capital Advisors, LLC in Tucson, Arizona. The company is engaged in investment banking and corporate finance. (Ex. 17). Mr. Young, a CPA since 1971, has vast experience in many areas, but for purposes of these cases, was called to testify in the realm of interest rates and the cost of funds. (Ex. 17).

Mr. Young explained the methodology by which he had arrived at his conclusions, and how he had canvassed the area in searching for appropriate market comparables. On the positive side, Mr. Young explained generally that Bashas' realized about $2 billion annually in revenues; that it employed approximately 8,500 employees; that it had been in business in Arizona for over 75 years, and that with proper debt restructuring and competent management the company could again be profitable. Negatively, the company had, in the past, been over-leveraged and suffered from "negative equity."

Turning to the Plan, Mr. Young observed that Bashas' diversification (for example, AJ's sells to more affluent customers, while Food City targets low to moderate income families) was a positive for the business. Moreover, making the projected Effective Date payments, of about $60 million, would immediately "de-leverage" the company by about 20%. And, within three years, if the company meets its projections for continued repayment of debt, it would have further de-leveraged itself to around 50%.

Mr. Young ultimately concluded that the floating rate proposed by the Debtors for the Banks would, today, be about 6.5%, and that that rate was consistent with the market, the type of loan that was best suited to bank lending, and the degree of risk taken. As for the Noteholders, he felt that the 8.5% fixed rate proposal was market equivalent, or better. (Ex. 18).

Mr. Young's opinion was bolstered by a written report (Ex. 18), wherein his source data was set forth and analyzed. His conclusion was that the Plan's "Proposed Rates and . . . Amortization periods . . . are reasonable and comparable to [equivalent] . . . debt securities held by companies in the grocery store and supermarket industry." (Ex. 18).

### 4. **Darl J. Andersen**

Mr. Andersen is Bashas's current President, Chief Operating and Restructuring Officer. He had retired from Bashas' in 2003, but during the early stages of the bankruptcy cases, in mid-August 2009, was asked to resume the helm in the company's struggle to keep the corporate ship off the shoals. His goals were to pay the Banks and the Noteholders, save 8,000-9,000 jobs, eliminate the company's "girth," restore dignity and profitability to the company, and prepare a reasonable and workable reorganization plan.

Mr. Andersen's background is in business and accounting. After obtaining degrees from Arizona State University, he began his career at Ernst and Ernst, auditing pension plans, including that of Bashas'. He joined Bashas' in 1977, and shortly thereafter was promoted to Chief Administrative Officer, where he served until his 2003 retirement. During his tenure, Mr. Andersen testified that the company never lost money, and that it consistently enjoyed good relationships with its Banks.

Upon his return to the Chapter 11 company, and finding blame for past failures to be counterproductive, Mr. Andersen undertook a forward-looking approach, and searched for old-fashioned ways to turn the business around. Starting with cutting costs, he explained that Ex. 22 was the "heart and soul" of some of the financial changes made in the new organization. A complete list is found in Ex. 22, but the changes range from across the board salary reductions from 2-15%, to cancellation of the corporate jet, to modifications of insurance programs, and even to renegotiating pest control contracts. The list is long and detailed, but the bottom line is that, since September 1, 2009 through May 30, 2010, the company has cut $57,563,180 from its annual

corporate budget, and has garnered an additional $9,500,000 in one-time savings for the same period (Ex. 22).

These measures, and continued efforts to look for ways to cut costs, have "stopped the bleeding" and gotten Bashas' profitable once again. For the first six months of 2010, Bashas' has "met or exceeded budgets" in only positive ways. The board of directors will add two outside members, "a very healthy change," the officer ranks have been slashed from 36 vice-presidents to six and Mr. Andersen has agreed to stay on as President and Chief Executive Office to see the Plan through. (Ex. 21).[7]

Mr. Andersen stated that the company is "motivated to proceed out of bankruptcy and fulfill our commitments." As for the company's projected sales/profit growth rate increase of 3% per year, Mr. Andersen surmised that this figure was realistic, reasonable and achievable, due to the company's internal management changes and commitments, and the advantages realized by the Bankruptcy Code itself, such as lease rejection or re-negotiation leverage attained with the landlords.

He agreed with Mr. Linscott's projections (Ex. 3), as well as confirming the positive figures in Ex. 33, stating that they were "reasonable, plausible and can be attained."

As for whether the company could operate without a line of credit to draw upon, Mr. Andersen explained while the lack of a line was not ideal, neither was it a necessity. He felt it to be "good insurance" in the event of a temporary cash shortfall, but that the company had other ways to raise cash, such as by selling real estate, its art collection, or by offering new stock in the company.

As for the fairness of the Plan, from a layman's perspective, Mr. Andersen felt that getting creditors fully paid over a three-year period was "not that long" and that the company had attempted to fix interest rates in comfortable ways for the Banks, which "enjoy variable rates," and

---

[7] One feature of the employment contract which was quickly and voluntarily changed, in order to comport with § 1129(a)(4) and (5), was the bonus to be paid Mr. Andersen upon confirmation. That feature is now eliminated. (*See* Ex. 21; Second Modifications, ECF No. 2338.) Similarly, Edward N. Basha, Jr. agreed to reduce his salary to only $1 per year. (ECF No. 2338).

for the Noteholders, which "prefer fixed rates." Without studying the markets, he felt that the bank rate would be about 7.7% on the day he testified, under the Plan's chosen formula. As for additional financial covenants to the Lenders (the current Plan proposes none), Mr. Andersen stated that the company would have no objection to some conservative additions.[8]

In Mr. Andersen's view, two "blessings" came from or during the Chapter 11: (1) the Union litigation was settled, which stopped the floodgates of attorneys' fees and added to customer and employee reassurance; and (2) rejections of leases, or concessions from landlords on rental terms, which gave more strength to the cash-flow projections.[9]

### 5. F. Phillips (Phil) Giltner

Mr. Giltner serves on the Unsecured Creditors' Committee. (Ex. 20). He is a Senior Vice-President, Chief Financial Officer, and Secretary-Treasurer of Shamrock Foods, which is one of Bashas' unsecured trade creditors. Shamrock voted its $615,689 claim in favor of the Bashas' Plan. (Ballot report and supplement, ECF Nos. 1631 and 2272).

Mr. Giltner testified that the Committee and its counsel, along with the Debtors' professionals, worked very hard to understand the financial workings of the Bashas' organization. With Chris Linscott's assistance, the Committee was comfortable with the financial aspects of the Plan, and that the Debtors had been accessible through the Plan process, had answered all questions posed by the creditors (*see, e.g.*, Ex. 26), made their professionals available, and provided reliable data from which to forecast the future. Mr. Giltner was complimentary of Darl Andersen, and the successful changes made by Bashas' since his re-hiring last fall. Asked if he felt the Plan was fair, he mused, "Getting fully paid sounds pretty fair," and added, "Everybody getting paid is a laudable

---

[8] Later, consistent with this sentiment, Bashas' asked to modify its Plan to add covenants regarding quarterly financial reporting; maintenance of a $100 million minimum inventory; reasonable inspection provisions; a maximum capital expenditure covenant; and maintenance of a $50 million EBITDA. (ECF No. 2338.)

[9] When Bashas' case was commenced, it leased 163 stores. In the bankruptcy cases, it has rejected 36 leases; modified 67, and assumed (with no modifications) 60 stores. (Ex. 31). It now has about 127 leased properties, rather than 163.

goal." The Committee felt that Bashas' had positioned itself with the right leadership to make the Plan work: "If they continue as they have, they can be successful."

Mr. Giltner pointed out that the unsecured creditors felt that the forecasting was reliable, and that the Committee was solidly in support of the Plan.

## B. **Objecting Creditors' Case**

At the confirmation hearing, only the Banks and Noteholders took an active role. In opposition to the Plan, they presented one witness.

### 1. **Morris C. Aaron**

Mr. Aaron was engaged by the Banks and Noteholders on June 25, 2010, one month before the confirmation hearing, as an expert witness on feasibility and interest rates. By July 13, 2010, he and his company, MCA Financial, had produced a report (Ex. PP) and compiled a list of the Debtors' real property, which contained a Broker's Price Opinion of Value (Ex. MMMM). The person who prepared the real property analysis, James C. Donley, did not testify and is not a real property appraiser, and is licensed only as a broker. Mr. Aaron testified that he relied on Mr. Donley's exhibit concerning the real property values in formulating his opinions. Mr. Donley is an employee of MCA Financial or one of its affiliates, MCA Brokerage Services.

Mr. Aaron and his associates did not have sufficient time to converse with the Debtors' management, nor to attain an appraiser's value on the numerous properties owned by the Debtors. Instead, they limited their review to numerous documents provided by Bashas' to parties during these cases, to the Banks' records and to various financial reports compiled throughout the bankruptcy cases. This information was received over a period of time from July 1-12, 2010. (Ex. PP, ex. A.)

Mr. Aaron is a Certified Public Accountant, and since 2000, has been the President of MCA Financial Group (Ex. PP, ex. B.), which assists clients with various aspects of their financial needs. He has never been a banker, nor been involved in the making of institutional loans.

Called as the Banks' and Noteholders' expert witness on both interest rates and the Plan's feasibility, Mr. Aaron outlined for the court his method of choosing what he believed would be a realistic rate to be charged by "the market" to a borrower in Bashas' current financial condition. His method was based upon segregating Bashas' property into their separate and distinct types, and then applying a risk formula to each type, as well as ascribing a "loan-to-value" ratio for each separate bundle of collateral. (Ex. PP, ex. D.)

Through this analysis, Mr. Aaron arrived at different interest rates for the "senior secured line of credit," the "non-core" real estate and what he described as the subordinated debt. Then, he applied "risk factors" to his conclusions, and arrived at what he felt was a market rate of interest of between 13-15% for the Banks.

As for the Noteholders, Mr. Aaron felt that a market rate of interest would range from 10.3-25%.

On cross-examination, Mr. Aaron acknowledged that he was unaware of the evidentiary hearing held on June 23, 2010, regarding the dispute over whether Bashas' should assume its selected real property leases, with modifications. Mr. Aaron relied on outdated information for that portion of his opinion, in opining on how many stores were losing money. (He felt that 24 stores were involved, when in fact the true number was six.)

He also agreed that since there had been no prior, pre-bankruptcy monetary defaults, the risk of future defaults was much less than the typical Chapter 11 case. Mr. Aaron did not appear to appreciate that the Debtors had actually been able to accumulate over $100 million to use for plan purposes and to move forward. Nor did Mr. Aaron's opinion take into account that the Grace loan of only $2 million would be paid off in one year, and that the Debtors would then have approximately $80 million of unencumbered real estate to support their financial strength.

Also, Mr. Aaron's report, in part, assumes that the Parra Litigants will eventually prevail in their entire $36-38 million claim. However, when pressed on the point, Mr. Aaron

admitted that he had undertaken no in-depth analysis of the current state of the District Court records; what proceedings had occurred to date; had not discussed the risk/success probabilities with either Parra Litigants' or Bashas' counsel; and had not canvassed the available legal literature concerning the size of verdicts on the legal theories asserted by the Parra Litigants. Mr. Aaron eventually conceded that he knew very little about the Parra litigation. As a non-attorney, Mr. Aaron lacked the credentials to even begin to opine on contested litigation and its probable outcome.

The same difficulty confronted Mr. Aaron when asked, on cross-examination, about his opinions concerning the Debtors' real property values. Mr. Aaron is not a real property appraiser, and the opinions on which he relied, were also not prepared by a qualified appraiser.

Instead, the estimated values were the work product of an in-house broker for MCA, James C. Donley. Mr. Aaron admitted that Mr. Donley spoke with no one at Bashas' or Hilco about his real estate conclusions.

Thus, as for the "non-core" real estate conclusion that the fair market values were 45% less than the Debtors' values, there was nothing substantive to back it up. The same goes for Mr. Aaron's view that the core real estate was overstated by $20 million. While Mr. Aaron is, of course, entitled to his opinion, it lacks the necessary weight and underlying support to be considered reliable as an expert valuation.

While opining on the feasibility of the Plan, Mr. Aaron emphasized the negatives, but gave no apparent weight to such factors as competence of management; substantive cost-cutting achieved to date; savings realized by lease modifications; sales of excess property during the Chapter 11; realizing profitability; and banking over $100 million since the inception of bankruptcy.

Additionally, Mr. Aaron piled on the Bank's default interest, and the Noteholders' Yield-Management figure, without consideration or appreciation for the fact that these aspects of the Lender Group's loans were in dispute. Again, there was no analysis as to the legal probabilities of success on those claims.

Mr. Aaron also testified that he felt the Debtors' store equipment was old and would need expensive replacement. He based his opinion on a cursory walk-through of only eight of the Debtors' 130 stores (6% of the stores). And, when against questioned about his valuation credentials

for equipment, he acknowledged that he had none.  Nor does a "walk-through" constitute much of a survey to be considered viable evidence.

Mr. Aaron did acknowledge that he agreed with the operating financial information provided by Mr. Linscott, and that he did not find material differences, but ultimately concluded that the Plan was not feasible.

Similarly, Mr. Aaron opined that the Bashas' entities would not be able to finance out of the Chapter 11 in three years, and felt that they would be unable to borrow the necessary $155 million.

## VIII.  OBJECTIONS TO THE PLAN

### A.  Preliminary Comment

Reorganization of a struggling business, through a federal bankruptcy court, is a uniquely American concept.  The theory behind the statutes is, whenever possible, to save a viable entity from liquidation, and in the process retain jobs, preserve ongoing and future vendor relationships, and pay creditors as much or more than they would receive than if the business was liquidated.  If it is possible to pay all creditors, then preservation of the going concern value for shareholders can also be achieved.

Here, in that spirit, the Debtors have presented an ambitious plan, which promises to pay most creditors the full amount of their allowed claims, with interest, over a three-year period. Bashas' creditor classes are 18 in number, and their equity (shareholder) class is the nineteenth.

The Plan has the support of 14 of the voting classes (administrative claims are not included within that number).  Three classes of creditors oppose the Plan.

Thus, even though a bankruptcy proceeding represents the "dark side of capitalism," Chapter 11 allows for financial redemption.  Many times, plans are approved with the unanimous consent of all affected creditors.  Other times, plans are opposed and all sides may present their

positions for and against plan approval (confirmation). When the latter event occurs, the bankruptcy court weighs the evidence, considers its persuasiveness and applies the law to the facts.

Here, unanimous consent was not reached, and the Debtors presented evidence in support of their Plan. They bear the burden of proof by a preponderance of the evidence under § 1129(a) and (b) of the Code. *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 653 (9th Cir. 1997); *In re Arnold and Baker Farms*, 177 B.R. 648, 654 (9th Cir. BAP 1994), *aff'd*, 85 F.3d 1415 (9th Cir. 1996).

## B. Specific Legal Objections

Objections to the Debtors' Plan were initially filed by four creditors (or groups of creditors). These parties are (1) the Bank Group (Class 3); (2) the Noteholders (Class 4); (3) the Japanese American Citizens League (no class--assumed lease); and (4) the Parra Litigants (Class 16).[10] However, post-hearing, the Japanese American Citizens League withdrew its Plan objections due to a settlement. In general, the objections of each of the three remaining objecting parties can be charted on a grid, as set forth below:

| Grounds for Objection | Banks[11] | Noteholders[12] | Parra Litigants |
|---|:---:|:---:|:---:|
| Plan Conforms to § 1129(a)(1) & (2) | ✓ | ✓ | ✓ |
| Lack of Disclosure § 1125; § 1127 | ✓ | ✓ | -- |
| Feasibility § 1129 (a)(11) | ✓ | ✓ | ✓ |
| Bad Faith § 1129(a)(3) | ✓ | ✓ | ✓ |

---

[10] One creditor, Topco Associates/Holdings filed a document styled "Reservation of Rights," on March 25, 2010. But Topco then voted to accept the Plan, as a Class 10 creditor (ECF No. 1631). Topco did not file an objection to the Plan or participate in the confirmation hearing. The court therefore concludes that Topco is satisfied with its treatment under the Plan, which moots out its earlier concerns.

[11] The Bank Group objects, also, on the grounds that it is entitled to default interest. That legal issue will be presented at a later time. Similarly, the issues of § 506 entitlement to professional fees and costs to an oversecured creditor must be decided later.

[12] The arguments as to whether the "make-whole" or Yield-Maintenance agreement is a prepayment penalty is likewise reserved for later decision.

| | | | |
|---|---|---|---|
| Cramdown; Absolute Priority; Fair & Equitable; Unfair Discrimination § 1129(b) | ✓ | ✓ | ✓ |
| Future Management & Compensation § 1129(b)(5) | ✓ | ✓ | -- |
| Substantive Consolidation | ✓ | ✓ | -- |
| Classification § 1123 | -- | ✓ | -- |
| Best Interests Test § 1129(a)(7) | -- | -- | ✓ |

In the pages that follow, the court will address each objection, and will detail the applicable law and apply it to the facts of these cases.

The most logical way to deal with this variety of objections is to discuss them in relation to the elements required of debtors to affirmatively prove that their businesses can be reorganized.

Thus, the court will begin its analysis by discussing each of the legal requirements for the confirmation of a plan.

## IX.  THE CONFIRMATION ELEMENTS OF § 1129--THE 16 ELEMENTS

As can be seen by the foregoing chart, many of the objections touch on the same legal subject.  Therefore, unless an objection has a "creditor specific" component, each of the objections will be dealt with together, in the same discussion, as each confirmation element is marked off, discussed and decided.

Confirmation has two major parts (1) the § 1129(a) factors, comprised of 16 separate areas of inquiry and proof, and (2) § 1129(b)'s scrutiny for whether a plan treats dissenting classes fairly and equitably.  If it is found to have done so, a plan can be confirmed in spite of the objections, and those dissenters will be bound by the plan.

The court is charged with the responsibility of determining whether a debtor has proven each of the applicable elements of § 1129.  It does this by measuring the factual evidence against the appropriate legal standards.

**A.  Sections 1129(a)(1) and (2)--General Compliance**

**1.  In General**

The section requires that the plan and plan proponent (here, the Debtors) have complied with applicable bankruptcy law.  This means that the law has been followed throughout the administrative portion of the case, appropriate fees and reports have been tendered, that the court and creditors have been privy to financial information, that in all respects a debtor has been transparent and candid in its communications, and that it has materially complied with the substantive bankruptcy statutes and rules.

Here, the administrative record supports the finding that these elements have been met.  All necessary professionals in the cases have been appointed by the court, fees for those professionals have been disclosed and vetted, and procedures for noticing out the Debtors' Plan with adequate disclosure (§ 1125) have been followed.  There has been no assertion that the vote solicitation process for votes has been tainted or is otherwise improper.  Therefore, it appears that, in general, these provisions of the Bankruptcy Code have been satisfactorily met.

**2.  Specific Concerns**

Concerns of the three objecting creditors, as to the §§ 1129(a)(1) and (2) elements, argue that compliance with this portion of the statute was deficient.  Each argument will be addressed in turn.

**(a)  The Parra Litigants**

This group of potential creditors have been placed into a separate class (Class 16) because, to date, and for the last eight years, they have merely subsisted in a filed lawsuit, which

appears to still be far from decision. Today, they have no liquidated claims, and, as their objection acknowledges, they are years away from that result. (ECF No. 1589, at 5, lines 18-19.)

This class was allowed to vote, and has rejected the Plan.

The Parra Litigants argue that the Plan violates the Code in several ways. First, they claim that by being isolated into a single class, they are being "unfairly discriminated" against. By being so segregated, they contend that the Code's general provisions are violated. This argument fails on the merits. The Bankruptcy Code does not outlaw discrimination between classes of claims. It only outlaws "unfair" discrimination. Discrimination is appropriate if there is a sound and rational business reason for doing so. *See In re Johnston*, 21 F.3d 323 (9th Cir. 1994) (a plan satisfies § 1129(b)(1) if there are "reasonable, nondiscriminatory reasons" for separate classification). Likewise, § 1122 is also clear on the point. Claims must be "substantially similar" to be put in the same class. 11 U.S.C. § 1122(a); *see also Johnston*, 21 F.3d at 328.

There is no question, on the entire record before the court, that the Parra Litigants' claims bear no similarity whatsoever to the other unsecured creditors. Not only are they disputed and wholly unliquidated, they are embroiled in contested litigation, where they have languished for the last eight years. No evidence was presented by the Parra Litigants that their case is anywhere close to trial, and their own statement is that such a resolution is "easily . . . two or more years after the Effective Date." (Parra Objection at 5, lines 18-19, ECF No. 1589.) Today, all the Parra Litigants' claims are merely untested legal theories, nothing more and nothing less. They presented no evidence at the confirmation hearing. They therefore bear no similarities to the other classes which have actual liquidated claims, and thus, separate classification of the Parra Litigants' claims does not offend the Code and is consistent with Ninth Circuit law on this issue. Their current status in this reorganization has very little practical significance.

Next, the Parra Litigants complain that their disputed, unliquidated claims do not bear interest until the claims are liquidated. Neither does this Plan provision offend the law. For example, Arizona law will not allow pre-judgment interest to be calculated on matters in dispute, for the reason that the party ultimately held to be liable does not know the sum he owes and hence cannot be in default for not paying. *Ariz. Eastern R. Co. v. Head*, 26 Ariz. 259, 224 P. 1057 (1924);

*Fogleman v. Peruvian Assocs*., 127 Ariz. 504, 507, 622 P.2d 63, 66 (App. 1980); *Ariz. Feeds v. Southern Pac. Transp. Co.*, 21 Ariz.App. 346, 519 P.2d 199 (1974). Thus, there is no legal reason to pay interest on a disputed claim until that claim is liquidated and allowed.[13] Deferring payment until an exact sum in litigation is known does not offend the Bankruptcy Code, the common law or justice.

The Parra Litigants also complain that no reserve is carved out for their future benefit. For the same reasons that these claims should not bear interest on an unknown amount (or no amount), there is no Code provision or case of which this court is aware that would require any kind of substantial deposit to be made for the Parra Litigants' class' sole benefit.

The Parra Litigants also contend that the Plan's treatment fails to give them the "indubitable present value equivalent to the . . . potential allowed claim." Here, the Parra Litigants miss the point, which is that today the claims have <u>no</u> value. Theirs are only unproven assertions, about which the outcome is speculative, uncertain, risky and unpredictable. Today, the claims are value<u>less</u>. They are zero. They have no present value. Thus, the "indubitable equivalent" of zero is zero. *See, e.g., In re Aspen Limo. Service, Inc.*, 193 B.R. 325 (D. Colo. 1996) (plan not to be held hostage to vague claims of entitlement).

The Parra Litigants contend that the Plan violates the absolute priority rule. It does not. The Parra Litigants' proposed treatment, if and when they are able to liquidate claims against Bashas', will be paid in the same manner with that accorded other unsecured creditors. That treatment is 100% of the approved claims, with interest. The only difference is that the payment schedule will not commence until they liquidate their claims.

In that same vein, the Parra Litigants argue that a court must take into account the possibility that, as a potential creditor, they may recover a large judgment, and therefore Bashas' must reserve for it. Without discussing whether the Parra Litigants' case supports that notion, the court notes that the Parra Litigants presented no evidence, no expert witnesses and no documentation upon which this court could make a single finding as to <u>any</u> value to be ascribed to the Parra

---

[13] Along these lines, if the District Court were to grant the Parra Litigants a judgment, any interest entitlement would constitute a part of the decision.

Litigants' litigation or claims. Without a single piece of evidence on this issue, the Parra Litigants are left without this toehold upon which to oppose confirmation.

At confirmation, the Lender Group's[14] expert, Morris Aaron, was questioned about the Parra Litigants' claims, by counsel and by the court. Mr. Aaron testified that he had done no in-depth study of the claims, did not know the procedural status in the District Court, did not review the District Court's file nor confer with either the Parra Litigants' or Bashas' litigation counsel, and did not canvass available legal literature and journals as to the range of past verdicts in similar cases. He was fully unable to offer even a layman's opinion on the probabilities of the success of the claims (Mr. Aaron is not an attorney). In short, Mr. Aaron's testimony concerning any part of the Parra Litigants' claims or litigation, and the merits or difficulties inherent in the litigation, was simply devoid of information which might have any degree of probative value.

Nor does the transcript of June 16, 2010 support any argument that there was either a binding stipulation or court approval of a stipulation as to how the Parra Litigants' claims would be treated at confirmation. (*See* Banks' Request for Judicial Notice, filed July 21, 2010, ECF No. 2278.) In that hearing, the only Parra matter on for hearing that day was a discovery dispute between the Debtors and the Parra Litigants, which centered around the voting process, not a confirmation evidentiary concern.

Even if the parties discussed the possibility of entering into a future stipulation, one was never presented to the court. The court asked the parties: "Why don't you work on a stipulation." (Trans. at 55, lines 7-8, ECF No.2278.) Nothing was heard on the subject since.

Then, in actually ruling on the matter before it, on June 16, 2010, the court stated: "Let me grant the motion to quash for now, and I trust you all will have some conversations and hopefully work out some of these details to your satisfaction." (Trans. of June 16, 2010 hearing at 58, lines 14-19, ECF No. 2278.) A review of that transcript, in its proper context, reveals that no stipulation, concerning how to treat the Parra Litigants' claims in the confirmation case, was ever settled. The Parra Litigants' suggestion that the hearing on the discovery dispute, on a pure

---

[14]     The Lender Group consists of the Banks and the Noteholders.

discovery issue, somehow morphed[15] into a binding stipulation concerning an important confirmation issue is rejected.

The Parra Litigants' objection to the Debtors' Plan, on § 1129(a)(1) and (2) grounds, will therefore be OVERRULED.

### (b) **Bank Group**

The Bank Group also opposes the Plan, and maintains that several legal bases have not been adequately proven in order to carry confirmation. The Bank Group challenges the Debtors' plan on legal grounds, which can be separated by the court into categories. As the court views the case, these contentions cover the following areas:

|   | **Law** | **Area of Concern** |
|---|---|---|
| • | § 302; FED. R. BANKR. P. 1015 | Substantive consolidation of Sportsman's and Bashas'. |
| • | § 1129((a)(3) | Good faith. |
| • | § 1129(a)(11) | Feasibility. |
| • | § 1129(b)(2) | Cramdown interest rate and whether treatment is "fair and equitable." |
| • | §§ 1129(b)(4) & (5) | Compensation to management. |
| • | §§ 1129(a)(1) & (2); § 1125; § 1127 | Modification and disclosure. |
| • | §§ 1129(a)(1) & (2) | Bank professional fees and pre-petition payments. |

In this part of the discussion, the court will address the Banks' objection on § 1129(a)(1) and (2) grounds. The Banks focus on what they believe to be inadequate disclosures with regard to the Debtors' Modifications filed on June 14, 2010 (ECF No. 1949).

The purpose for adequate disclosure is to enable creditors to consider meaningful information as will enable them to make an informed decision when voting on a debtor's plan.

---

[15]     "To transform or be transformed," WEBSTER'S NEW WORLD COLLEGE DICTIONARY, 2010.

§ 1125.  Although the Banks state that "while a few courts have allowed simultaneous consideration of a plan modification and confirmation of the plan as modified,"  the Banks  argue that this is not one of those cases.

The court differs with the Banks on this general premise.  Modifications of plan occur in many different ways, and in many types of factual scenarios.  In order for a reorganization case to function as intended--which is to move it forward at a reasonable pace consistent with justice--it is necessary to consider the totality of circumstances when it comes to modifications.  The challenge for courts, creditors and attorneys comes, with operating businesses, in the knowledge that nothing remains static, and constant adjustment is necessary to attempt to reach the correct result at the end of the case.  As the courts have noted, because reorganization cases are fluid, there may be shifting alliances, ongoing negotiations and last-minute changes, right up to and sometimes through confirmation.[16]  *See In Re Woodbrook Assocs.*, 19 F.3d 312, 322 (7th Cir. 1994):  "A special aspect of the practice of bankruptcy is that it functions on a fluid set of facts, i.e., the plan can always be changed.  And, for the most part, bankruptcy courts permit the parties to submit numerous and alternative plans.  Yet, bankruptcy courts are given a great deal of discretion to say when enough is enough."  *See also  In re Henry Mayo Newhall Mem'l Hosp.*, 282 B.R. 444, 457 (9th Cir. BAP 2002) (Marlar, J., concurring) (considering "all the fluid factors of an evolving chapter 11 case"); *In re Buckner*, 218 B.R. 137, 149 (10th Cir. BAP 1998) (Matheson, J., concurring) ("Bankruptcy proceedings are not static; they are fluid and continuing.").  This is the reality of a Chapter 11 practice, and it happens every day, and sometimes several times in one day.  Thus, this court cannot accept the Banks' blanket statement that only "a few courts" permit this.  This court's experience as an attorney, judge and former Ninth Circuit Bankruptcy Appellate Panel judge shows this type of practice to be the rule, not the exception.  Were a court to be so rigid in the application of equitable principles that it required that new disclosures and solicitations were needed for every change, it

---

[16]     For example, the Japanese American Citizens League settled its dispute and withdrew its Plan objection, one week after conclusion of the evidentiary confirmation hearing, notifying the court of the settlement on August 6, 2010.

would be extremely difficult to achieve meaningful progress on any given case. Cases would stall as the parties endlessly debated evolving new issues.

As the Banks point out, and the court agrees, that in order for there to be a halt called to ongoing proceedings, and new information relayed to constituents, any proposed modifications must be material to any affected class. *In re Downtown Inv. Club III,* 89 B. R. 59 (9th Cir. BAP 1988).

The court has carefully considered the original plan (ECF No. 1372) and the Modifications (ECF No. 1949), as well as the Second Modifications made as part of the Debtors' case-in-chief (ECF No. 2338), and now addresses the materiality concerns.

The Banks first contend that it is material that Grace Financing has now elected to not lend more to the Debtors than the $2 million which it lent pre-petition. This is not, in the court's view, a material item which needs re-disclosure. This is so because Grace never lent more than $2 million to the Debtors, even though it had been approved as a DIP post-petition lender (ECF Nos. 11 and 154). As to its pre-petition status, pursuant to § 365(c)(2), Grace could not be forced to lend, post-petition, under a pre-petition agreement (Ex. CC). Grace's note interest rate has been alleged to range between 8%-12%, but Grace has now agreed to accept the lesser amount. This is not a material change, and it is not adverse. Moreover, by not lending further to Bashas', its debt has remained static and will not grow. In addition, as Mr. Andersen testified, the Debtors will not require additional interim financing for the next three years.

As for the interest rate being fixed at 8%, this change only adversely affects Grace, and Grace voted in favor of the Plan and supports it. (Trans. Depo. of Howard T. Grace at 9, lines 2-3; Ballot report and supplement, ECF Nos. 1631 and 2272.) If the Plan's other provisions are fair and equitable to other classes, then this change to the Grace obligation is not material. And, materially underlined helping the other constituencies is the provision that requires Grace to release a substantial portion of the real property collateral upon the Effective Date, and the balance of the lien will be released at the end of one year. At confirmation, that released portion of the non-core realty is then pledged as underlined additional collateral to the Lender Group (Banks and Noteholders). It is not only doubtful that creditor classes would have changed their votes if this were to be more fully disclosed,

but the Banks failed to present any affirmative evidence of any creditor or class which contends they were either misled or mistreated by this change.

Next, the Banks contend that the change in interest rate to Classes 10, 11, 12 and 16, from Prime Rate (3.25%) to 5% needed more disclosure. Inherent in this argument is that unsecured creditors would reject being paid <u>more interest</u>, and would insist on taking less. This is not plausible. Moreover, the largest group with recognized claims, the trade creditor class, was represented by a Creditors' Committee with competent counsel. Through Mr. Giltner, the testimony was that the Committee unanimously supported the Plan. The class vote affirms that testimony.

Thus, the Banks' argument "that reasonable creditors might consider [an interest increase of 3.5% to 5%] unfavorable" was neither proven by the facts nor is supported by common sense. (Banks' Confirmation Memorandum at 23-24, ECF No. 2245). To accept the argument would promote form over substance. In addition, payment terms were shortened from five to three years. Mr. Giltner, for the Committee, approved of this positive change as well.

Finally, on this entire argument, the court notes that the Banks are, and have been throughout this proceeding fully secured. (*See* Banks' Objection at 29, line 3, ECF No. 2245.) Thus, they have no standing to speak for Classes 10, 11, 12 and 16, nor object on their behalf.

The first amended disclosure statement in these cases, approved by the court and sent to each of the 16,000 creditors in these cases, was 98 pages long, to which were appended numerous documents (ECF No. 1373). The later modification served on these same parties referred them to updated information which was available on the Internet (ECF No. 1949 at 11). This modern method of communicating supplemental information was adequate. No legitimate purpose would be served by a costly and time-wasting exercise in formalized futility.

Finally, the Banks argue that the Debtors "need a revolving line of credit, and that fact requires a re-disclosure." Unfortunately for the Banks' argument, the facts of these cases do not support the statement. While Mr. Andersen testified that while such a revolving line would be "good insurance" against unknown contingencies, he also stated that it was not required, since the Debtors had operated, without having such a line, for the past year, and could continue to do so in the future.

In sum, the court disagrees with the Banks that the Debtors have been guilty of "willful and deliberate violation" of the Bankruptcy Code's disclosure requirements. (*See* Banks' objection at 10, lines 14-15, ECF No. 2245.)

Thus, the objections on 11 U.S.C. § 1129(a)(1) and (2) grounds will be OVERRULED.

### (c) The Noteholders

To the extent that the Noteholders joined in the Banks' objections (Noteholders' objection at 2, lines 17-18, ECF No. 2246), those objections will be OVERRULED for the reasons stated above.

The Noteholders spend the majority of their objection discussing their disagreement with the Debtors' challenge to that portion of their claim referred to as the "Yield-Maintenance" provision. They contend that they have been misclassified as a creditor class, and that therefore the Plan is in violation of §§ 1122 and 1123, and that this taints the §§ 1129(a)(1) and (2) requirements of the Code.

In reviewing the objection, the court cannot find any suggestion from the Noteholders as to which class they feel would better fit with their interests. It is doubtful that the Noteholders would prefer the floating interest rate proposed for the Banks (Class 3), and thus forsake the 8.5% interest provision proposed for the Noteholders in the Plan. Likewise, it is doubtful that they would waive their collateral, and agree to become unsecured creditors and opt for 5% interest, when the Plan calls for an 8.5% fixed rate.

Eventually, the court will be called upon to decide whether the Yield-Maintenance provision of the Noteholders' debt is a penalty or a proper part of the Noteholders' obligations. This, however, is not a Plan issue. It is a claim issue. Whatever the Yield-Maintenance provision turns out to be will determine the amount to be repaid. However, that amount will be paid pursuant to the Plan, if confirmed, or even in a post-confirmation modification proceeding. § 1127.

This objection, then, as to the §§ 1129(a)(1) and (2) requirements, will be OVERRULED.

### 3. **Sections 1129(a)(1) and (a)(2)--Conclusion**

The court finds and concludes that the Debtors have satisfied §§1129(a)(1) and (a)(2) of the Code.

### B. **Section 1129(a)(3)--Good Faith**

Good faith is an inherent requirement which runs throughout the entire Bankruptcy Code. Because the bankruptcy court is a court of equity, as well as a court of law, and because of the fluidity of bankruptcy proceedings, equity demands a constant balancing of the competing needs of the various constituencies. It is essential that bankruptcy proceedings be transparent, candid and always operate in that spirit.

In its most basic sense, "good faith" means honesty in purpose, faithfulness to one's duty or obligation, observance of concepts of fair dealing, and the absence of intent to defraud or to seek unconscionable advantage. BLACK'S LAW DICTIONARY (9th ed. 2009). The bankruptcy definition most commonly applied is that the good faith, that is needed to confirm a plan of reorganization, requires the plan to achieve a result consistent with the objectives and purposes of the Bankruptcy Code. *In re Sylmar Plaza, L. P.,* 314 F.3d 1070, 1074 (9th Cir. 2002) *(citing In re Corey*, 892 F.2d 829, 835 (9th Cir.1989)); *In re Stolrow's, Inc.*, 84 B.R. 167, 172 (9th Cir. BAP 1988); *In re Jorgensen*, 66 B.R. 104, 108-09 (9th Cir. BAP 1986). In order to determine good faith, a court must inquire into the totality of circumstances surrounding the plan, the application of the principal of fundamental fairness in dealing with creditors, and whether the plan itself will fairly achieve a result consistent with the objectives and purposes of the Code. *Sylmar Plaza*, 314 F.3d at 1074; *Stolrow's,* 84 B.R. at 172; *Jorgensen*, 66 B.R. at 109; *see also In re Kemp*, 134 B.R. 413, 414-15 (Bankr. E.D. Cal. 1991); *In re Jasik*, 727 F.2d 1379, 1383 (5th Cir. 1984).

With these concepts in mind, the court now considers the individual objections, on good faith grounds, in the context of the cases' progress in the bankruptcy court.

## 1. **Parra Litigants**

The Parra Litigants maintain that the Debtors' Plan violates the good faith requirements of § 1129(a)(3), principally, because the Parra Litigants argue, their claims have been separately classified in order to "gerrymander" the votes.

This argument fails for two reasons: (1) As the court has previously noted, separately classifying a potential class due to its dissimilarity from other unsecured claims is permissible. *Johnston*, 21 F.3d at 328. There is no question but that separate classification of the Parra Litigants' claims meet that test. (2) Even if the Parra Litigants were to be included along with the unsecured class, they would not control the class, nor come anywhere close to control, because the Parra Litigants' claims--for voting purposes--were earlier stipulated to be $10,000 each. Therefore, rejecting votes of $20,000 would not impact the unsecured class, which had $16,791,528.80 in acceptances. (*See* Ballot report and supplement, ECF Nos. 1631 and 2272.)[17] There would thus have been no manipulation of the class structure ("gerrymandering") to warrant a finding of bad faith.

As for their first contention, the Parra Litigants presented no evidence to prove that their type of unliquidated, disputed claims bore similarities to any other class.

Nor is the argument supported that the Plan improperly "gerrymanders" the classes in order to isolate the Parra Litigants. Where a plan separately classifies similarly-situated creditor claims but treats them equally, in order to create a friendly class to vote for the plan, the "gerrymandering" of the claims constitutes lack of good faith. *In re Barakat*, 99 F.3d 1520, 1525 (9th Cir. 1996); *see also In re Cardsystems Solutions, Inc.*, 2007 WL 4166184, at *10-11 (Bankr. D.Ariz. Nov. 19, 2007). The Parra argument fails.

---

[17] Rejecting ballots were only $186,512.95. Adding $20,000 to that figure does not change the outcome of the Class 11 vote in favor of the Plan.

As stated, the Parra claims are different from other classes, and separately classifying them has no impact on the Debtors' ability to gather accepting votes from the numerous other classes.

This objection, made under § 1129(a)(3), will be OVERRULED.

## 2.  **Banks and Noteholders**

Although the Noteholders joined in the Banks' objections, concerning the Debtors' good faith, they raised no independent arguments.  The Noteholders' principal opposition comes in the application of the "cramdown" requirements, and their concerns over the Yield-Maintenance component of their claims.

The Banks, on the other hand, argued that several factors required a judicial finding of bad faith.

First, the Banks argue that the bankruptcy cases were filed to "pursue pointless litigation." The court assumes that the Banks are referring to the preference action, which the Banks won at the trial level.  That matter is still on appeal, and no final decision has yet been made on it. Until it is finalized by a reviewing court, it is premature for anyone to consider whose view of justice is the correct one.  This court judged the matter at the trial level; the appellate courts can decide whether legal error was made in connection therewith.  This court has lost jurisdiction to comment further on the matter.  As for the "point" of the litigation, no one knows that answer until an appellate court finally provides it. A plan is not proposed with a lack of good faith merely because opponents question the legality of some of its terms. *In re Pac. Gas & Elec. Co.*, 304 B.R. 395, 404 n.13 (Bankr. N.D. Cal. 2004).

Next, the Banks maintain that the Debtors "played a 'shell game' with the Lender Group and the Committee for almost a year" in the Chapter 11.  In noting that the unsecured creditors voted in favor of the Plan, did not object and supported the Plan, the court finds that the Banks have not produced any evidence that the Committee or unsecured creditors led them astray, nor have they any other support for their contention.  Nor did the Banks present any affirmative

evidence of any "shell game" (whatever is meant by that term) from any of the affected Banks. In fact, both Mr. Andersen and Mr. Giltner testified that they had hoped that the Banks would have taken a more active role in the case. This objection fails for lack of evidence.

Third, the Banks argue that the cases were filed to "gain leverage" over the Lender Group, and that the Debtors changed course between methods of implementing the Plan (operational repayment vs. immediate takeout financing). Exploring different options in a Chapter 11 case is not indicative of bad faith. It simply means running the maze and seeking a way out. This is the very definition of how a Chapter 11 case proceeds. Nothing is set in concrete until confirmation of a plan finally fixes the rules.

Fourth, the Banks complain that the insiders have carved out a comfortable position for themselves at the expense of the creditors. The court disagrees. This is a large and complex commercial enterprise, with over 8,000 employees, and with annual cash revenues of $2 billion. The Debtors have built up over $100 million in cash in the last year, made dramatic changes to their financial and management structure, and need proper corporate expertise to manage the business and implement the Plan. No evidence was presented to show that the current salaries are out of line in comparison to similar businesses. The Banks maintain that successfully reorganizing the businesses will allow the current equity holders to "capture any upside should the Debtors' business thrive or be sold." (Banks' objection at 14, lines 17-18, ECF No. 2245). If that were to happen, of course, it would mean that the Plan would be consummated and the creditors would be paid 100%, plus interest. The court understands that this is exactly what Chapter 11 is designed to do.

Aside from the objecting parties' concerns, the court independently concludes that these large cases have moved forward at a fast and steady pace, with competent professionals representing all major constituencies, and have done so, for the most part, in a cooperative and professional way. The court is always alert for abuses of the system, and, happily, has not seen that to be the case here.

### 3.  **Section 1129(a)(3)--Conclusion**


These Chapter 11 cases are progressing as they should, and the court finds that the Debtors and all creditor constituencies have presented themselves in the best possible light throughout.

The objections on § 1129(a)(3) grounds will be OVERRULED.  The Debtors have satisfied this statutory requirement.


### C.  **Section 1129(a)(4)--Payments In Connection With the**
### **Case or Incident to the Case Must Be Approved and Reasonable**


Typically, this Code section refers to the court's supervision over professional fees. To date, all professionals who are required to do so have applied to the court for fees, have circulated their requests to the primary constituents and the U.S. Trustee, and have given parties the opportunity to object.

The court has approved fees on an interim basis, and eventually, procedures will be followed to allow the final entry of orders.  The Plan allows the court to retain jurisdiction, for this purpose, post-confirmation.  (*See* Plan, at 30-32, para. IX, items D, F, I and M, ECF No. 1372.)

The court finds and concludes that § 1129(a)(4) has been met by the Plan and its proponents.


### D.  **Section 1129(a)(5)--Post-Confirmation**
### **Officers and Directors, Insiders and Compensation**


A Chapter 11 plan may not be confirmed if the continuation in management of the persons proposed to serve as officers or managers of debtor is not in the interests of creditors and public policy.  § 1129(a)(5)(A)(ii); *see  In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003) (citing *In re Sovereign Group*, 1984-21 Ltd., 88 B.R. 325, 329 (Bankr. D. Colo. 1988)).

Indeed, continued service by prior management may be inconsistent with the interests of creditors and public policy if it directly or indirectly perpetuates incompetence, lack of discretion, inexperience or affiliations with groups inimical to the best interests of the debtor. *Beyond.com*, 289 B.R. at 145 *(*citing *In re Polytherm Indus., Inc.*, 33 B.R. 823, 829 (W.D. Wis. 1983)); *In re Sherwood Square Assocs.*, 107 B.R. 872, 878 (Bankr. D. Md. 1989); *In re SM 104 Ltd.*, 160 B.R. 202 (Bankr. S.D. Fla. 1993) (manager who diverted rents, violated court orders, made misrepresentations to secured creditors, commingled funds and maintained a grossly inadequate accounting system, was prohibited by § 1129(a)(5) from continuing in that capacity).

Against this legal backdrop, only the Banks have argued against the future management provisions of the Debtors' Plan (Banks' objection at 25-26, ECF No. 2245). The Banks point out that "creditors have a legitimate interest in knowing which members of the Basha family are to be employed going forward, what they will be doing, and how much of the Debtors' resources will be utilized for their compensation." The court agrees with this statement. After a review of the evidence, and the administrative record, however, the court determines that this provision of the Code has been adequately addressed.

The Debtors are closely-held corporations. (Disclosure Statement at 57, ECF No. 1373.) The Plan proposes that their shareholders will retain their interests. (Disclosure Statement at 75, ECF No. 1373.)

Sportsman's stock is owned 100% by Bashas' Inc. (Ex. XXXX, Statement of Financial Affairs, Question 21.) Bashas' Inc. has 14 shareholders, many from the Basha family, one of whom is Edward N. Basha, Jr., who owns 49.485% of the stock. (Bashas' Inc. Case No. 09-16050, Statement of Financial Affairs, Question 21, ECF No. 324.) Leaseco's sole shareholder is also Bashas' Inc. (Leaseco's Case No. 09-16051, Statement of Financial Affairs, Question 21, ECF No. 45.)

In its Modifications, Bashas' detailed who would be its post-confirmation management team. Those parties are:

1. Darl Andersen, President and CEO
2. E. N. Basha Jr., Chairman of the Board

3. A. J. Basha, Jr., Vice Chairman, VP Real Estate
4. Edward N. Basha III, VP Retail Operations
5. David Basha, Director Real Estate
6. Michael J. Basha, VP Logistics
7. James J. Buhr, VP CFO
8. Robert Ortiz, VP Merchandising and Marketing
9. Andrew N. Basha, Director Retail Operations-AJ's
10. Thomas E. Swanson, Director Retail Operations--Food City
11. Ralph Woodward, Director Retail Operations-Bashas'
12. Gregg J. Tucek, VP Legal Affairs

(Modifications at 8, ECF No. 1949; Ex. D at Conf. Hearing.) In addition, the Disclosure Statement and Plan Modifications noted that the Bashas' board would now also include two new, independent, outside directors. Both Mr. Giltner, for the Committee, and Mr. Andersen, for Bashas', testified that such a change was healthy for the company. These new directors are to be approved by the Lender Group and the Committee.

Mr. Andersen is proposed to be the operations' new Chief Executive Officer through the Plan's duration and consummation. In that regard, his employment contract was presented at the hearing (Ex. 21). Other than the provision concerning a bonus on exiting Chapter 11, which Mr. Andersen readily agreed to remove and defer, the compensation package is not out of line for the size, nature and complexity of the Bashas' business.

As for the other officers, the Debtors disclosed and reported that they were knowledgeable and experienced, and that their compensation was consistent with that set forth in the Operating Statements filed with the court. Moreover, Ex. 22 and Mr. Andersen's testimony confirmed that officer salaries had been cut by 15% in the last year, as part of Bashas' overall efforts to reduce costs. The court was also requested to review Answers to Interrogatories concerning the amounts paid to officers and executives. After doing so, based upon the size of the companies, their complexities, and their revenues, the court concludes that the salaries and benefits paid to Bashas' experienced management is not inconsistent with their responsibilities. The sole exception, based on Mr. Andersen's testimony, is the salary paid to Edward N. Basha, Jr. However, Mr. Basha agreed to reduce his salary to $1 per year for the Plan's duration. (*See* Answer to Question. 25, Interrogatories; ECF No. 2338.)

Finally, some family members hold minor hourly or weekly jobs within the Debtors. Those seven (7) people were disclosed at the confirmation hearing (Ex. 32). Their employment and wages are hereby found to be reasonable by the court.

No affirmative evidence was brought forth, by any objecting party, from which the court might conclude that § 1129(a)(5)'s requirements were not met. Therefore, the objections on § 1129(a)(5) grounds will be OVERRULED.

The Debtors have satisfied their burden as to § 1129(a)(5).

## E. Section 1129(a)(6)--Governmental Rate Control

This element of § 1129(a) is inapplicable to these Debtors. No creditor or class raised an objection on this ground, and thus the court finds that § 1129(a)(6) does not apply.

## F. Section 1129(a)(7)--Best Interests of Creditors Test

This section of § 1129(a) requires, with respect to each impaired class of claims or interests, that each holder of a claim or interest in the class either accept the plan or receive under the plan at least as much as it would receive on liquidation. *In re Mid Pac. Airlines, Inc.*, 110 B.R. 489 (Bankr. D. Haw. 1990). This is commonly referred to as the "best interests of creditors test." *In re M. Long Arabians*, 103 B.R. 211, 215 (9th Cir. BAP 1989).

In their Disclosure Statement (ECF No. 1373 at 88-91, plus Ex. S thereto), the Debtors detailed their best estimation of how creditors would fare in a hypothetical liquidation. For unsecured creditors, the estimated recovery ranged from 19-23% of each claim.

Only the Parra Litigants (Class 16) have opposed the Debtors' Plan on § 1129(a)(7) grounds.

The Plan proposes to fully pay unsecured creditors with allowed claims over a three-year period with 5% interest. The Parra Litigants' Class 16 will not participate in any distributions, nor is it provided with any interest until its claims are eventually liquidated. If they ever have

claims, the Plan provides that those claims will be paid in full, plus 5% interest, on the same type of schedule as the unsecured creditors, with one important exception--the three year payout period begins on the date the Parra Litigants' claims are liquidated. (Modification, ECF No. 1949, Ex. D.) This different treatment does not unfairly discriminate, because today, the Parra Litigants' claims have not been liquidated and are in dispute. Moreover, if the Parra Litigants are fortunate enough to have their claims liquidated in a large amount, the Debtors need time to pay them rather than collapse under their weight. Providing a similar payment period as every other unsecured creditor is consistent with the goal of consummating the Plan.

The Parra Litigants did not present any affirmative evidence that the Debtors' liquidation analysis was flawed. The Parra Litigants' objection, on § 1129(a)(7) grounds, will be OVERRULED.

The Debtors have therefore sustained their burden of proof relative to § 1129(a)(7), and that element of § 1129 has been satisfied.

## G. Section 1129(a)(8)--Each Class Must Accept or is Left Unimpaired

This provision of the Code is the counterpart of §§ 1129(a)(10) and 1129(b)(1). If each class accepts or is left unimpaired, this provision is satisfied. If one or more classes dissent and reject the plan, then the debtor must have at least one other impaired class which consents to the plan. § 1129(a)(10). Then, if all of the other § 1129(a) factors are satisfied, the case may proceed to the fair and equitable considerations of § 1129(b) (the "cramdown").

Here, the Debtors cannot satisfy § 1129(a)(8) because they do not have unanimous class consent for their Plan.

But, since they have at least one impaired consenting class, § 1129(a)(8) simply becomes inapplicable, and is replaced by § 1129(a)(10) and § 1129(b)(1).

## H.  Section 1129(a)(9)--Priorities

No party objected on this ground.  The court finds it to be satisfied.

## I.  Section 1129(a)(10)--At Least One Impaired Consenting Class

As noted above, in the § 1129(a)(8) discussion, the Debtors have cleared this statutory hurdle, because they have several impaired classes, not including "insiders," which have voted in favor of the Plan.

Section 1129(a)(10) has been satisfied.

## J.  Section 1129(a)(11)--Feasibility

Feasibility is the heart of every Chapter 11 reorganization case.  It is the most important element of § 1129(a).  Section 1129(a)(11) permits confirmation only if:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

"The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation."  *In re Pizza of Haw., Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting 5 COLLIER ON BANKRUPTCY ¶ 1129.02[11], at 1129-34 (15th ed. 1984)).

"A plan meets this feasibility standard if the plan offers a reasonable prospect of success and is workable. . . .The prospect of financial uncertainly does not defeat plan confirmation on feasibility grounds since a guarantee of the future is not required. . . . The mere potential for failure of the plan is insufficient to disprove feasibility."  *In re Patrician St. Joseph Partners Ltd. P'ship*, 169 B.R. 669, 674 (D. Ariz. 1994).

Every debtor is required to present "ample evidence to demonstrate that the Plan has a reasonable probability of success." *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986); *see also* 7 COLLIER ON BANKRUPTCY ¶ 1129.02[11], at 1129-52, (16th ed. 2010). Section 1129(a)(11) "requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan." *Id.* at 1129-53 (citation omitted). In order to determine whether § 1129(a)(11) is satisfied, a court must "scrutinize the plan to determine whether it offers a reasonable prospect of success and is workable." *In re Sagewood Manor Assocs. Ltd. P'ship*, 223 B.R. 756, 762 (Bankr. D. Nev. 1998). Plans which are based on speculation are not proper candidates for reorganization. *Pizza of Haw., supra.*

In evaluating the feasibility of a plan, the Ninth Circuit's BAP has directed courts to consider several factors, including: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *In re Wiersma*, 324 B.R. 92, 113 (9th Cir. BAP 2005), *aff'd in part and rev'd in part on other grounds,* 483 F.3d 933 (9th Cir.2007).

The Debtors' Plan has two main components. The first component, for the major constituencies, is the agreement to make regular payments over a three-year period, both in principal reductions and interest. The second component is the agreement to pay any remaining balance at the end of the third year, post-confirmation (technically, three years from the Plan's "Effective Date").

This final payment, sometimes referred to as a "balloon" payment, is proposed to come from new financing to be acquired by the Debtors in the form of some new lending vehicle. Whether that balloon payment can likely be made, and new financing acquired, requires credible evidence proving that obtaining that future financing is a reasonable likelihood. *See In re Inv. Co. of The Southwest, Inc.*, 341 B.R. 298, 311, 314, 316 (10th Cir. BAP 2006) (plan not feasible where there was no evidence to demonstrate how the debtor would be able to fund required balloon payments).

A court may not confirm a plan if its feasibility depends on future refinancing, unless there is an adequate evidentiary showing that such refinancing is likely to occur. *See In re Made in Detroit, Inc.*, 299 B.R. 170, 179-80 (Bankr. E.D. Mich 2003) (plan not confirmed when proponent made inadequate showing of ability to obtain financing); *In re Vanderveer Estates Holding, LLC*, 293 B.R. 560 (Bankr. E.D.N.Y. 2003) (similar); *In re Walker* 165 B.R. 994 (E.D. Va. 1994) (similar with respect to future sale of property).

As for future management concerns, this proof is also critical in evaluating the feasibility of a reorganization plan. *See, e.g., In re Gulph Woods Corp.*, 84 B.R. 961, 974 (Bankr. E.D. Pa. 1988); *In re Rusty Jones, Inc.*, 110 B.R. 362, 367, 372, 375 (Bankr. N.D.Ill. 1990)(finding Chapter 11 plan not to be feasible, in part, because "there can be no assurance of proper management in the future" due to management's lack of experience in the debtor's business and their prior bad acts).

The Banks have objected to the Plan on feasibility grounds, contending that the Debtors will have "no ability to refinance the massive amount of debt" that will be due three years hence. (Banks' Objection at 12, ECF No. 2245.) The Banks also argue that Debtors will experience a "massive amount of execution risk" and conclude that the Plan is "not even close to feasible." (Banks' Objection at 11, ECF No. 2245.)

The court acknowledges that, as in any litigation, there is always room for differences of opinion. But, as all attorneys know, when the evidence required to prove a particular fact is a "preponderance," this means that the proof must withstand a challenge to whether that fact is more likely than not to be correct.

Here, after considering each piece of evidence presented by all sides, both written and oral, the court finds and concludes that the Debtors have met their evidentiary burden. The cumulative witness testimony presented by the Debtors was frank, honest and persuasive, and it was presented by individuals who have impeccable personal and professional credentials. Their testimony was to the point, and it was believable. After considered review of the evidence, the court concludes that the weight of the evidence, on all aspects of feasibility (current payments, interest rates and a balloon in three years time) was credible.

The secured creditors, by having their pre-confirmation interest paid at applicable contract rates upon the Effective Date, will then be deemed to be once again current, and a "new contract"--the Plan provisions--will bind the parties in the post-confirmation period.[18]  § 1141(a); *In re Dow Corning Corp.*, 456 F.3d 668, 676 (6th Cir. 2006), *cert. denied,* 549 U.S. 1317 (2007) (holding that a chapter 11 plan is "essentially a new contract" between the debtors and its creditors) (citing *Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n*, 997 F. 2d 581, 588 (9th Cir. 1993)).  "As to post-confirmation debts, a Chapter 11 plan of reorganization constitutes a new contract between a debtor and his or her creditors."  *Murdock  v. Holquin*, 323 B.R. 275, 282 (N.D. Cal. 2005).  "[O]nce the reorganization plan is approved by the bankruptcy court, each claimant gets a 'new' claim, based upon whatever treatment is accorded to it in the plan itself."  *In re Benjamin Coal Co.*, 978 F.2d 823, 827 (3d Cir. 1992); *accord Paul v. Monts*, 906 F.2d 1468, 1471, n.3 (10th Cir. 1990) (stating that action for breach of obligations under a confirmed Chapter 11 plan was "analogous to a contract claim").

When evaluating expert opinions on such matters as interest rates and feasibility, the court is left to choose between two versions of the same "truth."  Only one can prevail.  In these cases, the court is persuaded that the Debtors proved their feasibility case by a cumulative approach, wherein the court was able to meld the facts and opinions from several sources, rather than rely exclusively on the opinions of a single witness.

The depth and breadth of the Debtors' witnesses, who have many years of experience in their respective fields, was a powerful part of the Debtors' presentation.  While the court notes that Mr. Aaron did yeoman's work in the short time he had to render an opinion adverse to the Debtors, ultimately he was disadvantaged by the short time he had from engagement to final product.  His three-week review did not come close to discrediting the collective opinions of Messrs. Linscott, Plomin, Young, Andersen and Giltner.  Moreover, both Mr. Aaron's testimony and his report suffered from too many infirmities to be able to support the enormity of the task he was asked to accomplish within a such a limited time.

---

[18]     The disputed legal issue as to whether secured creditors must also be paid default interest will be later decided in post-confirmation proceedings.

Weighing the evidence, the court finds and concludes that feasibility has been proven, and that the interest rates proposed by the Debtors are representative of the current market. On the entire record before the court, the Plan is feasible and the interest rates are fair and equitable.

Neither did Mr. Aaron appear to give any credit to Debtors' ability to have successfully run the businesses for one year, without need for DIP financing. This is a strong indicator of ability to perform in the future.

The court was also unpersuaded by his unduly rigid and inflexible approach, in an effort to dissect a hypothetical loan too finely. The Debtors' assets, liabilities, management, strategies and attitudes are an intricate and interwoven tapestry. To focus too much on the separate parts, rather than the whole, creates an artificial "market" which is not indicative of true market realities.

As noted elsewhere in this decision, MCA's real property values were problematic. MCA purported to "value" the Debtors' "non-core" real property assets, and "found" them to be worth $19.03 million, "or about half of the Debtors' values" based on "outdated appraisals." The difficulty with this conclusion is that the person who did this valuation was not a certified real estate appraiser who employed the typical methodology utilized by appraisers. In fact, the court was never informed of what method (or indeed any method) was used, since the person opining, Mr. Donley, did not testify. The opinion of value, therefore, carried no persuasive weight.

Although MCA attempted to "hedge" this lesser value, by stating that it would accept the Debtors' values (Ex. PP at 17), it then commented negatively on all aspects of that "non-core" real estate and assessed significant "risk" to the land, again "backing into" its non-expert opinion that "it is MCA's opinion that the current market value of the "non-core" real estate is approximately $19.03--not the $35.3 million alleged by the Debtors." (Ex. PP at 19.) This type of sleight of hand, is first, not helpful to the court, and second, diminishes the entire report's credibility.

The Debtors proved 11 U.S.C. § 1129(a)(11).

**K.  Section 1129(a)(12)--Fees**


The U.S. Trustee has not objected on the grounds that its fees, or related fees, are unpaid.  No creditor has suggested that compliance with this section is incomplete.

The court therefore finds and concludes that this provision of the Code has been satisfied.


**L.  Section 1129(a)(13)--Retiree Benefits**


Neither the Pension Benefit Guaranty Corporation, nor any of the retiree benefit classes (Classes 17 or 18), or affected individuals, have objected to the Debtors' Plan on the basis that the Debtors have violated this provision of the Bankruptcy Code.  In fact, the members of the class have unanimously voted in favor of the Plan.

Accordingly, the court finds that the Debtors have satisfied § 1129(a)(13).


**M.  Section 1129(a)(14)--Domestic Support Obligations (Alimony; Child Support)**


This section is not applicable to these Debtors.


**N.  Section 1129(a)(15)--Individual Chapter 11 Case**


This section is not applicable to these Debtors.


**O.  Section 1129(a)(16)--Transfers of Property**


The Plan does not intend to transfer any of the Debtors' assets, except in two ways: (1)  In the ordinary course of business, or as necessary to attach new liens to non-core real estate in favor of the Lender Group; or (2) to sell real estate or other non-essential property, as needed for

operational emergencies or to pay down Classes 3 and 4 (Banks and Noteholders). No creditor or class has opposed confirmation on this ground.

Therefore, this section either does not apply, or the Debtors have met whatever minimal burdens satisfy this Code provision.

## X. SECTION 1129(b)--THE CRAMDOWN PROVISIONS AND UNFAIR DISCRIMINATION

If a debtor is able to prove each of the applicable elements of § 1129(a), as these Debtors now have, they then must run the gauntlet of § 1129(b), commonly known as "cramdown." What the Code attempts to do in this section is to have the court analyze, for each rejecting and dissenting class, whether the plan treats them "fairly" and "equitably," and does not unfairly discriminate against them. If a secured class objects, their treatment under the plan must pass through the fire of § 1129(b)(2)(A). For an unsecured class, the applicable Code section is § 1129(b)(2)(B).

If a debtor cannot satisfy the cramdown elements, contained in § 1129(b), then a plan cannot be confirmed.

### A. Classes 3 and 4: The Secured Debt (Banks and Noteholders)--Cramdown Interest Rates

#### 1. In General

In order for cramdown to be implemented, and the Plan confirmed over their class votes against it, the Debtors must show that the Plan does not unfairly discriminate against these dissenters, and that their treatment is "fair and equitable." These latter terms have defined meanings, and in this case, require that their lien interests remain in place, and if payments are deferred and paid over a term, that those payments have appropriate "value." This "value" is generally

understood to be a market rate of interest, considering the terms, quality of the security and any risk to be borne by the affected creditor. *In re P.J. Keating Co*., 168 B.R. 464, 472 (Bankr. D.Mass 1994) (quoting applicable portion of §1129(b)(2)(A)). As a result, the interest rate paid to the secured creditor must be an appropriate rate of interest so that the creditor may realize the present value of the claim. *In re Landscape Assocs., Inc*., 81 B.R. 485, 487-88 (Bankr. E.D. Ark. 1987). If a Chapter 11 plan proposes payment of an interest rate below the "range of prevailing market rates for loans of comparable risk and duration" or which does not take into account the actual risk of that loan, confirmation must be denied because the deferred payments will not yield the present value of the claim and, therefore, the plan is not "fair and equitable" and will not satisfy § 1129(b)(2)(A)(i)(II). *See, e.g., In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 706 (Bankr. S.D.N.Y. 1993).

Some courts calculate the permissible interest rate for a Chapter 11 plan using a "formula" approach, i.e., starting with a base rate--such as the prime rate or the rate on treasury obligations--and adding a risk factor. *See, e.g., Camino Real Landscape Maint. Contractors, Inc.*, 818 F.2d 1503, 1508 (9th Cir. 1987); *In re LWD, Inc.*, 332 B.R. 543, 556 (Bankr. W.D. Ky. 2005), *aff'd,* 340 B.R. 363 (W.D. Ky. 2006). In *Till v. SCS Credit Corp.*, 541 U.S. 465 (2003), the Supreme Court adopted this formula approach for calculating interest in Chapter 13 cases. Under *Till*, interest on a secured claim is calculated based on the national prime rate and adding a risk premium--to account for the dual risks of inflation and default. *Id*.

In light of the difference between the existence of a market for cramdown loans in Chapter 11 cases, and the lack of such a market in Chapter 13 cases, the *Till* Court acknowledged that a somewhat different analysis may be required in Chapter 11 cases. That is, it may be appropriate for a court to determine the rate of interest in an "efficient" market, assuming such a market exists. *Till*, 541 U.S. at 477 n.14.

The Ninth Circuit suggests that it is the burden of the debtor in a Chapter 11 case[19] to introduce "sufficient evidence" which will establish that the proposed adjustments to the interest rate will take into consideration "the term of deferment of present use and risk of default, as affected by any security." *Camino Real*, 818 F.2d at 1507.

It would not be an exaggeration to state that cases abound on this subject, and that "one size does not fit all." In other words, there are many different kinds of approaches to how this test is met, depending on the unique circumstances of a given case.

For example, some authorities in the Ninth Circuit support the use of the blended rate analysis. *In re Boulders on the River, Inc.*, 164 B.R. 99, 105-06 (9th Cir. BAP 1994) (approving the lender's use of the blended rate methodology to determine the cramdown interest rate on a secured real estate loan under a Chapter 11 plan that provided the creditor with an 88.5% loan to value ratio); *In re North Valley Mall, LLC*, __ B.R. __, __, 2010 WL 2632017, at *6-7 (Bankr. C.D. Cal. June 21, 2010) (Albert, J.) (reviewing and analyzing *Till* and then utilizing the blended rate approach with three "tranches" or tiers: a "senior tranche" covering the debt up to the first 65% of value, a "mezzanine tranche" covering the debt up to the next 20% of value, and an "equity tranche" covering the last 15% of value). Post-*Till*, in a Chapter 11 income-producing real estate case, the Court in *North Valley Mall* observed:

> [T]he blended rate approach suggested in cases like *Boulders* and in the Reehl and Milner articles is not an attempt to mirror an *actual* market that exists. Rather, it is an attempt by principled approach to create a proxy for a market extrapolated from current data such that the court can reach the ultimate question of "present value." . . . .
>
> . . . .
>
> [I]t [one expert's testimony using this method] makes some reasonable attempt to recognize that the level of risk changes depending upon whether a lender is at the 66% mark on the collateral, or the 99% mark. Just because the marketplace right now does not quote on mezzanine debt does not change this reality nor should it, in the Court's view, constrain the parties

---

[19]  The Supreme Court in *Till* places the burden of proof on the creditor in a Chapter 13 plan confirmation dispute to establish the evidentiary predicate for the appropriate "build up" on the prime rate due to the existence of identified risk factors. *Till*, 541 U.S. at 479.

from interpolating data in a principled way to recognize this difference. As stated above, the formula or blended rate approach is not merely a mirror of market conditions; rather, it is a principled derivation from current data of a proxy rate where no market currently exists.

*Id*. at *6 (alteration added).

For at least the last 20 years, the Ninth Circuit Court of Appeals has instructed bankruptcy courts to assess, and whenever possible use a "formula approach," and consider "the risks associated with a given debtor and the security associated with a specific debt." *In re Fowler*, 903 F.2d 694, 697-99 (9th Cir. 1990); *see also Camino Real*, 818 F.2d at 1508.

As noted, the formula approach was recognized by the United States Supreme Court in *Till*, 541 U.S. at 479-480. *Till* recognized that the factors relevant to the risk adjustment fall squarely within the bankruptcy court's area of expertise, and that the court must "select a rate high enough to compensate the creditor for its risk but not so high as to doom the plan." *Id*. Such adjustments recognized by other bankruptcy courts are generally approved at 1- 3%. *Id*. at 480.

In *Till*, the Supreme Court rejected three alternative approaches to setting a cramdown interest rate: the coerced loan, presumptive contract rate, and cost of funds approaches. "Each of these approaches is complicated, imposes significant evidentiary costs, and aims to make each individual creditor whole rather than to ensure the debtor's payments have the required present value." *Id*. at 477.

As case law has evolved since *Till*, another approach is obtaining traction. In both *In re American Homepatient, Inc.*, 420 F.3d 559 (6th Cir. 2005) and *Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1 (D. Conn. 2006), these courts urged the bankruptcy courts to first consider whether an "efficient market" exists, and if so, to utilize those rates. If no efficient market exists, then a bankruptcy court should fall back on the formula approach. *See generally* Gary W. Marsh, Matthew M. Weiss, *Chapter 11 Interest Rates After Till*, 84 AM. BANKR. L.J. 209 (Spring 2010) (review of development of cramdown interest rates since 2004).

In the final analysis, though, this court has always taken comfort in the very practical, easily-understood cases from the Ninth Circuit, *Camino Real* and *Fowler*. And this court, speaking only for itself, appreciates the understanding of the *Camino Real* court, where respected Ninth

Circuit Judge Joseph Sneed, speaking for the Circuit, observed that the setting of cramdown interest rates carries some degree of subjectivity:

> Finally, the *Armour* court increased the treasury bill rate by 2% for risk, then decreased it by 1% to account for the security. The government claims that the magnitude of these adjustments was arbitrary. To some degree that may be true. But rough estimates are better than no estimates. We are willing to rely on the expertise of the bankruptcy judge in a case such as this, particularly where no contrary evidence was introduced. A bankruptcy court should be accorded substantial deference in these matters because it has "almost daily experience with the rates charged by actual commercial lenders and other financier's [sic] of chapter 11 debtors." *In re Fi-Hi Pizza*, 40 B.R. 258, 271 (Bankr. D. Mass.1984). We uphold the bankruptcy court's judgment here.

*Camino Real*, 818 F.2d at 1508. The Circuit, in *Fowler*, further asked the trial courts to follow the "guiding principal . . . that the bankruptcy court's findings must be sufficient to allow meaningful review, and must demonstrate to the reviewing court that the bankruptcy judge's determination was supported by the evidence." *Fowler,* 903 F.2d at 699 n.7.

Although *Fowler* was a Chapter 12 case, the Circuit found no significant differences to distinguish it from the cramdown exercise in either that Chapter or Chapter 11.[20] In instructing the trial courts on cramdown rates, the Circuit explained that they were to look to either "market interest rates for similar loans" or use the "formula approach" and measure the risk and the security. *Id.* at 698.

In *Fowler*, 903 F.2d at 696-97 (citing 5 COLLIER ON BANKRUPTCY ¶ 1225.03[4][c], at 1225-21 (15th ed. 1989)), the Circuit said:

> When the debtor's plan proposes to pay a secured claim in deferred cash installments, the court must find that the present value of the proposed payments is not less than the allowed amount of the secured claim. In order to make this finding, it will be necessary for the court to apply a discount factor to the proposed stream of payments to determine the present value of

---

[20] Nor has the Ninth Circuit's BAP questioned this logic. *See In re Yett*, 306 B.R. 287, 290-91 (9th Cir. BAP 2004). *See generally* David G. Epstein, *Don't Go and Do Something Rash about Cram Down Interest Rates*, 49 ALA. L. REV. 435, 439-42 (Winter 1998); C.B. Reehl, Stephen P. Milner, *Chapter 11 Real Estate Cram-down Plans: The Legacy of Till*, 30 CALIF. BANKR. J. 405 (2010).

those payments. This is typically accomplished by ascribing an interest rate to the allowed amount of the claim and by requiring payment of the amount of the claim along with interest at the specified rate.

Whether one starts with a "base rate" and adds for risk, or just accepts that a proven market rate includes relevant risk (in an appropriate case), the result should not vary by much. A contract rate of interest may be evidence of the proper rate for a plan, but it is neither presumptive nor conclusive. *See Till*, 541 U.S. at 477-78 (rejecting presumptive contract rate approach in favor of the formula approach). In the final analysis, the interest rate determination is to be made on a case-by-case basis. *Boulders*, 164 B.R. at 105; *Camino Real*, 818 F.2d at 1508.

Finally, *Fowler* requires the bankruptcy courts to make "explicit findings" regarding (1) how it assesses the risk of default; (2) how it assesses the nature of the security; (3) what market rates exist for the type of loan at issue; and (4) what risks reduce or heighten the risks associated with a particular debtor. *Fowler*, 903 F.2d at 699.

With these principles in mind, the court now turns to the facts of these cases, and the objections to the rates proposed in the Debtors' Plan.

## 2. Banks' Objection Regarding Cramdown Interest Rates; Unfair Discrimination

The Banks' objection to confirmation (ECF No. 2245) expresses several concerns which, they argue, prevent approval of the Plan.

The first concern has to do with whether the Debtors have proposed a proper rate of interest for the loans which are deferred. (Objection at 16.) The court agrees that this factor is a matter of proof, and that it has weighed the evidence. The analysis made by the court utilizes all of the guidance provided by applicable case law, and it has reached a conclusion using its best efforts. The conclusion is that the Debtors' proposed rates for the Banks meet the test for "value" required by § 1129(b)(2)(A)(i)(II).

The second concern expressed by the Banks is that the Plan improperly discriminates against them. They contend that Grace Financing (Class 2) is receiving better treatment than are

the Banks, because Grace is "massively oversecured," and receives full payment at the end of the first year, post-confirmation, while they must wait for three years.

As noted above, the Ninth Circuit in *Johnston* has explained that discrimination--based upon reasonable differences--is appropriate. Thus, as a matter of law, it can be acceptable to do so, as done here. It may also be noted that the differences between the Banks' loans and the Grace loans are two vastly different types of commercial transactions: (1) Grace is only a $2 million obligation while the Banks are owed about $120 million; (2) Grace is secured by real estate, while the Banks never bargained for real estate, and have virtually everything else in their collateral bundle; and (3) upon confirmation, Grace collateral which is "non-core" is to be released and then simultaneously pledged to the Banks and the Noteholders. This enhances the Lender Group's post-confirmation collateral package, rather than diminishes it; and (4) when Grace is paid off in one year, the Debtors will once more have the unencumbered use of the "core" real estate, which will improve their balance sheet and make ultimate consummation of the Plan that much more capable of success. The court therefore believes this concern of the Banks will have minimal impact on the Debtors' ability to perform their promise to repay the Banks.

In short, the Banks are not unfairly discriminated against by the differences in the Plan's treatment of Grace (Class 2).

### 3. <u>Noteholders' Objections to Cramdown Interest Rates</u>

The Noteholders have not been strongly heard on the 8.5% interest rate proposed for them, as their principal concern has to do with the right to Yield-Maintenance payments. However, the opinions presented by Mr. Aaron appear to be adopted by the Noteholders.

### 4. <u>Cramdown Rates as to the Banks--Conclusion</u>

Utilizing the 'explicit findings" requirement of the *Fowler* case, the court finds, as to the proposed interest rates and terms of the Banks' restructured Plan debt:

(a) The nature of the security is predictable and realizable. It consists of a diverse collateral package which leaves the Banks with more collateral than necessary to repay their debt. The collateral is well-managed by the Debtors, and the Second Modifications provide reasonable methods for the Banks to police their collateral on a regular basis. Quarterly reports will be provided by the Debtors. The Banks will continue to be oversecured for the Plan's duration, and there are appropriate safe-guards in place to enable the Banks to react quickly should the collateral be in danger of deteriorating.

(b) There are no additional factors associated with these Debtors which would heighten the risk to the Banks. The primary Debtor, Bashas', has a long-standing excellent reputation in the community, and has had it for three-quarters of a century. Current management has promptly addressed adverse issues such as over-expansion, and has properly righted its corporate ship in both management and financial controls. As it had never previously been in monetary default with the Banks, and through the Plan is curing all outstanding interest payments, past defaults are waived. § 1123(a)(5)(G). By receiving future monthly interest payments, the Banks can quickly react to financial difficulties which are not now anticipated, should they develop.

The rates proposed in the Plan reflect market rates, and embedded within those rates is an appropriate risk factor. No additional risks exist which this court feels requires a premium to be added to the Plan's proposed rates.

(c) The court concludes, based on its finding that the Plan is feasible, that the Debtors are not likely to default or need further reorganization.

(d) The market rates, for the type of restructured loans proposed for the Banks, was proven by a preponderance of the evidence to be the rates

63

set forth by the Debtors' expert witnesses, Conrad Plomin and Jon Young. Their long years of expertise. in the areas in which they testified, persuasively convinced the court that their opinions were objective and consistent with the markets today. Their demeanor in providing testimony was straightforward, easy to understand, and was deeply rooted in experience.

Mr. Plomin had the additional advantage, as a witness, of not only having dealt with Bashas' as a long-standing client, but also of having represented so many others in his chosen profession, where he has investigated sources of financing. He therefore understands how to evaluate the character, creditworthiness, collateral and unique needs of each type of client.

Similarly, Mr. Young's testimony and credentials, in rendering his opinion in the narrow field which his examination covered, was articulate, clear, sincere, direct and credible.

Neither witness strayed from the path of his respective expertise. As a result, the court found that their testimony was credible in establishing appropriate market interest rates, and in proving the feasibility of obtaining a new takeout loan three years in the future.

(e) As the Banks are oversecured, the risk of suffering a shortfall, even if default occurs, is minimal.[21]

The court therefore concludes that the proposed interest rates, for the terms set forth by the Plan, are fair and reasonable as to the Banks, and returns to them a fair rate of interest, considering all relevant factors.

---

[21] The conclusion is bolstered by the fact that only 90 days pre-petition, the Banks and Noteholders had been comfortable with unsecured loans totaling almost $200 million.

## 5. Cramdown Rates as to the Noteholders--Conclusion

For the same reasons expressed for the Banks, the court also finds and concludes that the Plan's rates and term for the Noteholders' claims are similarly fair and equitable.

For both the Noteholders and the Banks, the concept of a court setting interest rates in a chapter 11 proceeding is consistent with one of the twin pillars of bankruptcy--equality of distribution.[22] It is firmly rooted in equity. As noted by the United States Supreme Court in *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), "A . . . reorganization court is just as much a court of equity as were its statutory and chancery antecedents." *Id.*, 329 U.S. at 165, 67 S.Ct. at 241. This is only one of many similar pronouncements made by the Court on bankruptcy issues. *See, e.g., Local Loan Co. v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934).

The purpose of the bankruptcy laws is not to create state-by-state or contract-by-contract windfalls, but instead, as the U.S. Constitution requires, to retain "uniform laws on the subject of Bankruptcies." U.S. Const. art. I, § 8, cl. 4, *Vanston*, 329 U.S. at 172, 67 S. Ct. at 244 (Frankfurter, J., concurring):

> The Constitutional requirement of uniformity is a requirement of geographic uniformity. It is wholly satisfied when existing obligations of a debtor are treated alike by the bankruptcy administration throughout the country regardless of the State in which the bankruptcy court sits.

The balancing required for equality of distribution is simply to ensure that no creditor, nor class, receives more than its fair due, recognizing that a properly managed pool of assets can produce worthy benefits for all, including the preservation of a worthy and viable business entity.

---

[22] The other pillar is that of gaining a discharge of indebtedness, a concept reserved principally for individual debtors.

**6. Cramdown as to Secured Creditors--Conclusion**

After assessment of the totality of the evidence surrounding cramdown rates proposed for both the Banks and the Noteholders, and for the reasons set forth above, the court finds and concludes that the rates proposed by Debtors' Plan are fair and equitable to those parties, and thereby §§ 1129(b)(2)(A)(i)(II) has been properly proven. The Banks' and Noteholders' objections will be OVERRULED.

**B. Section 1129(b)(2)(A)(i)(I)--Retention of Liens (Cramdown)**

The Plan proposes that the Banks and the Noteholders retain their existing liens. In addition, the Debtors have offered them new real estate collateral, which they have not had before, with a value of approximately $35 million. (Ex. D.)

No party has argued that this section of the Code is not satisfied. The court therefore finds that it has been.

**C. Section 1129(b)--Other Unfair Discrimination**

**1. Banks**

The next objection, which the Banks argue unfairly discriminates against them, is the treatment given to Classes 17 and 18, the retirement beneficiaries. The estimated claim amounts of those two groups are approximately $457,000, compared to about $120 million or more claimed by the Banks.[23] However, these retirement beneficiaries, and their Plan treatment, will have no adverse

---

[23] These amounts could be somewhat higher. The Banks argue that Edward Basha, Jr., the Debtors' chairman, may be owed more than $715,000 under the Rabbi Trust. Mr. Andersen, the CRO, may have a claim of more than $825,000 against the Rabbi Trust. Mr. Andersen is also a Supplemental Executive Retirement Plan participant who will resume receiving, among other benefits: (i) compensation for life at $3,088 per month, and (ii) a grocery allowance of $33,973 per year for life.

impact on the Debtors' ability to perform under the Plan. Since, by the Bank's own analysis, it stands to receive over $35 million in principal paydown over the next three years, and then be paid off--all with interest and without having to give up any collateral until fully paid, it is not injured by the treatment offered to Class 17 and 18. The Banks' concerns over the retirement beneficiaries' treatment is not, therefore, perceived by the court to be of any real legal or practical significance requiring a finding of unfair discrimination.

The Banks cite *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 657 (9th Cir. 1997), wherein the Ninth Circuit laid out a four-part test on the issue of "unfair discrimination:" (1) the discrimination must have a reasonable basis; (2) the debtor could not confirm or consummate the Plan without the discrimination; (3) the discrimination is proposed in good faith; and (4) the degree of the discrimination is directly related to the basis or rationale for the discrimination. *Id.* at 656. The court, in applying that test to the grievance here, finds that <u>if</u> there is any discrimination, which the court is disinclined to find, then such discrimination is rationally based, made in good faith and has not been done for the sole purpose of achieving confirmation of the Plan. As for the last point, it is clear that the Debtors have numerous other consenting and impaired classes, and do not need the votes of either Grace (Class 2) or the retirement beneficiaries (Classes 17 and 18) to satisfy all relevant § 1129(a) factors. The Debtors could confirm their Plan without the affirmative votes of Classes 2, 17 and 18.

Also objectionable to the Banks is that "the Debtors leave sixty-five percent (65%) of the Lender Group's debt unpaid until the end of the plan term." Under principles of Chapter 11, this type of extension of a loan's term is authorized, §§ 1123(a)(H) and 1123(b)(5). A thirty-five percent paydown, with interest over the three-year Plan term, on its face does not appear, as the Banks suggest, to "shift virtually all of the risk" to them, especially since there is no dispute that they are currently oversecured. Moreover, they presented no evidence to show that their collateral position would be in jeopardy over the Plan's duration. No banker testified in the opposition's case on this issue.[24]

---

[24] In addition, the Plan provides that the remaining 65% balance is to be paid off in full at the end of the Plan term.

67

Likewise of concern to the Banks is that the Plan strips them of their contractual "covenants." However, nothing in the Chapter 11 statutes proscribes this. Under § 1123, the modification of secured "rights" is expressly allowed. § 1123(b)(5). And, perhaps this concern has been mooted somewhat, by Mr. Andersen's testimony that Bashas' would have no objection to inserting reasonable and conservative covenants into any plan. A modification summarizing that sentiment was filed on August 4, 2010 (ECF No. 2338). This use of the Bankruptcy Code, in the manner intended, does not equate to "unfair discrimination."

The Lender Group next complains that the non-core real estate to be pledged to them will still be subject to the Grace lien. This is inaccurate. Under the Plan, Grace will release its lien on the "non-core" real estate, and it will be pledged to the Banks as additional collateral. As for not having deeds of trust, this detail can be addressed at a later time, as the court retains jurisdiction to construe, implement and enforce the Plan. (Plan at 30-31, para. B, ECF No. 1372.) That ministerial act can be easily accomplished, post-confirmation.

The same analysis holds true relative to the Banks' uncertainty as to which date its interest payments will be due. These alleged "ill-defined" payments can be quickly dealt with in post-confirmation "mop-up" proceedings. The Plan does not implode due to concerns over this small detail.

Finally, the Banks are concerned about whether and when they will receive default interest. The Plan provides for curing all past due and unpaid interest payments on the Effective Date at the applicable contract rate. Whether default interest will then still be owed, and in what amount, is properly reserved for later claims adjudication. It is not a confirmation issue.

The court finds and concludes that the Banks' objections to confirmation based upon their "unfair discrimination" arguments will be OVERRULED.

## 2. **Noteholders**

The Noteholders' "unfair discrimination" objections revolve around their contention that their Yield-Maintenance amount is not dealt with in the Plan, or if dealt with, it is cast in

68

unflattering terminology.  The Debtors dispute that portion of the Noteholders' claims, contending that it is, in essence, a disallowable pre-payment penalty.  As with the Banks' claim for default interest, that determination can eventually be sorted out in the claims adjudication process.  There is no such dispute regarding the principal of the notes, nor their pre-Effective Date interest entitlement.  If the Yield-Maintenance provisions survive challenge, and are liquidated and settled, there is no reason why repayment of such amount cannot be dealt with in a § 1127(b) post-confirmation context.  The amount is not so significant to derail the current Plan.

The only other Noteholders' Plan objection deals with the argument that the Debtors' Plan is not providing them the "indubitable equivalent" of their claim.  § 1129(b)(2)(A)(iii).  That is correct, but is a "straw" argument because the Debtors (1) do not propose to take away the Noteholders' collateral, and (2) seek to pay them in cash, with an interest rate determined in accordance with applicable law, allowable under § 1129(b)(2)(A)(i).  The section the Noteholders refer to, subpart (iii), is an <u>alternative</u> section to that chosen by the Debtors, who are proceeding exclusively under subpart (i).  As the statute indicates, by use of the word "or" in § 1129(b)(2)(A), each of the (i), (ii) and (iii) parts are not exclusive, but they can be.  *See* § 102(5).  In the context of this Plan, subpart (i) is intended to be exclusive.  The Debtors have picked only subpart (i), rendering consideration of subpart (iii) unnecessary.

Accordingly, the Noteholders' objections to confirmation on "unfair discrimination" grounds will be OVERRULED.


## XI.  <u>OTHER MISCELLANEOUS OBJECTIONS</u>


### A.  <u>Banks</u>


The Banks have raised two other objections to the Plan which may be dealt with summarily.  The Banks correctly note that a plan cannot effectuate a "turnover" or offsets regarding their claim, and that some type of adversary proceeding or access to due process is needed.

They also argue that the Plan, which they assert limits their right to reasonable fees and costs to $3.1 million (for both the combined Banks' and Noteholders' fees) requires an actual hearing and other due process protections.  The court also agrees with the Banks on this point.

Both of these concerns deal only with the final resolution of the Banks' allowed claim against the estate.  This type of proceeding is both provided for under the Plan (at 30-31, para. IX(A), ECF No. 1372), and pursuant to rules and statute.  FED. R. BANKR. P. 3007, § 506(b) (oversecured claim entitled to reasonable fees, costs or charges).

As noted elsewhere in this Memorandum Decision, there still exist lingering claim issues concerning entitlement to default interest.  Fees, setoff and "turnover" clearly relate only to matters concerning how to arrive at final numbers for the Banks' claim.  As for the fee issue, the Plan simply notes that the sum of up to $3.1 million will be included in the claim, unless otherwise adjusted by the court.  In the event that a higher amount is found to be appropriate, the court and parties can determine how payment would be made, even in a post-confirmation modification context.  § 1127.

With this clarification, then, the court does not perceive these concerns to be true objections relating to § 1129(a) or (b).  Accordingly, as miscellaneous objections to the Plan, they will be OVERRULED.

## B.  **Noteholders**

At oral argument on August 9, 2010, the Noteholders brought up a point that had not been previously raised in the pleadings.  They argued that the court could not allow any portion of the impounded $100 million to be used for the payment of administrative or inferior classes.

In support of their position, they cited a case from the Idaho Bankruptcy Court, by Bankruptcy Judge Jim D. Pappas, *In re Stallings*, 290 B.R. 777 (Bankr. D. Idaho 2003).  There, the court held that a Chapter 12 debtor could not use a creditor's cash collateral to fund its plan.  But, as pointed out in a Montana case, *In re Wilson*, 378 B.R. 862 (Bankr. D. Mont. 2007), the *Stallings'* creditor was undersecured, a fact which made all the difference.  Where creditors are oversecured,

and will remain so even after effective date payments from their cash collateral, such use is not prohibited. *Wilson,* 378 B.R. at 886-87.

Accordingly, this objection raised by the Noteholders will be OVERRULED.

## XII. <u>SECTION 1129(b)(2)(A)(iii)--</u>
## <u>"INDUBITABLE EQUIVALENT" (NOTEHOLDERS)</u>

The Noteholders' fallback position, asserting that Debtors have failed to meet the cramdown requirements of § 1129(b)(2)(A)(i)(I) and (II), is that the Plan fails to give them the "indubitable equivalent" of their claim. § 1129(b)(2)(A)(iii).

This section of the Code provides a debtor an alternative way of obtaining confirmation. But here, the Debtors are not proceeding under that section. They have based their entire case only on subpart (i) of § 1129(b)(2)(A). Thus, it is not necessary to consider subpart (iii). In any event, if the argument is directed towards the Yield-Maintenance provision, the court is treating that challenge only as a claim issue, not as a plan issue. When that dispute is adjudicated and the claim fully liquidated, the Noteholders will be treated under Class 4. If a minor modification is required, the court can consider that issue at a later time. § 1127(b).

Subpart (iii) of § 1129(b)(2)(A) is not applicable.

The Noteholders' objection on this basis will be OVERRULED.

## XIII. <u>SECTION 1129(b)(2)(A)--ABSOLUTE PRIORITY RULE (NOTEHOLDERS)</u>

The Noteholders also object to the Debtors' Plan on the basis that it violates the "absolute priority" rule. The Noteholders' argument on this issue is weak. They cite but one case for their assertion, a District Court case from the Central District of California, *In re Monarch Beach Venture, Ltd.*, 166 B.R. 428 (C.D. Cal. 1993).

With respect, this court disagrees with the *Monarch* decision, if it is intended to apply the absolute priority rule to a <u>secured</u> class of creditors. This is because the statute expressly

contains the solitary expression of this rule in the section that only deals with unsecured creditors. § 1129(b)(2)(B) (ii). The absolute priority rule must not be violated if the unsecured creditors object, which they have not. In fact, most of the unsecured creditors voted in favor of the Plan. And importantly, because the Plan calls for full payment plus interest to the unsecured classes, the rule is not violated. *See, e.g., In re Arden Props., Inc.,* 248 B.R. 164, 173-74 (Bankr. D. Ariz. 2000) (Haines, J.) ("[T]he absolute priority rule applies only to unsecured classes, not to secured claims, the requirements for which are separately set forth in § 1129(b)(2)(A), which says nothing about the timing of the repayment nor any comparison to the treatment of any other class."); *In re Cypresswood Land Partners, I,* 409 B.R. 396, 437 (Bankr. S.D. Tex. 2009) (secured creditor lacked standing to object that the plan violated the absolute priority rule).

The only statutory cramdown section that applies to the rights accorded to secured creditors is found in § 1129(b)(2)(A), and an "absolute priority" protection is nowhere to be located within that statute.

The court will not carry coals to Newcastle in further analysis of this argument. The Noteholders' suggestion, as oversecured creditors, that they are entitled to the protections of the absolute priority rule, is rejected, and their objection on that basis will be OVERRULED.

## XIV. SUBSTANTIVE CONSOLIDATION

The Debtor entities ask the court to allow a single, unified plan, in order to deal with their respective creditors. The Banks have opposed the request, observing that the court must find either (1) that the creditors dealt with the Debtors as a single economic unit and did not rely on the separate credit of each of the consolidated entities; or (2) that the Debtors' operations are excessively entangled to the extent that consolidation will benefit all creditors. *In re Bonham*, 229 F.3d 750, 766 (9th Cir. 2000).

The Banks have presented no affirmative evidence to show that they would be prejudiced by a substantive consolidation, or that they would be practically impaired by combining the Debtor entities' assets and liabilities in these cases. The Banks already have the Debtor entities'

continuing guarantees for the Bashas' debts (Ex. Z), and likewise have UCC-1 filings as to the Debtor entities' assets (Ex. W) as well as a signed security agreement (Ex. V). All unsecured creditors of the Debtor entities have voted in favor of the Plan, which includes the consolidation of the bankruptcy cases for plan and payment purposes. The Plan is a 100% payment plan for all creditors.

The court thus perceives no practical nor legal prejudice to the Banks or any other creditor. As the Ninth Circuit found in its *Bonham* decision, the heart of the remedy lies in the court's general equity powers. *Id*. at 763-64. As Judge Thomas, writing for the Circuit, noted, the primary purpose of substantive consolidation is to ensure the equitable treatment of creditors, because, quoting Justice Douglas: "[T]he theme of the Bankruptcy Act is equality of distribution." *Id*. at 764. Looking at the other side of the coin, other considerations for whether cases should be substantively consolidated lie in creating a single pool from which all claims against two or more debtors are satisfied, and preventing debtors from insulating money "through transfers among intercompany shell corporations with impunity." *Id*.

In the instant cases, there has not been shown to be "hopeless entanglement," nor prohibited commingling of assets. Nor has it been asserted that there have been improper intercompany transfers. Moreover, there has been no assertion that the books and records for each entity have been poorly maintained.

In a nutshell, the reason for the consolidation request is purely for convenience. Equality of distribution is maintained because all creditors of all entities are proposed to be paid 100%, plus interest. In *Bonham*, the presence of potential or actual *harm* drove the decision. Here, that concern has never surfaced nor been articulated, such as improper transfers or fraudulent conveyances between the entities.

When the *Bonham* case is considered in its complete context, it is clear that the Ninth Circuit did not require bankruptcy courts to look only to the two negative concerns set forth above, in some "'Pavlovian'" way. *Id*. at 767. The basic rules, and the discretion to apply them, stem solely and completely from a weighing of the equities, and a decision which emanates from one guiding light: "Is this reasonable under the circumstances?"

> In either case, the bankruptcy court must in essence determine that the assets of all of the consolidated parties are substantially the same. Moreover, the effect of substantive consolidation is to pool both the assets and liabilities of the consolidated entities and to treat them as the same in satisfying the claims of the creditors. As such, we see no principled need to apply the layered analysis set forth in *Auto-Train*. Rather, we leave it to the discretion of the bankruptcy court to determine in light of the equitable nature of substantive consolidation whether *nunc pro tunc* consolidation should be ordered. However, the cautionary principles which apply to orders of substantive consolidation must be considered with particular care before a court orders *nunc pro tunc* consolidation: the power should be sparingly used and <u>must be tailored to meet the needs of each particular case</u>.

*Id*. at 771 (emphasis supplied).

Therefore, applying the law, the court finds and concludes that substantive consolidation, for plan purposes of Sportsman's, Leaseco and Bashas', is a positive feature which benefits all creditors while harming none.

The Debtors' Plan proposal to substantively consolidate the three estates for plan purposes will be APPROVED, and the Bank's objection OVERRULED.

## XV. CONCLUSION--CONFIRMATION APPROVED

Based on the foregoing analysis of all outstanding legal and factual issues, the court will confirm the Plan, substantively allow the cases to be consolidated for plan purposes and will approve the proposed modifications to the Plan as non-adverse.

The court makes one final observation. At final argument the court asked the Banks' and Noteholders' counsel what relief they desired. They simply noted that they wanted the process to begin once more.[25] The Banks' suggestion must be rejected, because not acting now would negatively affect any ability of the Debtors to reorganize due to (1) the time delay, (2) the ongoing burden of administrative expenses, and (3) the continuing uncertainty of the Debtors' business and repayment plan. No competing or alternative plans have been proposed. Any new plan could not

---

[25] The words used at oral argument by Banks' counsel were that the Banks desired a "do over."

74

exceed the 100% payment now proposed.  It would be futile to go back to the drawing board, with an acceptable 100% payment plan now before the court.[26]  In addition, this court recognizes that in cases of this magnitude, with their inherent and unique complexities, the number of Arizona jobs involved, and with thousands of creditors, it is critical that this full payment plan, over a reasonably short period of time, which meets the Bankruptcy Code's legal requirements, be confirmed now.  Further delay is not in anyone's best interest.

A separate order will issue consistent with this Memorandum Decision.  FED. R. BANKR. P. 9021.  Any aggrieved party shall have 14 days from the docketing of the order within which to appeal.  FED. R. BANKR. P. 8002.


DATED AND SIGNED ABOVE.


COPIES served via email on the date signed above:

Michael McGrath, Attorney for Debtor

Michael W. Carmel, Attorney for Debtor

Robert J. Miller, Attorney for Bank Group

Steven Wilamowsky, Attorney for Noteholders

Gary Kaplan, Attorney for Parra Litigants

James E. Cross, Attorney for Official Joint Committee of Unsecured Creditors

Edward K. Bernatavicius, Office of U.S. Trustee


By    /s/ M.B. Thompson
         Judicial Assistant

---

[26]    The proposed Plan is remarkable in its proposed length of only three years--even in a Chapter 13 individual wage-earner case, a debtor may take up to five years to consummate a plan.